

## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

# FILED

Name _____ NEBLETT _____ JOHN _____
      (Last)                     (First)              (Initial)

JUL 2 4 2008

Prisoner Number ___ D-04841 _____

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Institutional Address SAN QUENTIN STATE PRISON; SAN QUENTIN, CA 94974

*SI*

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

# CV 08 3545

___ JOHN NEBLETT _____
Full Name of Petitioner

Case No.(To be provided by the
clerk of court)

vs.

ROBERT L. AYERS, JR. WARDEN _____
    Name of Respondent
    (Warden or jailor)

PETITION FOR A WRIT OF HABEAS CORPUS

### Read Comments Carefully Before Filling In

#### When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.    What sentence are you challenging in this petition? I AM CHALLENGING DENIAL OF PAROLE. I AM NOT CHALLENGING ORIGINAL CONVICTION.
      (a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland): BOARD OF PAROLE HEARINGS.

_____        _____
        Court                                   Location

      (b)    Case number, if known _____
      (c)    Date and terms of sentence _____
      (d)    Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes X  No

Where? SAN QUENTIN STATE PRISON;  SAN QUENTIN, CA 94974
          (Name of Institution)                    (Address)

2.    For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

SECOND DEGREE MURDER; P.C. 187 _____

_____

_____

3.    Did you have any of the following?

Arraignment: Yes X  No __   Preliminary Hearing: Yes X  No __ Motion to Suppress: Yes __  No __

3

4.    How did you plead?

Guilty __XX__    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) _____

5    If you went to trial, what kind of trial did you have?

Jury _____    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes __ No __

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment   Yes _X_        No __
(b)    Preliminary hearing        Yes            No __
(c)    Time of plea   Yes _X_      No _
(d)    Trial   Yes __        No __
(e)    Sentencing   Yes _X_        No __
(f)    Appeal        Yes ____        No
(g)    Other post-conviction proceeding   Yes __        No __

8.    Did you appeal your conviction?   Yes __ No _X_

(a)    If you did, to what court(s) did you appeal?

Court of Appeal        Yes __        No __        _____
                                                                              (Year)                              (Result)

Supreme Court of
California                      Yes __        No __        _____
                                                                              (Year)                              (Result)

Any other court        Yes __        No __        _____
                                                                              (Year)                              (Result)

(b)    If you appealed, were the grounds the same as those that you are raising in this
petition?                                                Yes __ No __

(c)    Was there an opinion?        Yes        No

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                                Yes            No

4

If you did, give the name of the court and the result:

---

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes        No x
I AM APPEALING THE DENIAL OF PAROLE. I HAVE EXHAUSTED ALL
STATE COURT REMEDIES, EXHIBIT "G"

5

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

        (a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I DID NOT APPEAL MY CONVICTION, RATHER THE DENIAL OF PAROLE

I.   Name of Court _____

    Type of Proceeding _____

    Grounds raised (Be brief but specific):

    a.   _____

    b.   _____

    c.   _____

    d.   _____

    Result _____ Date of Result _____

II.   Name of Court _____

    Type of Proceeding _____

    Grounds raised (Be brief but specific):

    a.   _____

    b.   _____

    c.   _____

    d.   _____

    Result _____ Date of Result _____

III.   Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

    (b)   Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes <u>X</u>  No __

HABEAS PETITION IN THE NINTH CIRCUIT COURT OF APPEALS REGARDING DENIAL OF PAROLE.

(Name and location of court)

## B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: SEE ATTACHED PAGES FOR ALL ARGUMENTS IN THIS PETITION.

Supporting Facts: __SEE ATTACHED PAGES_____

_____

_____

_____

Claim Two: _SEE ATTACHED_____

_____

Supporting Facts: ____SEE ATTACHED_____

_____

_____

_____

Claim Three: _SEE ATTACHED_____

_____

Supporting Facts: __SEE ATTACHED_____

_____

_____

_____

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why:

_____

_____

_____

List, by name and citation only, any cases that you think are close factually to yours so that they

are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of

these cases:

SEE ATTACHED PAGES _____

_____

_____

Do you have an attorney for this petition?     Yes ___ No _X_     HOWEVER, PETITIONER
REQUEST APPOINTMENT OF
COUNSEL DUE TO COMPLEXITY
If you do, give the name and address of your attorney:          OF THESE ISSUES.

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be

entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on __7-17-08__          _____
          Date                    Signature of Petitioner

( rev. 5/96)

9

## CONTENTION

### I.

### PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS WERE VIOLATED WHEN THE BOARD OF PAROLE HEARINGS DENIED PETITIONER PAROLE WITHOUT "SOME EVIDENCE"

Petitioner John Neblett, (Petitioner) appeared before the Board of Parole Hearings (Board) for parole consideration on May 2, 2007, and was denied parole for two years. The Board stated that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The Board stated:

We find that the commitment offense was carried out in a very cruel, very cold and callous. It was carried out in a rather calculated manner, in that the inmate basically chose to go retrieve the weapon that was inside the motor home.. .

And it really showed a total disregard for human life. The motive for the crime, per Mr. Neblett, was that he states that he - It was really based on fear and anger that he had at the time.

Regarding a prior record, this inmate does have an escalating pattern of criminal conduct, that we find that it may be minor but it's definitely a pattern. And his two prior arrests before this life crime occurred, basically all had to do with alcohol comsumption.

The overarching factor regarding parole suitability is whether a prisoner is a current threat to society. There is absolutely no evidence to support the Board's determination that Petitioner poses a current threat to public safety. The Board's statement that the offense was carried out in a very cold and callous manner. It was carried out in a rather calculated manner, in that the inmate basically chose to go retrieve the weapon that was inside the motor home.

1

Petitioner was convicted of second degree murder, second
degree murder is defined as "the unlawful killing of a human
being with malice aforethought." (People v. Nieto Benitez
(1992) Malice itself involves "'an element of viciousness--an
extreme indifference to the value of life.'" (People v.
Summers (1983) 147 Cal.App.3d 180, 184.) Thus, all second
degree murder will involve some amount of viciousness or
callousness. (Cf. In re Smith (2003) 114 Cal.App.4th 343,
366).

    If the Board is going to rely on the commitment offense,
than the commitment offense must meet the standard set forth
in  In re Rosenkrantrz, 29 Cal.4th 616, 683; 128 Cal.Rptr.2d
104, 161 (2002), which states that denial of parole based on
the nature of the offense could raise due process violations,
if no circumstances of the commitment offense was more than
the minimum necessary to convict for that offense. In In re
Dannenberg, 34 Cal.4th 1061, 1095; 23 Cal.Rptr.3d 417, 440
(2005), the California Supreme Court further held that the
Board could deny parole if the crime is "more than the
minimally necessary to convict him of the offense for which
he is confined." When compared to this evolved standard set
forth in these two cases, (Rosenkrantz and Dannenberg)
Petitioner's offense does not even compare to either one.
Petitioner's commitment offense, although vicious, Petitioner
did not use more than the necessary force to sustain a
conviction. The fact remains that Petitioner was convicted of
second degree murder, Petitioner did not use more than the
minimum force necessary to convict him of that crime.

2

Recently several state cases were decided where these prisoners were ordered released, or ordered back to the Board for a new suitability hearing because they did not meet the standard set forth in Rosenkrantz, or Dannenbereg.

In In re Smith, (2003) 109 Cal.App.4th 489. that prisoner was a drug dealer who was convicted for shooting, beating, and drowning of another drug dealer 15 years before he was found suitable for parole.

In In re Scott, (2005) 133 Cal.App.4th 572, 579, Scott drove to his wife's lover's house and shot the lover in the head with a rifle.

In In re Wen Lee, (2006) 143 Cal.App.4th 1400, 1404, Lee shot a man that owed him money after the man refused to pay him, wounding him and killing the debtor's wife.

In In re Weider, (2006) 145 Cal.App.4th 570, 575-576, Weider, another distraught husband, took a gun and shot the man who was living with his estranged wife, killing that man and wounding two others. The shooting took place in a restaurant.

In In re Elkins, (2006) 144 Cal.App 4th 475, (first degree murder) Elkins killed, a man he owed money to for drugs, so he could rob him. Elkins repeatedly beat his victim with a baseball bat. Elkins was on probation at the time.

Recently, just in the last month or so, a few other state court cases were decided.

In In re SANDRA DAVIS LAWRENCE, 59 Cal.Rptr.3d 537 (2007) (first degree murder) Lawrence killed her lover's wife because she was an obstacle in the way. Lawrence shot her

3

victim 4 times, and than stabbed her victim with a potato
peeling. That court ruled that the Governor's finding that
Lawrence's offense was "shockingly vicious use of lethality"
and exceptionally callous disregard for human suffering," was
inconsistent with the evidence.

In In re DAVID BARKER, 59 Cal.Rptr.3d (2007), Barker
participated in the killing of his friend Barry Braeseke's
parents and grandfather. Braseseke killed his parents and
Barker killed Braeseke' grandfather. The Barker court found
that Barker's murder of the grandfather did not involve any of
the characteristics of a first degree murder. Nor that
Barker's involvement in three murders made him a threat to
public safety. Barker was convicted of two second degree
murders and one first degree murder.

The federal court found that the prisoner in which the
'particularly egregious' standard was initially set did not
fit that criteria after a long period of time. (That prisoner
was Robert Rosenkrantz.)

In Rosenkrantz v. Marshall, (C.D. 2006) 444 F.Supp.2d
1963, the Central District ordered Rosenkrantz released.
Rosenkrantz killed a young man after that man outed him as a
homosexual. Rosenkrantz bought a gun and practiced with it and
even planned his killing.

In Martin v. Marshall, (N.D. Cal. 2006) 431 F.Supp 2d
1038, 1040, Martin was ordered released. Martin was a drug
user who shot his drug dealer who he owed money to, and two
other restaurant patrons.

The Lawrence supra, court stated:

4

All of the above murders involved at least
as shockingly vicious use of lethality" and
"exceptionally callous disregard for human
suffering" as did Lawrence's murder of her
paramour's wife. Several resulted in the killing
or wounding of multiple victims. several had
economic as opposed to emotional motives, and
several prisoners were involved in other criminal
activities at the time of the offense. Yet the
state appellate courts or federal courts found these
earlier commitment offenses failed to provide some
evidence" of the perpetrator's present dangerousness
if released to the outside world.

(In re Lawrence, supra at p. 55).

The other factors relied on by the Board was that
Petitioner's offense was inexplicable, although Petitioner
explained that he reacted out of fear and shot the victim
after the victim refused to leave the motor home, after the
victim had broke in.

The Board also stated that Petitioner had an escalating
patttern of criminal conduct, although Petitioner only had two
minor infractions. In 1981, Petitioner was taken to jail for
being drunk, and in 1982 was fined $40.00 dollars for having
beer on the beach. This can hardly be considered an escalating
pattern of criminal conduct, when it was not until two years
after that Petitioner committed this offense. The Board uses
the 'escalating pattern of criminal conduct' factor to every
prisoner that has an arrest record for at least one arrest.

The Board also stated that Petitioner lacks realistic
parole plans, (Exhibit "A" p. 124) that Petitioner does not
have viable residential plans. However, the California Code of
Regulations Title 15 (CCR Title 15) §2402 states that
Petitioner must have realistic goals for parole. Petitioner
submitted plans for New York, San Francisco, San Diego.

5

Exhibit "A" pp. 66-74; and Exhibit "C" p. 6-7)

Petitioner cannot be expected to have a place to reside
in, in the county of commitment after almost 25 years, of
incarceration. Petitioner does not have residence in San
Diego, because he was enlisted in the Navy and was only
stationed in San Diego. Petitioner is a certified journeyman
level electrician and should have no trouble finding
employment. In a recent decision by the United States District
Court for the Northern District Willis v. Kane, 485 F.Supp.2d
1126, 1133 (N.D.Cal. 2007) found that prisoner Willis's plans
to parole to a transitional housing not in the county of
commitment, were realistic goals for parole. California Penal
Code § 3003 (a) & (b) states that a prisoner may "be returned
to another county if that would be in the best interests of
the public." The statute also allows for parole to another
state. California Penal Code 3003 (j) (4); see also Cal. Penal
Code §  1175 et seq. (Uniform Act For Out-Of-State Parolee
Supervision

Petitioner has been incarcerated over 23 years and since
his incarceration, Petitioner has worked at rehabilitating
himself. Although the Board states that Petitioner does not
have enough self-help, Petitioner has participated is several
programs. (Exhibit "C" p. 5-6) He has made an effort to find a
place to parole to. When discussing possible places for
Petitioner to parole to, the Board contradicts itself by
stating that the Board has the option of release where the
best programs are, and then when Petitioner points out that he
could parole to his home in New York, the Board than says that

9

it is up to New York. (Exhibit "A" pp. 76-79; Exhibit "D" p.7)

## A. THE CONTINUED RELIANCE ON IMMUTABLE FACTORS TO DENY PAROLE VIOLATES DUE PROCESS

In In re Scott, supra, at pp. 594-595 that court found
that held that the commitment offense is one of only two
immutable factors that will never change. The Scott court
further echoed a federal court finding that "[R]eliance  on
such an immutable factor 'without regard to or consideration
of subsequent circumstances' may be unfair, and runs contrary
to the rehabilitative goals espoused by the prison system and
could result in a due process violation.' (See Biggs v.
Terhune, (9th Cir. 2003) 334 F.3d 910, 915). The Scott court
went on to hold that the predictive value of the commitment
offense may be very questionable after a long period of
time. **"Thus, denial of release based solely on the basis of
the gravity of the commitment offense warrants especially
close scrutiny."** In Irons v. Carey, 358 F.Supp.2d 936 found
that the Board had relied on the commitment offense four prior
times,[1] and that under those circumstances continued
reliance on those factors at his 2001 (4th suitability

1. Recently the United States Ninth Circuit Court of Appeals
held in Irons, supra, that the Board could rely on the
commitment offense to deny parole. However, the Ninth
Circuit noted: **"All we held in those cases and all we hold
today**, therefore, is that, given the particular
circumstances of the offenses in these cases, due process
was not violated when these prisoners were deemed
unsuitable for parole prior to the expiration of their
minimum terms." The Ninth Circuit's holding is based on an
erroneous fact. A prisoner appears before parole
suitability 13 months prior to their eligibility date. Irons
had appeared to his forth hearing at the time of filing
(seven years after his minimum term, 22 years with good
time credit applied, which is how total time is
calculated.)

hearing) violated <u>Irons</u> due process. The Irons Court further
held that "continuous reliance on unchanging circumstances
transforms an offense for which California law provides
eligibility for parole into a de facto life imprisonment
without the possibility of parole." <u>Irons</u>, <u>supra</u>, at 947.

## B. THE PREDICTIVE VALUE OF THE COMMITMENT OFFENSE AFTER 20 YEARS DISSIPATES.

In an unpublished opinion, the Sixth Appellate District
for California quoted in <u>In re Wieder</u>, 145 Cal.App.4th 470 The
court noted that Weider:

> "has served so much time that, with custody credits,
> he is within the matrix for first degree murder ..
> **[I]t should be self evident that after an inmate has
> served the equivalent of 25 years, whether his actions
> were more than the minimally necessary for a second
> degree conviction... is no longer the appropriate
> question.** [The Board's] position, that inmates who
> were convicted of second degree may forever be
> denied parole based on some modicum of evidence
> that their acts rose to the level of a first,
> without acknowledging the fact that they have
> already served the time for a first, should be
> seen as so ridiculous that simply to state it is
> to refute it."

(See In re Wieder, 145 Cal.App.4th 470, 479 (2006).

Petitioner in this instant action is beyond the second
degree murder matrix for the most aggravated terms. Petitioner
has serve the equivalent of 27 years after good time is
applied, which puts Petitioner within the first degree murder
matrix. **"Thus, denial of release based solely on the basis of
the gravity of the gravity of the commitment offense warrants
especially close scrutiny."** (In re Scott, supra at p. 594-595)

In <u>Willis v. Kane</u>, 485 F.Supp.2d 1126, 1135 that court
held that although Willis's offense was a terrible crime; "The
facts of that crime will be just as terrible 20 years from

8

today as they are today and as they were 20 years ago." The
Willis court found that there was no evidence to support the
claim that Willis was still a threat to the public 20 years
later. The Willis court further stated:

> Willis' case is the kind of case Biggs and Irons
> cautioned about: "the continued reliance on the
> immutable events of the crime to deny parole
> for present dangerousness despite the candidate's
> exemplary behavior in prison, favorable current
> psychological reports, and the absence of any
> other violence or criminal record.

(Willis v. Kane, supra at 1135).

Petitioner situation is similar to Willis in several
aspects, in that he is continuously being denied parole based
on the commitment offense and parole plans. For the
aforementioned reasons, this court should grant relief prayed
for.

## CONTENTION

## II.

### THE DENIAL OF PAROLE BY THE BOARD OF PAROLE HEARINGS WAS ARBITRARY AND CAPRICIOUS AND VIOLATES PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS

Petitioner's May 2, 2007 parole consideration hearing was
an arbitrary and capricious decision by the Board. In In re
Rosenkrantz, 29 Cal.4th 616, 665 held that a parole decision
with no basis in fact and not supported by any evidence in the
record would be arbitrary and capricious, and it would affect
a liberty interest and violate principles of due process of
law.

Petitioner did nothing to warrant a two year denial at
this hearing. The psychologist also did not find that
Petitioner is a threat to society. In fact the psychologist

Dr. Richard Starret stated:

> In summary, the inmate's overall rating is in the
> low range for his propensity to commit violence in
> the future when compared to similar inmates.

(Exhibit "B" p. 8)

Furthermore, there is clear and convincing evidence that
the Board violates the legislative intent as set forth in
California Penal Code § 3041 that a parole date is to
normally be set.

First of all, Petitioner has done everything that the
previous board panel recommended. Second, Petitioner has not
deviated from his program, rather he has enhanced his ability
to function by continuously progressing in his rehabilitation
and locating transitional housing in which to reside, upon
parole. The Board nevertheless accused Petitioner of not
having a full recovery plan, (Exhibit "A" p. 119-120) or
finding a sponsor.

Petitioner cannot win with the Board because the Board's
primary purpose has changed from normally setting a parole
date to normally finding prisoners unsuitable for parole. For
instance, the Board pointed out that, although the recovery
home Petitioner found accepted him, the Board did accept it
and partially denied parole because it did not have enough
information about the rehabilitation home. Exhibit "A" p. 120

The Board's arbitrary and capricious decision is
evidenced by the Board's manipulation of the facts in the
above mentioned cases. The Board twists and omit some of the
positive facts to justify their decision. The court's in the
above mentioned decisions pointed several instances where the

10

Board mischaracterized offenses and applied unspecified factors to deny parole.

## A. BECAUSE PETITIONER'S 2007 PAROLE CONSIDERATION HEARING WAS PRE-DETERMINED, IT WAS ARBITRARY AND CAPRICIOUS.

Concomitant to the guarantee against arbitrary and capricious state action is the right to a fact-finder who has not predetermined the outcome of a hearing. Withrow v. Larkin, 421 U.S. 35 (1975). A fair trial in a fair tribunal is a basic requirement of due process, and this rule applies to administrative agencies which adjudicate as well as to courts; Edward v. Balisok, 35 F.3d 318, 326 (7th Cir. 1994) a Decision-making body "that has prejudged the outcome cannot render a decision that comports with due process." A fair tribunal can not rule the opposite of its earlier ruling, unless it had new evidence than what it used in its first decision. A fair court could not go back and find someone guilty of a crime in a fair trial after it had previously rule. that defendant innocent. To make a finding of unsuitability on the same evidence, or more evidence of exemplary conduct, by the same decision-making body can only mean that the unsuitability finding was pre-determined renders it arbitrary and capricious, therefore violating Petitioner's due process.

The Court is requested, in terms of California Evidence Code § 452 (d), to take judicial notice of a recent order in the matter of In re DONNELL E. JAMEISON, Case No. 71194 that court found that out of 470 parole suitability hearings, it found all 470 prisoners considered or in prior hearings, the commitment offense was 'exceptional.' See Exhibit "D"

11

For the aforementioned reasons this court should grant relief prayed for.

## CONTENTION

### III.

#### VIOLATION OF STATE AND FEDERAL DUE PROCESS AND EQUAL PROTECTION OF THE LAW UNDER THE FOURTEENT AMENDMENT, IN THAT RESPONDENTS VIOLATED PETITIONER'S PLEA BARGAIN AGREEMENT

On November 26, 1984 Petitioner plead guilty pursuant to a negotiated plea bargain, to second degree murder whereby the state dropped the gun allegation, making Petitioner eligible for parole after 10 years.

Plea agreements are contractual in nature and are measured by contract law standards. United States v. Keller, (9th Cir. 1990) 902 F.2d 1391, 1393. As with other contracts, provisions of the plea agreements are occasionally ambiguous and the government must bear responsibility for any lack of clarity. Construing ambiguities in favor of the defendant makes sense in lihght of the parties' respective bargaining power and expertise. United States v. De La Fuente, (9th Cir. 1993) 8 F.3d 1333, 1337-1338.

Both the State and the defendant must adhere to the terms of a plea bargain People v. McClellan, 91993) 6 Cal.4th 367, 375, and both should be held strictly to the terms of the agreement. People v. Armendariz, (1993) 16 Cal.App.4th 906, 91 ; People v. Nelson, (1987) 194 Cal.App.3d 77, 79. "A plea agreement is, in essence, a contract between the defendant and the prosecutor to which the court consents to be bound." Armendariz, supra, at 911. "When a guilty plea is entered in

exchange for specified benefits such as the dismissal of other counts or an agreed maximum punishment, both parties, including the state, must abide by the terms of the agreement." People v. Walker, (1993) 13 Cal.3d 1013, 1024.

The harmless error test is inapplicable to a situation involving failure to fulfill the terms of a plea bargain, People v Mikhail, (1993)) 13 Cal.App.4th 846, 850, since a court can only speculate as to why a defendant would negotiate for a particular term of a bargain, and a defendant's entitlement to benefit of his bargain cannot be predicated on the assumption that violation of the bargain must result in some measurable detriment. People v. Bounds, (1987) 194 Cal.App 3rd 1574, 1578. Môreover, the concept of harmless error only addresses whether the defendant was prejudiced by the error, while in the context of a broken plea agreement, there is at stake the honor of the government, public confidence in the fair administration of justice, and the efficient administration of justice. People v.Mancheno, (1982) 32 Cal.3d 855, 866.

The reciprocal nature of a plea bargain agreement mandates that either party to the agreement be entitled to enforce the agreement in a situation where the party to the agreement be entitled to enforce the agreement in a situation where the party is deprived of the benefit of the bargain. People v. Collins, (1996) 45 Cal.App.4th 849, 863.

When a guilty or nolo contendre plea is entered in exchange for specified benefits such as the dismissal of other counts or an agreed maximum punishment, both parties,

13

including the state, must abide by the terms of the
agreement. People v. Aparicio, (1994) 74 Cal.App.4th 286, 289.

Thus, where a defendant has given up a valuable
constitutional right or otherwise detrimentally relied upon
the promises made in the plea bargain and the agreement is
violated by the state, the defendant may elect to specifically
enforce that agreement. People v. Leroy, (1984) 55 Cal.App.3d
602, 606-607; People v. Rutledge, (1982) 140 Cal.App.3d 955,
963; Santobello v. New York, (1971) 404 U.S. 257, 263.

Petitioner in this action plead guilty for a 15 year to
life sentence. The benefit to Petitioner granted by the state
in exchange for his plea, was that he would be eligible for
parole in 10 years. At the time Petitioner agreed to waive his
rights in exchange for his plea, there was not a "no parole
policy." At the time Petitioner accepted his plea, based on
all available information, probably expected he would serve a
uniform term, and that if he made substantial efforts towards
reforming himself (e.g. demonstrated a sincere appreciation
for, and remorse for, the gravity and wrongfulness of his
crime, and learned marketable skills with realistic parole
plans, and obtaining psychiatric clearance for parole), and if
he behaved well in prison (e.g. a reduced classification score
from over 60 points down to zero (recently the level of points
for all term to life prisoner can not go lower than 19 points)
a parole board conscientiously exercising its discretion would
set a parole date, and Petitioner would be released. Otherwise
there would have been no benefit to Petitioner in pleading.
Petitioner has been deprived of the benefit from Petitioner's

14

plea bargain. By repeated denial of parole, this leads to an inference of a pattern that Petitioner will never be suitable for parole, especially since the board makes the same recommendations over and over again and Petitioner does nothing continues to fulfill them.

In California "[a]ll contracts, whether public or private, are to be interpreted by the same rules..." CAL. CIV. CODE § 1635 (See also, Shelton, 7 Cal.4th at 766-67; Toscano, 124 Cal.App.4th at 344). A court must first look to the plain meaning of the agreement's language. CAL. CIV. CODE §§ 1638, 1644. If the language in the contract is ambiguous, "it must be interpreted in time of making it, that the promise believed. The plain meaning of the languatge was that if Petitioner rehabilitated himself and fulfilled all the Board's recommendations, he would be serve fifteen (15) years and be released, unless he seriously misbehaved. Petitioner understood this very well. The inquiry considers not the subjective belief of the promisor, but rather, the "objectively reasonable" expectiation of the promisee. Bank of the West v. Superior  Court, 2 Cal.4th 1245, 1265 (1982); Badie v. Ban of Am., 67 Cal.App.4th 779, 802 n.9 (1998) ("Although the intent of the parties determines the meaning of the contract, the relevant evidenced by the words of the instrument, not a party's intent..." Shelton, 37 Cal.4th at 767. If after this second inquiry the ambiguity remains, "the language of a contract should be interpreteed most strongly against the party who caused the uncertainty to exist." CAL. CIV. CODE § 1654; (See also, Toscano, 124 Cal.App.4th at 345.

15

("ambiguities [in a plea agreement] are construed in favor of the defendant") Petitioner should have received consideration of value. The mere opportunity to appear before a second punishment tribunal that historically maximizes punishment for 90% of those under its jurisdiction is not actual consideration. It is not the "less severe punishment system leniency [or] lessened punishment" owed by the state to Petitioner. (See Victoria v. Supreme Court, (1985) 40 Cal.3d 634, 639, 645), noting that "[h]owever, broad may be the terms of a contract, it extends only to those things what it appears that [BOTH] the parties intend to contract." Petitioner agreed to the plea agreement with the understanding that once he fulfilled his end of the bargain, and reached his minimum eligible release date (MEPD), barring any serious disciplinary conduct, (which does not exist in this case) he would be released.

Petitioner has more than complied with his end of the agreement by serving 23 years, over 30 years with good time applied. Petitioner has served more time than the matrix proscribes for the most aggravated second degree murders, and well into the first degree murder matrix. Petitioner plead guilty to life with the possibility of parole, not life without parole. Continuously deny Petitioner in light of an exemplary record, violates Petitioner's plea argeement as he understood it.

16

## CONTENTION

### IV

### THE APPELLATE COURT DECISION WAS AN UNREASONABLE DETERMINATION OF STATE AND FEDERAL LAW, AND OR; AN UNREASONABLE DETERMINATION OF THE FACTS, THEREBY VIOLATING PETITIONER'S DUE PROCESS RIGHTS

On October 3, 2007, Petitioner received a denial of his habeas petition claims by the Fourth Appellate District Court. Exhibit "E" The Board's decision was not based on the record before it. The frustration by Petitioner does not indicate anger management problems, rather an expression of confusion because of Board Commissioner Eng's unwillingness at accept Petitioner's numerous possibilities of places to parole. Furthermore, Petitioner did not make no physical outburst, or demonstrated any type of violent behavior. Petitioner reacted, using the tools taught to him in anger management classes The Board commissioners are not professional psychologist and are not qualified to make a determination of prisoners state of mind, or make predictions of future behavior. If our State Supreme Court has noted that studies by pyschiatrist have erred in predicting certain individuals as potentially violent, "thus branding as 'dangrous' many persons who are in reality totally harmless. [Citation]" People v. Burnic (97) 14 Cal.3d 306 327, 12 Cal.Rptr. 488, 535 P.2d 352.).

Furthermore, In In re Weider, the Sixth Appellate District held that the opposition by the district Attorney cannot add weight where there is no evidene of unsuitability to place the balance. (In re Weider 52 Cal.Rptr.3d 147 (Cal.App.th. Dist. 2006)). The factors relied on by the Board must reliably evidence

17

a prisoner is still a threat to public safety.

> "Thus, it is not enough that there is some evidence
> to support the factors cited for denial; that evidence
> must also rationally support the core determination
> required by the statute before parole an be denied.
> i.e., that a prisoner's release will unreasonably
> endangers public safety." (See In re Lee, (2006) 143
Cal.App.4th 1400, 1408; In re De Luna, (2005) 126 Cal.App.4th
58, 591.)

Petitioner would ask this Court to take judicial notice

that recently, in two other recent decisions by state courts,

In re Dannenberg, Case No. H03003 (11/16/07), the Dannenberg

Court pointed to In re Jacobson, (2007) 154 Cal.App.4th 849,

stating: "Jacobson held that a parole unsuitability decision

must be upheld so long as some evidence supports a finding that

the offense was "especially heinous" without regard to whether

there is a nexus between this finding and a conclusion that

the prisoner currently poses an unreasonable risk of danger

to society if released. We reject this criticism of Scott, Lee,

and Elkins." Recently the Santa Clara County Superior Court

in In re Criscione, Case No. 716141 found that the Board, in

a hundred percent of the cases reviewed by the Board, the

exception to the rule that parole is to be set was used to deny

parole. Exhibit "F" Petitioner would ask this Court to take

judicial notice of the Criscione case (Exhibit "F")pursuant

to Evidence Code § 452 (d) See specifically, in the habeas corpus

context, In re Vargas (2000) 83 Cal. App.4th 1125, 1134, 1136,

1143).

Thus, continued reliance on factors that have already been

used to deny parole, by defacto turns Petitioner's offense into

a sentence of life without the possibility of parole. For the

## PRAYER FOR RELIEF

Wherefore, Petitioner prays that this Court will;

1. Issue a Writ of Habeas Corpus;

2. Order the Board to take Petitioner back to the Board immediately;

3. Order Petitioner's immediate release forthwith;

4. Appoint counsel;

5. Grant any and all relief deemed appropriate.

Dated this 17, day of July 2008.

John Neblett
In Pro Se

19

 

EXHIBIT    "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )   CDC Number: D-04841
Term Parole Consideration )
Hearing of: )
 )
JOHN NEBLETT )   INMATE COPY
 )
_____)

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

MAY 2, 2007

9:24 A.M.

PANEL PRESENT:

JANICE ENG, Presiding Commissioner
JOAN THOMPSON, Deputy Commissioner

OTHERS PRESENT:

JOHN NEBLETT, Inmate
JOHN STRINGER, Attorney for Inmate

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____No   See Review of Hearing
_____Yes   Transcript Memorandum

Teresa Morris, Capitol Electronic Reporting

# I N D E X

|  |  | Page |
|---|---|---|
| Proceedings......................................... | | 3 |
| Case Factors....................................... | | 14 |
| Pre-Commitment Factors............................. | | 26 |
| Post-Commitment Factors............................ | | 41 |
| Parole Plans....................................... | | 65 |
| Closing Statements................................. | | 110 |
| Recess............................................. | | 119 |
| Decision........................................... | | 120 |
| Adjournment........................................ | | 130 |
| Transcript Certification........................... | | 131 |

3

1                    **P R O C E E D I N G S**

2       **PRESIDING COMMISSIONER ENG:** Good morning.  This

3 is a Subsequent Parole Consideration Hearing for John

4 Neblett, CDC Number D-04841.  Today's date is May 2nd,

5 2007 and the time is 9:24 a.m.  We are located at San

6 Quentin State Prison.

7       The inmate was received on April 17th, 1985 from

8 San Diego County.  His life term began on that same

9 date, April 17th, 1985, and the minimum eligible parole

10 date was January 2nd, 1994.  The controlling offense for

11 which the inmate has been committed is murder two, with

12 use of a firearm, Case Number CR-69761, count one, Penal

13 Code Section 187.  No other one, okay.  The inmate did

14 receive a total term of 15  years to life.

15       The hearing is being recorded so for the purpose

16 of voice identification, each of us will be required to

17 state our first and last names, spelling out our last

18 names.  Mr. Neblett, when it comes to your turn, after

19 you spell your last name, please provide us with your

20 CDC number.

21       So I will begin and we'll move around the room to

22 my right.  My name is Janice Eng, E-N-G, Commissioner.

23       **DEPUTY COMMISSIONER THOMPSON:**  My name is Joan

24 Thompson, T-H-O-M-P-S-O-N, and I'm a Deputy

25 Commissioner.

1         **INMATE NEBLETT:** My name is John Neblett,

2 D-04841.

3         **ATTORNEY STRINGER:** John Stringer,

4 S-T-R-I-N-G-E-R, Attorney.

5         **PRESIDING COMMISSIONER ENG:** Okay, thank you. We

6 also have two correctional officers present for security

7 reasons, and they will not be participating in the

8 hearing.

9         Before we begin, Mr. Neblett, I want to ask if

10 you would kindly read aloud that ADA statement that you

11 have in front of you. You can begin.

12         **INMATE NEBLETT:**

13             "The Americans with Disabilities Act, ADA,

14         is a law to help people with disabilities.

15         Disabilities are problems that make it harder for

16         some people to see, hear, breathe, talk, walk,

17         learn, think, work, or take care of themselves

18         than it is for others. Nobody can be kept out of

19         public places or activities because of a

20         disability.

21             "If you have a disability, you have the

22         right to ask for help to get ready for your BPT

23         hearing, and get to the hearing, talk, read forms

24         and papers, and understand the hearing process.

25             "BPT will look at what you ask for to make

1           sure that you have a disability that is covered

2           by the ADA, and that you have asked for the right

3           kind of help.  If you do not get help or if you

4           don't think you got the kind of help you need,

5           ask for a BPT 1074 grievance form.  You can also

6           get help to fill it out."

7           **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

8    Sir, do you understand what your rights are under the

9    ADA?

10          **INMATE NEBLETT:**  Yes.

11          **PRESIDING COMMISSIONER ENG:**  Okay.  Sir, I'm

12   still going to have to go through some more information

13   and some more questions with you, so we can make sure

14   that we've got it adequately covered.  I do see that you

15   did sign a BPT Form 1073 and you signed that back on

16   February 23rd of 2007.  And sir, that form is the

17   reasonable accommodation notice and request in

18   accordance with the provisions under the Americans with

19   Disabilities Act.  And on this form you did check off

20   that you do not have any disabilities as defined under

21   the ADA.  So is this information current and correct?

22          **INMATE NEBLETT:**  Yes.

23          **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

24   Sir, do you have any problems walking up or down stairs

25   or for distances of 100 yards or more?

1    **INMATE NEBLETT:** No.

2    **PRESIDING COMMISSIONER ENG:** Okay. And I see

3    that you do have glasses. Are those for distance and

4    reading?

5    **INMATE NEBLETT:** Yes.

6    **PRESIDING COMMISSIONER ENG:** Okay. So those will

7    be adequate for you to get through the hearing today.

8    **INMATE NEBLETT:** Yes.

9    **PRESIDING COMMISSIONER ENG:** Okay. And do you

10   have any hearing impairments?

11   **INMATE NEBLETT:** No.

12   **PRESIDING COMMISSIONER ENG:** Have you ever been

13   included in the Triple-CMS or EOP Programs?

14   **INMATE NEBLETT:** No.

15   **PRESIDING COMMISSIONER ENG:** And do you know what

16   those are?

17   **INMATE NEBLETT:** Yes.

18   **PRESIDING COMMISSIONER ENG:** Okay. Have you ever

19   taken any psychotropic medications either in prison or

20   on the streets?

21   **INMATE NEBLETT:** In prison. My first year in

22   prison for one month.

23   **PRESIDING COMMISSIONER ENG:** Okay. So they had

24   you on psychotropics?

25   **INMATE NEBLETT:** Yes.

*Capitol Electronic Reporting*

1          **PRESIDING COMMISSIONER ENG:**  To help you adjust?

2          **INMATE NEBLETT:**  Yes.  I was undergoing some

3     stress at the time.

4          **PRESIDING COMMISSIONER ENG:**  Okay, okay.  Sir,

5     how far did you get in school?

6          **INMATE NEBLETT:**  Tenth grade.

7          **PRESIDING COMMISSIONER ENG:**  Okay.  And while you

8     were growing up, do you recall if you were ever enrolled

9     in any special education classes?

10         **INMATE NEBLETT:**  I was not enrolled in any

11    special education classes.

12         **PRESIDING COMMISSIONER ENG:**  Sir, do you suffer

13    from any disability that would prevent you from

14    participating in the hearing today?

15         **INMATE NEBLETT:**  No, I do not.

16         **PRESIDING COMMISSIONER ENG:**  Okay.  Mr. Stringer,

17    are there any ADA issues that you believe need further

18    discussion?

19         **ATTORNEY STRINGER:**  Commissioner, in my judgment,

20    my client can meaningfully participate in this hearing.

21         **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

22    This hearing is being conducted pursuant to the Penal

23    Code and the Rules and Regulations of the Board of

24    Parole Hearings governing Parole Consideration Hearings

25    for life inmates.

1      Sir, the purpose of today's hearing is to once
2  again consider your suitability for parole and in doing
3  so, we'll be considering the number and nature of the
4  crimes for which you were committed, your prior criminal
5  and social history, your behavior and programming since
6  your commitment, and your plans if released.

7      So we've already had the opportunity to review
8  your central file, and you also will have a chance to
9  either make any corrections or to clarify the record for
10  us.  Okay.  we will consider your progress since your
11  commitment, your counselors' reports, and your mental
12  health evaluations.  However, we will focus on your
13  progress and any new reports since your last hearing.
14  So if you have any changes in your parole plans, that
15  should be brought to our attention.  Okay.

16      We will reach a decision today and inform you
17  whether or not we find you suitable for parole and of
18  course, the reasons for our decision.  So if you are
19  found suitable for parole, the length of your
20  confinement will be explained to you at that time.

21      Before we take a recess for deliberations, our
22  District Attorney representative was present but had a
23  conflict, but normally they would give a final
24  statement.  However, your Attorney and you, yourself,
25  will be given an opportunity to make a final statement

1  regarding your suitability.  So if you choose to make a

2  final statement to the Panel, you should focus on why

3  you believe you are suitable for parole today.  Okay.

4        And upon that, we will then take a recess, we'll

5  clear the room, and we'll begin our deliberations.  And

6  once we complete those deliberations, then we'll resume

7  the hearing and announce our decision.

8        California Code of Regulations states that

9  regardless of time served, a life inmate shall be found

10  unsuitable for and denied parole if, in the judgment of

11  the Panel, the inmate would pose an unreasonable risk of

12  danger to society if released from prison.

13        So sir, you have certain rights.  And those

14  rights do include the right to a timely notice of this

15  hearing, the right to review your central file, and the

16  right to present relevant documents.  Mr. Stringer, so

17  far have your client's rights been met?

18        **ATTORNEY STRINGER:**  They have as to those rights,

19  Commissioner.

20        **PRESIDING COMMISSIONER ENG:**  Okay.  I just have

21  to ask you, Mr. Neblett, when was the last time you

22  reviewed your central file?

23        **INMATE NEBLETT:**  I believe it was September 2006.

24        **PRESIDING COMMISSIONER ENG:**  Because I have here

25  that you had declined to review it in September.

| | |
|---|---|
| 1 | **INMATE NEBLETT:** I did review it in the presence |
| 2 | of my counselor. |
| 3 | **PRESIDING COMMISSIONER ENG:** You did. |
| 4 | **INMATE NEBLETT:** CC One Ebert, yes. |
| 5 | **PRESIDING COMMISSIONER ENG:** Okay, okay. Because |
| 6 | I saw that -- Okay. So that's incorrect. So he did |
| 7 | review it. |
| 8 | **INMATE NEBLETT:** Yes. |
| 9 | **PRESIDING COMMISSIONER ENG:** Okay, good. Okay. |
| 10 | Sir, you have the additional right to be heard by an |
| 11 | impartial Panel. You've been introduced to this Panel. |
| 12 | Do you have any objections? |
| 13 | **INMATE NEBLETT:** No, I do not. |
| 14 | **PRESIDING COMMISSIONER ENG:** Mr. Stringer, any |
| 15 | objections to the Panel? |
| 16 | **ATTORNEY STRINGER:** I do not, Commissioner. |
| 17 | **PRESIDING COMMISSIONER ENG:** Sir, you will be |
| 18 | receiving a copy of our written tentative Decision |
| 19 | today, and that Decision does become final within 120 |
| 20 | days. So a copy of the final Decision and a copy of the |
| 21 | hearing transcript will be sent to you later on. |
| 22 | Just note that on May 1st, 2004, the regulations |
| 23 | regarding your right to appeal a decision made at this |
| 24 | hearing were repealed. So you basically have to go to |
| 25 | Court. If you have any questions about that policy, you |

1   should discuss that with your Legal Counsel, or see if

2   you can find a copy of it in your prison law library and

3   review it there.

4       **INMATE NEBLETT:**   Thank you.

5       **PRESIDING COMMISSIONER ENG:**   Sir, you're not

6   required to admit to or discuss your offense, but this

7   Panel does accept as true the findings of the Court.  So

8   do you understand what that means?

9       **INMATE NEBLETT:**   Yes.

10      **PRESIDING COMMISSIONER ENG:**   Commissioner

11  Thompson, is there any confidential material in the file

12  and if so, will we be using it today?

13      **DEPUTY COMMISSIONER THOMPSON:**   There is that

14  material in the file, but no, it will not be used today.

15      **PRESIDING COMMISSIONER ENG:**   Okay, thank you.

16  Mr. Neblett, I've already passed the Hearing Checklist

17  over to your Attorney and both of us have signed off on

18  it, and this is labeled Exhibit One.  And we do this to

19  make sure that we're all operating off the same set of

20  documents for your hearing.

21      **INMATE NEBLETT:**   Yes.

22      **PRESIDING COMMISSIONER ENG:**   Okay.  That goes in

23  with the paperwork.  Okay.  Mr. Stringer, any additional

24  documents to be submitted to the Panel this morning?

25      **ATTORNEY STRINGER:**   I do, Commissioner.  We have

1  for the Board's perusal several laudatory chronos, a

2  current work supervisor's report, and a chrono

3  concerning my client's participation in AA.

4       And we would submit also several letters of

5  support that include letters from the Insight Prison

6  Project, TRUST Fellows with accompanying documents,

7  Mankind Program, Miller Avenue Baptist Church, John

8  Kelly, Christina Sinclaire, Jackie McQuarrie, and from

9  the Joint Apprentice and Training Committee.

10      Some of these may be redundant but in the

11  interest of completing the record, we would also submit

12  them since they're not in the packet that I have.

13      **PRESIDING COMMISSIONER ENG:**  Okay.

14      **ATTORNEY STRINGER:**  We also reserve the right to

15  supplement the record, if that opportunity arises during

16  the hearing.

17      **PRESIDING COMMISSIONER ENG:**  Are some of these

18  support letters --

19      **ATTORNEY STRINGER:**  Yes.

20      **PRESIDING COMMISSIONER ENG:**  -- concerning parole

21  plans?

22      **ATTORNEY STRINGER:**  For support and parole plans.

23  We can separate them out if that will be helpful.

24      **PRESIDING COMMISSIONER ENG:**  Yes, I think so.

25  Okay, all right.  And I just want to make sure that

```
 1  they're not -- Will these override the ones that we have
 2  in the packet?  That's the other thing that I need to
 3  know because I don't want to waste time trying to figure
 4  out which ones are current and duplicates.  Okay.
 5          ATTORNEY STRINGER:  They may.  We could, if the
 6  Board preferred, we could hold these until such time as
 7  all of the letters are read in the record and if these
 8  aren't.
 9          PRESIDING COMMISSIONER ENG:  Okay.  What are the
10  dates on those?  Are they '07?
11          ATTORNEY STRINGER:  Two of these are from '07.
12          PRESIDING COMMISSIONER ENG:  Okay.  Those I would
13  want because those are the most current.  Because the
14  ones I believe that we have in the packet are, I think,
15  October of something, of '06.
16          ATTORNEY STRINGER:  Yes, although --
17          PRESIDING COMMISSIONER ENG:  That's why I want
18  them.
19          ATTORNEY STRINGER:  -- some of these letters are
20  not in the --
21          PRESIDING COMMISSIONER ENG:  Okay.  As long as
22  they have dates and stuff, that's fine.  Okay.  All
23  right.  So any preliminary objections?
24          ATTORNEY STRINGER:  We're ready to proceed,
25  Commissioner.
```

1    **PRESIDING COMMISSIONER ENG:**  Okay.  And will your

2    client be speaking with the Panel this morning?

3         **ATTORNEY STRINGER:**  He will.

4         **PRESIDING COMMISSIONER ENG:**  On all matters?

5         **ATTORNEY STRINGER:**  All matters.

6         **PRESIDING COMMISSIONER ENG:**  Okay.  Mr. Neblett,

7    I have to swear you in.  Please raise your right hand.

8    Do you solemnly swear or affirm that the testimony you

9    give at this hearing will be the truth, the whole truth,

10   and nothing but the truth?

11        **INMATE NEBLETT:**  Yes.

12        **PRESIDING COMMISSIONER ENG:**  Okay, thank you.  So

13   let's sit back and relax a little.  What I'm going to

14   do, sir, is first I'm going to read into the record the

15   Statement of Facts about the crime.  Okay.  And I

16   believe I'm going to take that from the probation

17   officer's report that's in the back in the Legal

18   Section, and your Counsel has a copy if you want to

19   follow along or just listen.  But it's basically pages

20   two to three of the PLR.  And I'm going to start on the

21   second paragraph under the offense.

22             "On July 14th, 1984 at 1635 hours, police

23        responded to a shooting that had occurred on

24        Fiesta Island.  Investigation revealed that the

25        shooting had occurred in a motor home parked on

| | |
|---|---|
| 1 | Fiesta Island for the 'Over the Line' tournament. |
| 2 | The owner of the motor home is William Mohrman, |
| 3 | M-O-H-R-M-A-N. |
| 4 | "Witnesses said they heard one gunshot |
| 5 | from within the motor home. A white male later |
| 6 | identified as John Neblett was then seen with |
| 7 | blood on his hand. He said 'I shot him'. The |
| 8 | victim was 22-year-old Robert Anthony Gortarez, |
| 9 | G-O-R-T-A-R-E-Z. |
| 10 | "Neblett and a friend had driven to Fiesta |
| 11 | Island at approximately ten a.m. and saw William |
| 12 | Mohrman's motor home. Mohrman is a friend of |
| 13 | Neblett as they worked together in the Navy. |
| 14 | Neblett and his friend had picked up a quarter |
| 15 | keg of beer and they took it over to the motor |
| 16 | home. This was approximately ten a.m. Various |
| 17 | people were in and out of the motor home. |
| 18 | "A little while later, Mohrman took out |
| 19 | his gun to show some friends that were parked |
| 20 | next to him, next to them. He left and a short |
| 21 | time later returned, brought the gun back |
| 22 | unloaded, and left it on the sofa of the motor |
| 23 | home. He put the shells next to the gun. |
| 24 | "Neblett's friend, Davilla, D-A-V-I-L-L-A, |
| 25 | picked up the gun and put it in a rear cabinet as |

1      he was afraid someone might get hurt.  He put the

2      shells to the gun on the right side of the

3      cabinet.  Mohrman and Neblett subsequently left

4      to go get some ice for the beer.  While they were

5      gone, Davilla was outside throwing a football

6      around with some friends when Gortarez came up

7      and joined them.

8             "Gortarez was in and out of the motor home

9      on several occasions drinking beer and asking for

10     cigarettes.  Neblett had given Gortarez another

11     beer and cigarette and told him to leave.

12     Gortarez did leave but returned in about 15

13     minutes for another cigarette and beer.  Neblett

14     was the only one there.  He told Gortarez that he

15     was getting on his nerves and he wanted him to

16     leave.  He said Gortarez was being obnoxious.

17            "Gortarez sat down on the step of the

18     motor home, and Neblett went to the rear of the

19     motor home and got the gun and held it at

20     Gortarez's head, stating 'we told you to get the

21     hell out of here.  I'm not fucking with you.'

22     Gortarez told him to take it easy.  Neblett then

23     pointed the gun in an upward angle below the

24     victim's ear and pulled the trigger.  This

25     resulted in the death of the victim.

1            "Neblett told police that he was feeling
2       very intimidated by Gortarez and that is why he
3       went and got the gun. He said he didn't 'give a
4       goddamn if it was loaded.' He knew Mohrman
5       usually kept it loaded but Neblett did not know
6       whether it was loaded or not.
7            "After the shooting, Neblett moved the
8       body to the back of the motor home. He then
9       began yelling for Bill, and told somebody to get
10      the cops because he had killed a man."
11   I know it was quite a while ago, but is that a
12 pretty accurate description of what occurred on that
13 July 14th, 1984?
14      **INMATE NEBLETT:** Yes, it is.
15      **PRESIDING COMMISSIONER ENG:** Sir, were you
16 present when Mr. Mohrman first took the gun out to show
17 his friends?
18      **INMATE NEBLETT:** Once I was. I do recall that,
19 yes.
20      **PRESIDING COMMISSIONER ENG:** Do you recall that,
21 seeing anybody take the bullets out?
22      **INMATE NEBLETT:** I think I did see the bullets
23 taken out by Mr. Mohrman when he went to show his
24 friends the gun, and I didn't see him reload it. And I
25 believe it states in the probation report that I must

*Capitol Electronic Reporting*

1  have loaded it, but I've never admitted to doing so, so.

2      **PRESIDING COMMISSIONER ENG:**  Because I know and

3  based on what I've read into the record, you know, your

4  friend, I may be mispronouncing, Davilla?

5      **INMATE NEBLETT:**  Davilla.

6      **PRESIDING COMMISSIONER ENG:**  Yeah.  Your friend

7  Davilla actually put the gun away because he was afraid

8  that someone would get hurt.

9      **INMATE NEBLETT:**  He said that but the gun was

10  sitting on that back couch when Mr. Gortarez came back

11  into the motor home.  And that's where I went and got

12  it.

13      **PRESIDING COMMISSIONER ENG:**  So was this the

14  first time you had ever seen Mr. Gortarez?

15      **INMATE NEBLETT:**  That day, yes.

16      **PRESIDING COMMISSIONER ENG:**  Had you -- Did you

17  know him from before or no?

18      **INMATE NEBLETT:**  No.

19      **PRESIDING COMMISSIONER ENG:**  So that day was the

20  first time you'd ever come in contact with him?

21      **INMATE NEBLETT:**  Yes.

22      **PRESIDING COMMISSIONER ENG:**  And did he have a

23  motor home in that area, too?

24      **INMATE NEBLETT:**  Not to my knowledge.

25      **PRESIDING COMMISSIONER ENG:**  Do you recall -- Did

1   you just take an instant dislike to this gentleman?

2           **INMATE NEBLETT:**  No, Ma'am.  What happened was,

3   was we ran out of beer.  Mr. Mohrman and I, we left

4   Fiesta Island to go to a store on Mission Beach in San

5   Diego and he locked his motor home, Mr. Mohrman, the

6   owner.  There was nobody in there.  When we came back,

7   the motor home was occupied by Mr. Davilla and

8   Mr. Gortarez and other men, that basically had broken

9   into the motor home in the absence of Mr. Mohrman and I

10  when we went to the store.

11          Mr. Mohrman, feeling that I was his only

12  connection between him and Davilla and Gortarez and the

13  other men at the scene, and furthered upon me, told me

14  that I was responsible for ejecting these gentlemen from

15  his motor home, okay, because they broke into his motor

16  home.  I was being held responsible because they were

17  more my friends than his.  And he basically asked me to

18  tell them that they had to leave, okay.

19          And I don't know how much of this story can be

20  pieced together from everybody's statements, but that's

21  exactly how it happened.  And everybody left and

22  Mr. Mohrman, Mr. Gortarez being the last man to leave,

23  okay.  And Mr. Mohrman left the motor home at that point

24  and said, John, I'm leaving the gun here on this back

25  couch in case you need to use it.

*Capitol Electronic Reporting*

| | |
|---|---|
| 1 | And then Mr. Gortarez came back and I panicked, I |
| 2 | reacted out of fear, okay. And once the gun was in my |
| 3 | hand, I felt very powerful and I felt that I could be |
| 4 | angry now, it was safe for me to be angry. Then my |
| 5 | temper just totally took full control over me and I |
| 6 | walked up to Mr. Gortarez. I told him I told you to |
| 7 | leave, with no expletives, and then he did say take it |
| 8 | easy, and then I shot him. That's my version of what |
| 9 | happened, basically. |
| 10 | **PRESIDING COMMISSIONER ENG:** Do you recall that |
| 11 | -- Okay, you had been in the Navy, correct? |
| 12 | **INMATE NEBLETT:** Yes, Ma'am. |
| 13 | **PRESIDING COMMISSIONER ENG:** Okay. So you were |
| 14 | familiar with firearms, correct? |
| 15 | **INMATE NEBLETT:** I had a one-day class in the use |
| 16 | of a firearm during my boot camp training. And so yes, |
| 17 | I was familiar that there were safety precautions to be |
| 18 | used around, use of firearms. |
| 19 | **PRESIDING COMMISSIONER ENG:** Well, prior to that, |
| 20 | had you had any exposure to firearms? |
| 21 | **INMATE NEBLETT:** When I was a 14-year-old, I was |
| 22 | at my aunt's home in New Jersey, and me and her son had |
| 23 | a .22 rifle in the woods one day. And we were just |
| 24 | shooting at targets in the woods. That was the only |
| 25 | other time I've ever been exposed to the use of a |

1   firearm prior to my time in the Navy and prior to my

2   time with the shooting incident, the murder.

3       **PRESIDING COMMISSIONER ENG:**  So you really --

4   Since that time in the Navy up to the time of this life

5   offense, you hadn't --

6       **INMATE NEBLETT:**  Three years.

7       **PRESIDING COMMISSIONER ENG:**  -- been exposed to

8   anything like that.

9       **INMATE NEBLETT:**  Three years had gone by since

10  the time I was at boot camp to the time I used that

11  weapon.  So weapons weren't a daily part of my life.

12      **PRESIDING COMMISSIONER ENG:**  Right.  So there

13  were quite a few of you there at the house drinking from

14  that -- What was it, a pony keg or something?

15      **INMATE NEBLETT:**  Yes, it's a pony keg.

16      **PRESIDING COMMISSIONER ENG:**  But there were quite

17  a few of you drinking out of that.

18      **INMATE NEBLETT:**  At times, there'd be four of us

19  in there, at times it would be six.  We'd go around to

20  see the Over the Line games that they were holding there

21  on Fiesta Island that day, the three-day Over the Line

22  Tournament.  And then we'd come back and have another

23  drink, and bullshit and tell stories, and that was that.

24      **PRESIDING COMMISSIONER ENG:**  What was going

25  through your head, though, at that point where this

1 | victim, Mr. Gortarez, was just sitting there and had
2 | said take it easy?  What triggered in you to take it to
3 | the next step?

4 | **INMATE NEBLETT:**  When I had the gun in my hand,
5 | okay, and I picked it up, I was -- My blood alcohol
6 | content measured six hours afterwards was .28.  So at
7 | the time I picked up the gun, I guess I had not
8 | metabolized all of that alcohol that was in my blood.

9 | But let's assume that I was a bit more
10 | intoxicated than I was measured six hours earlier.  And
11 | I had a hallucination, an alcohol-induced hallucination
12 | where it really re-doubled my feelings of anger, okay,
13 | thinking to myself in this hallucination that I was
14 | being called a sissy, okay.  And this is, you know,
15 | sissies are cowards, they're not going to do anything,
16 | okay.

17 | And I reacted against that fear, you know, with
18 | anger, okay, because -- Well, in one of the many
19 | programs I participated in over the years, Man Alive,
20 | especially.  It's okay for a man to express anger, not
21 | fear, okay.  It's a safe emotion for me to express,
22 | especially when I'm feeling fearful.  I can react with
23 | anger and violence, and that was wrong.

24 | That was the way I was thinking, impaired by
25 | alcohol, and by the way I was brought up as a male.

1  That was my solution, it was an okay solution for me,
2  and it was very flawed thinking.

3  **PRESIDING COMMISSIONER ENG:**  But there was nobody
4  else around besides you and that victim.  And it didn't
5  appear, at least, but it's different when you're reading
6  it.  It didn't appear that he was being assertive, or
7  aggressive, or threatening or, you know, in any way --

8  **INMATE NEBLETT:**  No, not physically assaulting me
9  or anything.  He just had a nice physical build, okay,
10  and some tattoos, okay, and brown skin, all right, and I
11  thought he was -- Since he had come back when I was by
12  myself, I made the connection unfairly.

13  **PRESIDING COMMISSIONER ENG:**  Yeah.

14  **INMATE NEBLETT:**  I made an unfair connection.
15  And as I said, my thinking was just totally flawed at
16  that time.  I didn't -- I couldn't conceive of any other
17  way out of it right then.

18  **PRESIDING COMMISSIONER ENG:**  Except to pull that
19  trigger.

20  **INMATE NEBLETT:**  Yes, Ma'am.

21  **PRESIDING COMMISSIONER ENG:**  All right.  It's
22  tough to bridge the gap and I hear what you're saying,
23  but I just -- I'm being honest with you, it's tough for
24  me to comprehend.  Having a gun is one thing to think,
25  that you're protecting yourself and to like stand up and

24

1  be the macho guy and get him out of there.  But putting
2  it up to his head and pulling the trigger is a whole
3  different thing.

4      **INMATE NEBLETT:**  Not to minimize, but the alcohol
5  in my system really acted as -- It's intended to
6  disinhibitory, okay, to loosen you up and I just
7  consumed it to such an amount to where my fear reaction
8  really, my anger reaction was uncontrollable.  And I
9  realize how terribly flawed it was.  If I could take
10  back that bullet, I would.

11      **PRESIDING COMMISSIONER ENG:**  What else were you
12  drinking?

13      **INMATE NEBLETT:**  That was all.

14      **PRESIDING COMMISSIONER ENG:**  Just beer?

15      **INMATE NEBLETT:**  Just beer, yes.  Michelob dark,
16  the strongest domestic beer on the market at that time.
17  And the beer commercial, I did go and cut loose on the
18  weekends and get crazy and chase girls, and you know,
19  but got crazy instead of chasing girls.

20      **PRESIDING COMMISSIONER ENG:**  Okay.  Had you -- It
21  appears that this wasn't the first time that you've been
22  drinking beer to excess.  Is that correct?

23      **INMATE NEBLETT:**  That's correct.

24      **PRESIDING COMMISSIONER ENG:**  Okay.  So in
25  previous times, have you gotten aggressive like that?

| | |
|---|---|
| 1 | **INMATE NEBLETT:** I could say once. When I was a |
| 2 | 17-year-old in New York City, I was in a fight where I |
| 3 | was on the wrong end, the receiving end. And I reported |
| 4 | it as an assault. But yeah, I was in a situation when I |
| 5 | was intoxicated, and it led to violence on both my part |
| 6 | and the perpetrator's part, so. |
| 7 | Other than that, I know the potential was there |
| 8 | for emotional excess, less control of emotions. But I |
| 9 | really had no capacity for analyzing myself back then, |
| 10 | not to the degree where I needed to. |
| 11 | **PRESIDING COMMISSIONER ENG:** Had anybody ever |
| 12 | told you or made a comment to you about being an ugly |
| 13 | drunk or a nasty drunk? |
| 14 | **INMATE NEBLETT:** No. |
| 15 | **PRESIDING COMMISSIONER ENG:** So you never had any |
| 16 | indications of that? |
| 17 | **INMATE NEBLETT:** No. |
| 18 | **PRESIDING COMMISSIONER ENG:** Okay. We'll |
| 19 | probably get back and ask some more questions about that |
| 20 | later. But right now, I sort of want to move on and get |
| 21 | a better information about your background and personal |
| 22 | history that may give us a little more insight into |
| 23 | possibly why, how you came upon the situation that you |
| 24 | did that ended you up here being incarcerated for so |
| 25 | many years. |

1          Let's take a look at your criminal background.
2   And it looks like -- Well, what I have based on this
3   December 2006 Board Report, and it shows that 1981
4   juvenile record.  Do you recall that in Memphis,
5   Tennessee, public drunkenness?

6          **INMATE NEBLETT:**  1981, I was on Liberty when I
7   was in the U.S. Navy, I was 18 years old so I was not a
8   juvenile.  And I spent the evening of Christmas Eve in
9   County Jail when we were stopped by the police and
10  basically, locked up for the night and it turned out for
11  the weekend.  I went Monday morning to Court, and then I
12  was able to report to my job assignment at ten in the
13  morning back on the Navy base in Millington, Tennessee.

14         **PRESIDING COMMISSIONER ENG:**  Okay.  It says that
15  you were released on your own recognizance with a small
16  fine.  But they have it under a juvenile but you were,
17  in actuality, that was an adult.  Had you ever had any
18  contact with law enforcement as a juvenile, that you
19  recall, for any type of mischief or anything?

20         **INMATE NEBLETT:**  Yeah.

21         **PRESIDING COMMISSIONER ENG:**  Drinking?

22         **INMATE NEBLETT:**  Not for drinking, possession of
23  marijuana when I was 16 years old in New York City.

24         **PRESIDING COMMISSIONER ENG:**  And what happened?

25         **INMATE NEBLETT:**  Basically, I was released with a

1  violation of city ordinance citation, and I went to

2  Court three months later and I paid a 25 dollar fine.

3      **PRESIDING COMMISSIONER ENG:**  So you were released

4  to your parents?

5      **INMATE NEBLETT:**  No, I was just released by the

6  Court.

7      **PRESIDING COMMISSIONER ENG:**  To your parents,

8  though, or no?

9      **INMATE NEBLETT:**  Yes.  I went home.

10     **PRESIDING COMMISSIONER ENG:**  Yeah.

11     **INMATE NEBLETT:**  I went home after that.

12     **PRESIDING COMMISSIONER ENG:**  Were you on

13  probation?

14     **INMATE NEBLETT:**  No.

15     **PRESIDING COMMISSIONER ENG:**  But you went to

16  Court and paid a fine.

17     **INMATE NEBLETT:**  Yes.

18     **PRESIDING COMMISSIONER ENG:**  Okay.  Was that just

19  one time?

20     **INMATE NEBLETT:**  Yes.

21     **PRESIDING COMMISSIONER ENG:**  So then the next

22  time happened in '81 --

23     **INMATE NEBLETT:**  Yes.

24     **PRESIDING COMMISSIONER ENG:**  -- in the Navy, and

25  then that was '81.  And then in 1982, you were still in

1   the Navy, correct?

2       **INMATE NEBLETT:** Yes.

3       **PRESIDING COMMISSIONER ENG:** And now in San

4   Diego, possession of alcohol on a beach and you were

5   fined 40 dollars.

6       **INMATE NEBLETT:** Yes, violation city ordinance.

7       **PRESIDING COMMISSIONER ENG:** Okay, okay. And

8   then we had in 1984, this life crime.

9       **INMATE NEBLETT:** Yes.

10      **PRESIDING COMMISSIONER ENG:** Okay. So you see a

11  little pattern there?

12      **INMATE NEBLETT:** Yes. I learned very early that

13  chemicals like alcohol and marijuana made me, I thought,

14  would make me feel good. That was the way to feel good

15  in life, okay, and that was the pattern my behavior

16  followed.

17      **PRESIDING COMMISSIONER ENG:** Let's take a look at

18  your personal background. You were born and raised in

19  New York on March 5th, 1963. So you were 21 --

20      **INMATE NEBLETT:** Yes.

21      **PRESIDING COMMISSIONER ENG:** -- at the time of

22  the life crime, and you are now 43.

23      **INMATE NEBLETT:** Yes.

24      **PRESIDING COMMISSIONER ENG:** Born and raised in

25  New York. You were the second youngest of five

29

```
1   children.  It says consisted of two older step-sisters,
2   an older brother, and one younger sister --
3           INMATE NEBLETT:  Yes.
4           PRESIDING COMMISSIONER ENG:  -- is that correct?
5           INMATE NEBLETT:  Yes.
6           PRESIDING COMMISSIONER ENG:  Okay.  And both
7   parents were hard workers.  Your mother was a waitress
8   and your father was a handyman.
9           INMATE NEBLETT:  Operating engineer.
10          PRESIDING COMMISSIONER ENG:  Operating engineer.
11          INMATE NEBLETT:  Yes.
12          PRESIDING COMMISSIONER ENG:  Okay, okay.  And it
13  states here that you remember both of your parents
14  showing signs of alcohol abuse.
15          INMATE NEBLETT:  Yes.  I can recall in my memory
16  seeing them drunk on some weekends, some Saturday
17  nights, and that's how people relaxed.  They would drink
18  and they were perfectly functioning people.  They were
19  responsible adults and they worked five days a week.
20  And come Friday, Saturday, they could do as they pleased
21  so long as they were responsible users.
22          PRESIDING COMMISSIONER ENG:  So generally, you
23  just saw them drinking on the weekends, or were they the
24  type that they would come home from work and have that
25  martini at five o'clock?
```

1    **INMATE NEBLETT:** Just on the weekends.

2    **PRESIDING COMMISSIONER ENG:** Just on the

3    weekends.

4    **INMATE NEBLETT:** Yes.

5    **PRESIDING COMMISSIONER ENG:** But they would drink

6    to excess where it was noticeable to you that --

7    **INMATE NEBLETT:** Well, it was noticeable to me on

8    several occasions when I was growing up, yes. There was

9    one or two dramatic recollections in my memory, where

10   there was a fight in the family once between my father

11   and my mother and her sister. And my father wound up

12   spending 30 days in jail over it.

13   **PRESIDING COMMISSIONER ENG:** What happened? Did

14   your father hit somebody?

15   **INMATE NEBLETT:** Well, I think that he was, an

16   incident of domestic violence and he did go to jail. He

17   was the one held responsible for it. I didn't see it,

18   I was in the bedroom and I just heard it. And then my

19   father wasn't home for 30 days.

20   **PRESIDING COMMISSIONER ENG:** How old were you?

21   **INMATE NEBLETT:** I think I was four.

22   **PRESIDING COMMISSIONER ENG:** Pretty young, but

23   you still have a vivid -- Yeah, sometimes you do have

24   vivid memories of certain circumstances, don't you?

25   **INMATE NEBLETT:** Yes, very.

*Capitol Electronic Reporting*

1        **PRESIDING COMMISSIONER ENG:** Yeah.

2        **INMATE NEBLETT:** Very. Not a photographic memory

3 but when you exercise it, some things are recollected.

4        **PRESIDING COMMISSIONER ENG:** So it states here in

5 this Board Report that your parents fought regularly,

6 and showed minimal affection towards each other and

7 towards the kids. But that they were free from alcohol

8 dependence for several years, financial situation was

9 stressed but comfortable. And you began working odd

10 jobs at an early age, I guess to get spending money.

11        **INMATE NEBLETT:** Yes.

12        **PRESIDING COMMISSIONER ENG:** Okay. Were you

13 living in Manhattan?

14        **INMATE NEBLETT:** Until 1975 and then we moved to

15 Astoria, Queens.

16        **PRESIDING COMMISSIONER ENG:** So in Manhattan,

17 were you in an apartment?

18        **INMATE NEBLETT:** Yes.

19        **PRESIDING COMMISSIONER ENG:** Okay. A walk-up?

20        **INMATE NEBLETT:** Yes. Five-floor, railroad flat

21 walk-up. Described it in a poem a few months ago.

22        **PRESIDING COMMISSIONER ENG:** Okay. Your parents

23 divorced, correct?

24        **INMATE NEBLETT:** Yes.

25        **PRESIDING COMMISSIONER ENG:** You were around 14,

1  and is that when your grades began to suffer?  Is that

2  when you became disinterested in school?

3       **INMATE NEBLETT**:  Yes.  Not so much disinterested

4  as becoming a constant truant, and really coping with

5  life by the use of marijuana.

6       **PRESIDING COMMISSIONER ENG**:  When did you start

7  smoking marijuana?

8       **INMATE NEBLETT**:  Fourteen.

9       **PRESIDING COMMISSIONER ENG**:  That's when you

10 started drinking too, right?

11      **INMATE NEBLETT**:  I had several episodes drinking,

12 too, when I was fourteen.  I was a regular user of

13 marijuana and an infrequent user of alcohol.  And I

14 would say, if you really want to get really specific,

15 alcohol once every two to three weeks, and marijuana two

16 to four times a week.

17      **PRESIDING COMMISSIONER ENG**:  So where did you get

18 introduced to the marijuana, in school?

19      **INMATE NEBLETT**:  My sister's boyfriend, okay,

20 turned me on and I thought it was the greatest thing

21 since, you know, color television, and at first, giddy

22 high when everything is giggles.  And then afterwards,

23 where it totally -- I guess the euphoria really blanks

24 out any other feelings, became quite enticing and a way

25 of living for me to feel that euphoria on a daily basis,

1  or close to it.  It was better than any other feeling

2  for me.

3       **PRESIDING COMMISSIONER ENG:**  But then you

4  switched and started drinking more and more.

5       **INMATE NEBLETT:**  If I may, when I went into

6  United States Navy in 1981, okay, they had regular

7  urinalysis testing.  So you really couldn't enjoy

8  marijuana as a drug of choice.

9       **PRESIDING COMMISSIONER ENG:**  Okay.

10      **INMATE NEBLETT:**  Okay.  So alcohol became my

11  social drug, okay.  Where marijuana used to be my social

12  drug, alcohol became my social drug of choice.

13      **PRESIDING COMMISSIONER ENG:**  Let me ask you

14  something.  When you were growing up, did you know what

15  alcoholism was or did you have any idea?

16      **INMATE NEBLETT:**  All I knew is that the one time

17  -- I was really fearful of my father if I saw him

18  impaired on alcohol, okay.

19      **PRESIDING COMMISSIONER ENG:**  Why?

20      **INMATE NEBLETT:**  Because I couldn't predict his

21  feelings.  He was unpredictable, okay, and it was like

22  walking on eggshells.  He could be either angry and that

23  anger could cause me fear, okay.  He was -- He handled

24  problems in the family physically, okay, and I would

25  basically be very wary of his discipline since my older

 brother would be disciplined first. So I learned to fly under the radar, okay.

So I'd be really sensitive to his feelings so I could escape his wrath. And they were pretty unpredictable on alcohol, but I didn't really add two plus two until the time I spent in prison and then the time in AA about how it affects people and how it affects families, how it affects developing children.

**PRESIDING COMMISSIONER ENG:** So do you consider yourself an alcoholic?

**INMATE NEBLETT:** I would say that the use of alcohol led to my crime. And Alcoholics Anonymous has helped me grow up, but I don't consider that alcohol is going to kill me. But I would adhere to every rule of parole in not using alcohol.

**PRESIDING COMMISSIONER ENG:** But you didn't answer me.

**INMATE NEBLETT:** Okay.

**PRESIDING COMMISSIONER ENG:** Do you consider yourself an alcoholic?

**INMATE NEBLETT:** No.

**PRESIDING COMMISSIONER ENG:** Why?

**INMATE NEBLETT:** Because I realize that that is not the most important thing in life is to get high. That is not remotely what will make me happy in my life,

1  okay.  I don't think it will kill me unless I think it's

 2  the most important thing in my life.

 3      **PRESIDING COMMISSIONER ENG:**  Well, some people

 4  though have, you know, it's like a physical addiction to

 5  it and the cravings.

 6      **INMATE NEBLETT:**  I've never experienced a

 7  physical addiction or a craving.

 8      **PRESIDING COMMISSIONER ENG:**  So are you telling

 9  this Panel that the years that you were drinking

10  heavily, you were always very conscientious.  I mean you

11  made the choice that you just wanted to drink to excess,

12  but it wasn't because you craved it?

13      **INMATE NEBLETT:**  It was more of a social thing on

14  the weekends.  It was not a daily thing through the week

15  when I was in the Navy.

16      **PRESIDING COMMISSIONER ENG:**  Okay.

17      **INMATE NEBLETT:**  I thought I was functional and

18  in control, except I was drinking to excess.  In my

19  years with Alcoholics Anonymous, I can say that the

20  steps have helped me grow up, okay.  I have confronted

21  myself according to the steps on a systematic basis,

22  okay.  And if we're willing to be completely honest with

23  ourselves, we can recover and I think I recovered from

24  that lifestyle.  I learned from my family, okay --

25      **PRESIDING COMMISSIONER ENG:**  Okay.

1       **INMATE NEBLETT:** -- and from society.  I believe

2   I am recovered, okay.  Not in recovery, but recovered.

3       **PRESIDING COMMISSIONER ENG:**  Right.  Do you

4   believe that your excessive drinking on that day was the

5   cause of you doing what you did?

6       **INMATE NEBLETT:**  It was part of the cause.  The

7   main cause was how I was brought up to react to

8   situations as a man, okay.  The alcohol was a

9   disinhibitory substance that allowed me to act as I

10  thought.  I don't think that way anymore.

11      **PRESIDING COMMISSIONER ENG:**  So how long did you

12  spend in the Navy?

13      **INMATE NEBLETT:**  Basically three and a half

14  years.

15      **PRESIDING COMMISSIONER ENG:**  Three and a half

16  years.  Okay.  And it states here that your performance

17  was good, you excelled in technical school training.

18      **INMATE NEBLETT:**  I have a document to support

19  that.

20      **PRESIDING COMMISSIONER ENG:**  Okay.  You were

21  given a less than honorable discharge from the Navy.

22      **INMATE NEBLETT:**  Yes.  And that is in my

23  education packet here.

24      **PRESIDING COMMISSIONER ENG:**  Well, were you were

25  still enlisted in the Navy at the time of this life

*Capitol Electronic Reporting*

1  crime?

2       **INMATE NEBLETT:**  Yes.

3       **PRESIDING COMMISSIONER ENG:**  Is that why --

4       **INMATE NEBLETT:**  TDAN Neblett is not recommended

5  for retention due to conviction of a civil crime.  But

6  in this evaluation report which was the last one that

7  was written for me, TDAN Neblett's professional and

8  military performance continues to be excellent.  His

9  diagnostic and trouble-shooting abilities are steadily

10 improving as he gains experience.  And the last

11 sentence, he willingly accepts and completes all

12 assignments, his uniforms are well-maintained, clean and

13 correctly worn, presenting the proper military image,

14 but because of this civil offense.

15      **PRESIDING COMMISSIONER ENG:**  Right, okay.  So

16 your parents then divorced.  Were they out West or are

17 they back in New York?

18      **INMATE NEBLETT:**  They are back in New York.

19      **PRESIDING COMMISSIONER ENG:**  Okay.  And so are

20 your siblings?

21      **INMATE NEBLETT:**  Yes.

22      **PRESIDING COMMISSIONER ENG:**  Okay.  So the reason

23 why you were out here in San Diego is because of the

24 Navy.

25      **INMATE NEBLETT:**  Yes.

1    **PRESIDING COMMISSIONER ENG:** So did either one of
2    your parents remarry?

3    **INMATE NEBLETT:** No.

4    **PRESIDING COMMISSIONER ENG:** Okay. How's your
5    relationship with them?

6    **INMATE NEBLETT:** My relationship with my father
7    and my mother are both good, except my mother is -- She
8    really doesn't understand. Is it my fault for being in
9    here all these years? Yes. But she doesn't understand
10   that I have to go to Parole Hearings in order to get out
11   except for in 1992, and so she's -- She has problems
12   with the situation.

13   **PRESIDING COMMISSIONER ENG:** It states here that
14   you have a good relationship with your two oldest step-
15   sisters.

16   **INMATE NEBLETT:** Yes.

17   **PRESIDING COMMISSIONER ENG:** Okay. But you don't
18   have any contact with your older brother and your
19   younger sister?

20   **INMATE NEBLETT:** I didn't introduce it as a
21   letter of support, but the last letter I received from
22   my brother was last summer.

23   **PRESIDING COMMISSIONER ENG:** Is your brother in
24   jail?

25   **INMATE NEBLETT:** No, he's not.

```
1        PRESIDING COMMISSIONER ENG:  Okay.  So he's out?
2        INMATE NEBLETT:  Yes.  He's been out.  He's in a
3   Veteran's, Samaritan Village Vets Program in Manhattan,
4   okay.
5        PRESIDING COMMISSIONER ENG:  So your brother was
6   in the service?
7        INMATE NEBLETT:  He served in the Army, 1979 to
8   1982 I think, was his years of service in the military.
9        PRESIDING COMMISSIONER ENG:  Okay.  I'm sorry,
10  what was he in for?
11       INMATE NEBLETT:  I don't know.  I think it was
12  for assault on a man, assault and battery.  He broke a
13  man's jaw and --
14       PRESIDING COMMISSIONER ENG:  Had he been
15  drinking?
16       INMATE NEBLETT:  He was probably chemically
17  impaired one way or another, yes.
18       PRESIDING COMMISSIONER ENG:  And your sister.
19  Your younger sister a drug abuser?
20       INMATE NEBLETT:  My sister Nancy, yes.
21       PRESIDING COMMISSIONER ENG:  Your other step-
22  sisters -- Did everybody do some drinking, a lot of
23  drinking or abuse that in anyway?
24       INMATE NEBLETT:  My two oldest sisters, I could
25  say that they were never addicted, okay, very
```

1  functional, law-abiding adults. One of my sisters has

2  raised three children in Florida, and I'm in contact

3  with her. And my oldest sister, Patricia, in New York,

4  I'm in contact with her and they didn't have near the

5  problems that my other two siblings and I have had.

6  **PRESIDING COMMISSIONER ENG:** So what's going on

7  with your younger sister?

8  **INMATE NEBLETT:** She's at home with my mother

9  right now, and she helps take care of my mother. I

10 believe she's been diagnosed with HIV since 1999.

11 **PRESIDING COMMISSIONER ENG:** Have any of your

12 family been out to see you?

13 **INMATE NEBLETT:** My last visit was by my parents

14 in 2002.

15 **PRESIDING COMMISSIONER ENG:** But you haven't seen

16 any of your siblings?

17 **INMATE NEBLETT:** No.

18 **PRESIDING COMMISSIONER ENG:** Ever get married?

19 **INMATE NEBLETT:** No, I haven't.

20 **PRESIDING COMMISSIONER ENG:** Children?

21 **INMATE NEBLETT:** No. It's very hard to maintain

22 that kind of responsibility and relationships around

23 here as I've witnessed. And it never occurred to me to

24 kind of hold my family to, I guess to hostage, to the

25 situation that I'm in and inflict my situation on

*Capitol Electronic Reporting*

1  others, you know.  Other than the victims that have

2  already suffered because of my actions, I really didn't

3  feel like adding to the list.

4       **PRESIDING COMMISSIONER ENG:**  Okay.  I think right

5  now before I get back to asking you some other questions

6  about the crime, Commissioner Thompson is going to bring

7  us up to date on what you've been doing in the

8  institution.  And letting us know about any current

9  chronos, and then she'll be reviewing your, the latest

10  psychological evaluation, okay?

11       **DEPUTY COMMISSIONER THOMPSON:**  We'll try to get

12  it all in.  You're free to interrupt if I leave

13  something out in a particular section.  We're looking at

14  a period of time of March the 26th, 2003 until today,

15  May 2nd of 2007, which is about a four-year portion of

16  your life.

17       You've been a resident here at San Quentin State

18  Prison in the general population throughout that period.

19  Your classification score is the mandatory 19.  And your

20  custody level, I believe, has remained medium A

21  throughout all of that, correct?

22       **INMATE NEBLETT:**  Yes.

23       **DEPUTY COMMISSIONER THOMPSON:**  Okay.  Now

24  academically, you have been participating in, I think

25  they call it the College Program or in the Individual

1  Self-Study. And there are no disciplinaries in the
2  reported period. And working, you've been in the Prison
3  Industry Authority most recently, apparently plant
4  operations clerk. Does that remain as a work or
5  employment position? I do have the --

6  **INMATE NEBLETT:** Latest.

7  **DEPUTY COMMISSIONER THOMPSON:** -- work evaluation
8  that your supervisor sent in, which shows you to be a
9  very good worker and to get things done and be helpful.
10  And there are others that indicate your work record is
11  commendable. And you've been active in groups, many of
12  them for long periods of time. I'll address that more
13  specifically. And you haven't had any psychiatric
14  treatment during the period we're looking at.

15  But you have received laudatory chronos for your
16  educational participation and also, for your
17  participation in Alcoholics Anonymous and other groups
18  throughout this period. And they consider you to be a
19  good member of the San Quentin community. And I want to
20  go into your Board Report which was not updated from
21  December of last year, which was I believe your last
22  appearance, and then it was postponed with a little more
23  specificity.

24  You have a number of chronos, many, many, for
25  your attendance in Alcoholics Anonymous which has gone

*Capitol Electronic Reporting*

1  on since 1989, actually.  They kind of put it in

2  quarters, I suspect.  And you have most recently a

3  chrono from the 5th of April, 2006, for your

4  participation and attendance.

5        You also tried briefly with Narcotics Anonymous

6  or were involved in 1988, been in the (indiscernible) of

7  the Alternatives to Violence, Advanced Alternatives to

8  Violence Project, Recovery Substance Abuse Program, and

9  their Work-A-Thon apparently, and Restorative Justice

10  Seminar, Impact in an Organization, with the initials

11  that spell out TRUST.  What kind of a program is that?

12        **INMATE NEBLETT:**  TRUST is Teaching Responsibility

13  Using Sociological Training, and I'm very happy to have

14  been involved with that.

15        **DEPUTY COMMISSIONER THOMPSON:**  Okay.

16        **INMATE NEBLETT:**  If you'd like to hear further,

17  there's an article here in the newspaper about the

18  founder of TRUST and a letter of support from the

19  founder.

20        **DEPUTY COMMISSIONER THOMPSON:**  All right, that's

21  wonderful.  Yes, they do feel that you are a commendable

22  member of their program, and it's reflected in their

23  notations and chronos.  And certainly in this letter,

24  the one of which is on their letterhead, TRUST Fellows

25  letterhead stationary, and that's dated August of 2006.

1  And this paper story appeared, I'm not sure exactly.  I
2  don't find, immediately find a date but --

3      **INMATE NEBLETT:**  It's pretty recent, the past six
4  months.

5      **DEPUTY COMMISSIONER THOMPSON:**  Yeah.  And it
6  looks as if it commends your involvement in that
7  particular program.  Academically, you've been doing the
8  College Program, and there are quite a few chronos in
9  here saying your good grades and your good work.

10     **INMATE NEBLETT:**  I have been auditing.  The
11 latest class I did take for credit, though, was in
12 Statistics.  And I don't have a chrono for that but my
13 latest completion, in my final exam, I scored a 105,
14 okay, on my exam in Statistics.

15     **DEPUTY COMMISSIONER THOMPSON:**  So that's the one
16 where figures lie and liars figure as --

17     **INMATE NEBLETT:**  There you go.  We talk about no
18 hypothesis and alternative hypothesis, and you got to
19 learn English before you learn Statistics.

20     **ATTORNEY STRINGER:**  (Indiscernible) of the IRS?
21     **DEPUTY COMMISSIONER THOMPSON:**  I'm sure you could
22 and probably would be eligible for it.  It's impressive
23 and congratulations.

24     **INMATE NEBLETT:**  Thank you.
25     **DEPUTY COMMISSIONER THOMPSON:**  And academically,

1  you do have an AA degree in General Education.  Have you

2  advanced a degree, or are just taking a course here and

3  there?

4  **INMATE NEBLETT**:  Well, as I said, that was my

5  most recent class for credit.  I'm trying to boost up my

6  CSU credits.  This is my transcript from Hartnell

7  College from 1988, but it was issued to me in February

8  of 2007, okay.

9  And what's important for me is my Bache Laureate

10  summary, and whatever classes I can take here, I add to

11  that score.  So it will lessen the amount of time it

12  will take for me to get a Bachelor's degree.  I

13  basically have just over two years of credit towards

14  that degree based on my Hartnell College participation

15  and my Patton University participation.

16  **DEPUTY COMMISSIONER THOMPSON**:  So you're keeping

17  it going --

18  **INMATE NEBLETT**:  Yes.

19  **DEPUTY COMMISSIONER THOMPSON**:  -- as best you can

20  as courses become available --

21  **INMATE NEBLETT**:  Yes.

22  **DEPUTY COMMISSIONER THOMPSON**:  -- or credits can

23  be earned.

24  **INMATE NEBLETT**:  Yes.  I look forward to Spanish

25  maybe next spring semester from here.

1    **DEPUTY COMMISSIONER THOMPSON:**  It probably would

2    be helpful as a second language, particularly in

3    California.

4        **INMATE NEBLETT:**  Yes, yes.  All over the country.

5        **DEPUTY COMMISSIONER THOMPSON:**  Well, all over

6    anywhere.

7        **INMATE NEBLETT:**  New York.

8        **DEPUTY COMMISSIONER THOMPSON:**  Yeah, I think so.

9    You have achieved certification in several areas.  One

10   is What A Man, and then Relationships, and then again,

11   the TRUST Program, and Academic Theories and Concepts,

12   Job Preparation.  Well, it's significant.  A 20-week

13   study of the National Electronics Code, Residential

14   Wiring, Residential Hands-On Testing and Analysis, and

15   Electricity Device Circuits and Materials.

16       **INMATE NEBLETT:**  Well, most of this is from 1993

17   to 1997 so far as my electrical vocational training was

18   concerned.

19       **DEPUTY COMMISSIONER THOMPSON:**  Have you finished

20   or completed, whatever their word is, so that your

21   trade-ready I believe is the term?

22       **INMATE NEBLETT:**  Yeah.  This is my certificate of

23   completion for the vocational Electrical Program in

24   1997, okay.  And again, in my Naval record it shows my

25   occupation in the military, ability and my skill, okay,

*Capitol Electronic Reporting*

1   in terms of my qualifications in the Navy that was

2   signed off in 1982, okay.  And my skill in the Navy was

3   flight simulator technician, okay.  They called it

4   trade-off men.  And so all my --

5        **DEPUTY COMMISSIONER THOMPSON:**  So you were

6   involved in that --

7        **INMATE NEBLETT:**  Yeah, all my life experience in

8   the electrical electronics trade is, I believe, 15 years

9   or so.

10       **DEPUTY COMMISSIONER THOMPSON:**  Okay.  So this

11  certificate was out of the Bayview School, San Rafael,

12  California.

13       **INMATE NEBLETT:**  San Quentin.

14       **DEPUTY COMMISSIONER THOMPSON:**  Well, because

15  (indiscernible) was wasted in that event.  But anyway,

16  they said San Rafael, and you said San Quentin.

17       **INMATE NEBLETT:**  Yes.

18       **DEPUTY COMMISSIONER THOMPSON:**  And it was

19  September the 25th of 1997, which means you can do

20  things electronically.  And then Insight Prison Project

21  was also something you participated in and apparently --

22       **INMATE NEBLETT:**  That's the one I'm most active

23  in, I'd say.

24       **DEPUTY COMMISSIONER THOMPSON:**  -- was impressive

25  to the staff.  We commend John Neblett for his efforts

1  in rehabilitating himself.  And that is always a good
2  thing to hear.  And then in March of this year, there
3  was also from the Office of the Secretary, 1515 South
4  State in Sacramento, and this would have been through
5  the Department of, California Department of Corrections
6  and Rehabilitation.  And will continue to identify and
7  implement programs that demonstrate a track record of
8  success in improving inmate's chances for successful
9  parole.  So this was a congratulations to you
10  apparently, for your work in these areas and in these
11  programs.

12      **INMATE NEBLETT:**  That was a general letter from
13  Secretary Tilton for the men who have participated in
14  IPP-sponsored programs in San Quentin, okay.  And the
15  letter from IPP is to me personally.

16      **DEPUTY COMMISSIONER THOMPSON:**  Right.

17      **INMATE NEBLETT:**  Okay.  So Secretary Tilton's
18  letter is for the program.

19      **PRESIDING COMMISSIONER ENG:**  Good.  Thank you for
20  elaborating on that.

21      **DEPUTY COMMISSIONER THOMPSON:**  It shows you as
22  having, being on the good list, maybe the A list as the
23  way we refer to it and it's impressive.

24      **INMATE NEBLETT:**  Yes.

25      **DEPUTY COMMISSIONER THOMPSON:**  It is impressive.

*Capitol Electronic Reporting*

1  And then back to the sense of the more negative side of
2  these things, your disciplinary history shows the last
3  115 you received to have been in August of 1988, which
4  was for delaying mandatory lock-up and was considered an
5  administrative rule violation report.  So it's a serious
6  thing, but it isn't as serious as if it had been for
7  some really adverse behavior.  They didn't like what
8  happened, but they didn't consider it as an execution-
9  type of issue.

10       And then there were a number of counseling
11  chronos, the last of which was in 1996 and related to
12  smoking.  So there was absenteeism and failure to
13  report, delaying things again.  But your disciplinary
14  record is essentially quite impressive.

15       And have I left out anything?  I think if these
16  are new ones that haven't made, but I'm not sure they
17  haven't made them, I'm going to give them back to you --
18       **INMATE NEBLETT:**  Okay.
19       **DEPUTY COMMISSIONER THOMPSON:**  -- because you
20  don't want to lose them.  And sometimes things do vanish
21  in transit, so.
22       **INMATE NEBLETT:**  Well, you did make note of these
23  and so it's in the record.
24       **DEPUTY COMMISSIONER THOMPSON:**  I thought most of
25  them sounded familiar, looked familiar, but no fault

1  with that.  So that rather covers your institutional

2  since the last time we sat at a table like this back in

3  March of 2003.  Is there something you might want to add

4  before I proceed to the psychiatric evaluation?

5  **INMATE NEBLETT:**  Yes.  Just a couple of

6  certificates of completion for the Impact Program.  I've

7  been involved in that as well.

8  **DEPUTY COMMISSIONER THOMPSON:**  Yes.  They did say

9  that you were, it's listed here, Impact.  You've been in

10  there since February of '06, June of '06, May, April,

11  March and then May of '05, June of '05, September of

12  '05, and August of '05 are all indicated, as chronos

13  indicating your participation and completion, I suspect

14  of various time quarters or group sessions, or whatever

15  they may represent.

16  **INMATE NEBLETT:**  And you did speak to my

17  continued participation in AA.  And this is my latest

18  chrono, was from April of '06.

19  **DEPUTY COMMISSIONER THOMPSON:**  April, yes.

20  That's an update.

21  **INMATE NEBLETT:**  Okay.

22  **DEPUTY COMMISSIONER THOMPSON:**  But again, I

23  suggest you keep it and get it in here.  Their most

24  recent one was June of '05.

25  **INMATE NEBLETT:**  '05, yes.

1      **DEPUTY COMMISSIONER THOMPSON:**  But you show that

2    you are continuing.  There are some gaps in here,

3    although your history dates back to 1989.  Are those

4    gaps because, like they did it on a quarterly you got a

5    chrono for completion, or was it that the program was

6    not available.

7      **INMATE NEBLETT:**  They have a complex little

8    formula they use.  You have to attend 50 percent of the

9    meetings to get a quarterly chrono.  And if there's a

10   lock-down based on race or something, and you were not

11   able to attend 50 percent of the meetings, you don't get

12   that quarter's chrono.

13     **DEPUTY COMMISSIONER THOMPSON:**  I see.

14     **INMATE NEBLETT:**  Okay, and they've been having

15   some infrequent lock-downs the past couple of years in

16   San Quentin, okay, so that might have --

17     **DEPUTY COMMISSIONER THOMPSON:**  It might account

18   for some of the --

19     **INMATE NEBLETT:**  -- but I continue to

20   participate.  I did not get a chrono for this first

21   quarter of 2007, yet, I did attend six or seven meetings

22   so far this year.

23     **DEPUTY COMMISSIONER THOMPSON:**  Yeah.

24     **INMATE NEBLETT:**  Okay.  So I just don't make

25   every meeting but I don't meet that formula sometimes.

1      **DEPUTY COMMISSIONER THOMPSON:** So the gaps that

2  are indicated are probably results of maybe

3  institutional considerations like lockdowns, or for one

4  reason or another, not being able to go to the meeting

5  as you would have wanted to do.

6      **INMATE NEBLETT:** Yes. Well, sometimes I would

7  choose not to go because I would be exhausted from all

8  the other programs, but my participation in Alcoholics

9  Anonymous continues.

10     **DEPUTY COMMISSIONER THOMPSON:** And it does, up to

11  and through this date, there's no argument about that.

12     **INMATE NEBLETT:** Thank you.

13     **DEPUTY COMMISSIONER THOMPSON:** But it's a little

14  spotty, not terribly much but a little. But that

15  explanation is the one that you just offered. A, it

16  might have been an institutional issue, and B, if you

17  had been in something, you didn't have the oomph to get

18  to something else.

19     **INMATE NEBLETT:** Yes.

20     **DEPUTY COMMISSIONER THOMPSON:** Okay. Anything

21  more you want to bring up?

22     **INMATE NEBLETT:** That covers my institutional

23  activities.

24     **DEPUTY COMMISSIONER THOMPSON:** Thank you. Any

25  questions, Commissioner?

*Capitol Electronic Reporting*

1    **PRESIDING COMMISSIONER ENG:**  No.

2    **DEPUTY COMMISSIONER THOMPSON:**  All right.  Well,

3    I'm going to turn to the psychiatric evaluation.  And

4    this was brought on, I think, by your last hearing which

5    was in December --

6                    [INTERRUPTION -- PHONE RINGING]

7    **PRESIDING COMMISSIONER ENG:**  Do we have the

8    remote thing?

9    **DEPUTY COMMISSIONER THOMPSON:**  Do I?

10   **PRESIDING COMMISSIONER ENG:**  What's going on with

11   that?  No, that's not it.  It's the --

12   **DEPUTY COMMISSIONER THOMPSON:**  Sorry for the

13   interruption.

14   **PRESIDING COMMISSIONER ENG:**  Do you have any idea

15   if this is San Diego calling in?

16   **DEPUTY COMMISSIONER THOMPSON:**  I wouldn't think

17   so.  I thought the agreement was that we'd call in as

18   soon as --

19   **PRESIDING COMMISSIONER ENG:**  Is this Sonoma?

20   **UNIDENTIFIED SPEAKER:**  Can you hear us?

21   **PRESIDING COMMISSIONER ENG:**  Yes, we can.  Can

22   you hear us?

23   **UNIDENTIFIED SPEAKER:**  Yes.

24   **PRESIDING COMMISSIONER ENG:**  All right.  Are you

25   with Sonoma County?

1 **UNIDENTIFIED SPEAKER:** Yes, we are.

2 **PRESIDING COMMISSIONER ENG:** Okay. I'm sorry, we

3 have not completed our first hearing yet. So we're

4 going to have to contact you when we're ready to go on

5 the second hearing.

6 **UNIDENTIFIED SPEAKER:** Do you have a timeframe?

7 **PRESIDING COMMISSIONER ENG:** Maybe an hour. But

8 we're right in the middle, so.

9 **UNIDENTIFIED SPEAKER:** Okay.

10 **PRESIDING COMMISSIONER ENG:** Why don't you give

11 them a call back, officer, okay, and schedule it.

12 **CORRECTIONAL OFFICER:** And what's your number,

13 Sir?

14 **DEPUTY DISTRICT ATTORNEY MCBRIDE:** It's 707-565-

15 3098.

16 **CORRECTIONAL OFFICER:** Thank you.

17 **UNIDENTIFIED SPEAKER:** And sorry for the

18 interruption.

19 **PRESIDING COMMISSIONER ENG:** Okay. Okay.

20 **DEPUTY COMMISSIONER THOMPSON:** There's really

21 nothing more than insistent than a telephone, is there?

22 **PRESIDING COMMISSIONER ENG:** It's one of those

23 days, Mr. Neblett.

24 **DEPUTY COMMISSIONER THOMPSON:** It's the 21st

25 Century and electronics has invaded every area of our

1   lives.

2   **PRESIDING COMMISSIONER ENG:**  Okay.

3   **DEPUTY COMMISSIONER THOMPSON:**  So what can I say?
4   Anyway, to proceed with the psychiatric evaluation that
5   was completed in February of this year, 2007.

6   There is a long preface dealing with psychiatric
7   and  psychological evaluations, tests.  And various
8   opinions and thoughts about what might or might not
9   explain it, as to some degree been touched on by the
10  Commissioner in your pre-conviction matters, it could be
11  returned to again.  However, with respect to why they
12  asked that it be done, there were two specific
13  questions.  One of which is, is there some indication
14  that you have an antagonism toward any cultural or
15  ethnic group that could be provocative with respect to
16  your violence or acting out?  And two, if there is an
17  issue of disturbance, can it be successfully  treated to
18  mitigate or hopefully extinguish and develop controls in
19  your violence?

20  On page six, there was a passing reference to the
21  possibility of some racial overtone in the loss of your
22  control.  But they don't indicate, or at least I didn't
23  read, that they thought that that was pathological and
24  or treatable.  The evaluation after they gave you the
25  two most common tests, which is something called PCL-R

1  and HCR-20 which are supposed to be reliable predictors,
2  was that you have developed insight, that you accept
3  responsibility for the crime, that you have been in
4  treatment, you have been in Alcoholics Anonymous.  And
5  it has been a continuing and apparently helpful
6  situation that you have pursued other self-help groups
7  and options.

8       And that as a result of the overall effect of all
9  this, you are seen or scored, if the test ratings are to
10  be used, in the low range in his level of psychopathy.
11  The inmate overall propensity for future violence is in
12  the low range on all factors, and this is historical,
13  clinical, and risk management, when compared to similar
14  inmates.  The problem is that they're saying you're very
15  low risk in a dysfunctional situation which prison is.
16  They're not making any real commitments as to what you
17  might be in a free community, but they think it should
18  transfer.  And if you developed controls in here, then
19  you should maintain them out there.

20       And as far as treatment is concerned, they simply
21  say stay on the path that you have now, which is group
22  self-help, and any available programs that you think are
23  available or that would be helpful to you.  I don't know
24  if that answers the two questions they essentially
25  posed, but that is what their prognosis and their

1   overall assessment is.  It was prepared by a Richard

2   Starrett, PhD and licensed psychologist, and it was

3   done, as I said, in February of 2007.  Had you read this

4   report?

5         **INMATE NEBLETT:**  Yes, I have.

6         **DEPUTY COMMISSIONER THOMPSON:**  Did you have any

7   questions about my evaluation or anything you want to

8   add or expand?

9         **INMATE NEBLETT:**  Okay.  I will speak to the idea

10  that I am well-adjusted in the institutional setting,

11  okay.  There are very many individuals here who have not

12  learned what I've learned over the years.  There's one

13  comment early in this report where he says, I didn't

14  answer a question about a simple proverb during, one of

15  the test -- What does Rome was not built in a day mean

16  to you?  Okay, and I answered it and the report that he

17  wrote in November, okay.  And then I give him a rambling

18  answer in this report that was written in February,

19  okay.  And the answer is, is change takes time.

20        That was the answer I gave him in November and I

21  didn't give it to him this time.  And the thing is, is

22  that those men have not had -- Most of the men in here

23  have not had that time to change.  Okay.  I've done 23

24  years.  maybe ten percent of the men in north block have

25  done that kind of time.  And we have to exist with the

1   other 90 percent of the men in north block in an H unit
2   who have not done that time, okay. And those are the, I
3   guess, the individuals who have really not changed their
4   behavior.

5       So I'm always, on a daily basis, dealing with
6   individuals who don't know how to handle their stress or
7   the way they were programmed to -- The big thing today
8   is respect. You're disrespecting me, it's my excuse for
9   violence, okay. All those young men out there shooting
10  each other, fighting each other and everything. And so
11  we're not described walking on egg shells around my
12  father, okay.

13      Sometimes you can see when an individual is
14  definitely stressed, okay, in the way that they react to
15  you. And you got to be man enough to let it lie, not to
16  react the way they would. And I'm told there are
17  definitely maladjusted individuals on the streets that
18  I'm going to have to deal with, and to accept that from
19  them.

20      I don't -- I've always thought that most of this
21  respect game in prison was, you know, strictly for those
22  people who are the least well-adjusted, okay. I really
23  don't have that much respect for, respect that is just
24  play-acting, okay. But when it comes to dealing with
25  men and being compassionate to them and understanding

1  that this is the only way they've learned to cope with

2  people, to learn to cope with challenges to their

3  masculinity, challenges to their, I guess, their self-

4  image, okay.

5       Now that I know about how I used to see myself in

6  terms of a self-image, and how I thought I had to react

7  like I did during the crime when I said, oh, I'm going

8  to be a sissy if I don't react this way, okay.  I'm

9  hearing that in my head, I'm seeing somebody laugh at

10 me.  And it ain't happening, okay, it's an image, it's

11 imaginary.  And these guys got things in their

12 imagination that they don't know how to handle.  And

13 whether it be a hallucination or just their way of

14 thinking, they're just not handling it well.

15      I'm certain that my skills I've developed in here

16 will transfer to the streets.  Because most of those men

17 who act that way in the streets do wind up in here, but

18 I'd really like to help them.  And that's really one of

19 the big things about the Man Alive, Mankind Program that

20 was commended by Secretary Tilton, okay.

21      We got -- We were educated in there by Mr. Peter

22 Van Dyke, he wrote a letter of support for me.  That we

23 have been living a male role belief system, okay, MRBS,

24 all right, and we can say it's male role BS, bullshit,

25 okay.  And these other men have not learned to think

1   beyond it.  It's the cognitive behavioral modification
2   approach that is the rage and the psychology now that
3   Mr. Van Dyke has been teaching her for 15 years, okay.
4   And I've had the opportunity to participate in it for
5   two years.

6       We deconstruct that male role belief system.
7   Feelings, actions, communication, thinking, and thinking
8   about sex.  We call that the box, okay, and -- Well, the
9   common feelings that men are allowed to have in the box,
10  according to the male role belief system, that part that
11  I was taught from culture and from family -- From the
12  time I was wrapped in a blue blanket when I came out of
13  the hospital, this is what makes you a man, is being in
14  a blue blanket, okay.  Maybe I should have been wrapped
15  in a pink blanket, and I wouldn't have been macho from
16  the gate, okay.  And we're allowed to be angry but we're
17  not allowed to fear, okay, and it's okay to fear, okay.
18  We're not allowed to be sad, we always have to be happy,
19  we have to act.

20      **PRESIDING COMMISSIONER ENG:**  Okay.  Yeah, okay.
21      **INMATE NEBLETT:**  I'm sorry.
22      **PRESIDING COMMISSIONER ENG:**  That's all right.
23  It demonstrates that you have a passion for it.  It's
24  nice to see that you have a passion for it --
25      **INMATE NEBLETT:**  Thank you.

1    **PRESIDING COMMISSIONER ENG:** -- but at the same

2   time, and what you're saying is true, that it's the way

3   you've been socialized.  But not all males that have

4   been taught to be macho, end up taking the life of

5   somebody else.

6    **INMATE NEBLETT:**  No, not all males do, okay.  My

7   brother didn't, my father didn't, but I did.

8    **PRESIDING COMMISSIONER ENG:**  Okay.  Let's get

9   back to the psychological evaluation.  I have a question

10  for you.  Why do you think two prior Panels have

11  requested, specifically addressing something about the

12  possibility of this being racially driven, or you having

13  some sort of ethnic bias against anyone of darker skin

14  possibly, or Mexicans in particular?  Why is it that

15  there were two prior psychological evaluations asking to

16  address that?

17       So something -- In other words, something must

18  have triggered in other Panels' minds because I happen

19  to remember -- Because sir, I'm the one that postponed

20  you back in December, but I didn't get this packet until

21  this morning when I got in here, so I had nothing to go

22  by.  And all of a sudden, I was reading about the life

23  crime and I stated something, I recall something about

24  something being possibly racially motivated.  So why is

25  it that Panels or Panel members have that planted in

*Capitol Electronic Reporting*

1    there somehow, okay?

2        **INMATE NEBLETT:**   Okay, okay.   The 2004 report,

3    written for the Board of Prison Terms by Dr. Julius

4    Kornberg, raised that issue, okay.   And the thing was

5    when I postponed my 2004 Hearing and my 2005 Hearing,

6    okay, I was trying to deal with the issues that Julius

7    Kornberg raised, okay.

8        And so when they read the reports and I

9    postponed, and they wrote their recommendations, I

10    didn't have a time to answer what was raised by

11    Dr. Kornberg because the report was negative.   And I

12    stipulated to unsuitability because of the negative

13    Board Report written by Dr. Kornberg, okay.   And so I

14    had to have a new report written.   But that issue that

15    was raised by the previous Panels has to do with a

16    statement by a witness, saying that I killed him because

17    he was Mexican, okay.

18        And first, in my very first Parole Hearing in

19    1993, I didn't have recollection of that because my mind

20    -- I guess it had not learned to retrieve that kind of

21    memory when I was under the influence to that degree,

22    okay.   To say that to a witness after I committed the

23    crime, I killed him because he was Mexican.   No.   I

24    killed him because I was afraid and then my fear turned

25    to anger, okay, that I was afraid of this man.   It was

*Capitol Electronic Reporting*

1  not because he was Mexican, okay.  I just said it, I

2  killed him because of my fear and anger, okay.

3      And if I said that during the crime, I said that

4  during the crime but I did not think it, okay.  I was

5  thinking out of the fear to myself and the anger that I

6  felt out of being afraid, you know.  I killed him

7  because of that anger, okay, not because he was Mexican.

8      **PRESIDING COMMISSIONER ENG:**  I just want to

9  understand.  Whether or not you have a bias against

10 Hispanics has nothing to do with the crime.  It has

11 nothing to do with your sentencing because, you know,

12 you were found -- Did you plead or did you --

13      **INMATE NEBLETT:**  I pled.

14      **PRESIDING COMMISSIONER ENG:**  You pled this out to

15 a murder two, it was not a hate crime, okay.  But it's

16 important that if you do have -- If you think that it

17 could have played a role, it helps you to discuss that

18 only because it gives you some better insight into why

19 you may have developed that.  Because let me tell you

20 something, because I was born and raised in New York,

21 too.  So I understand your upbringing back there and how

22 things were especially in Manhattan, okay.  So even

23 though, we back then in those days, we really didn't

24 have exposure to any Mexicans in New York.  It's

25 different today --

1       **INMATE NEBLETT:** Yes, it is.

2       **PRESIDING COMMISSIONER ENG:** -- but we didn't

3 have that.

4       **INMATE NEBLETT:** Do you remember the movie, West

5 Side Story, it was Puerto Ricans and it was Blacks. And

6 the thing is, yeah, I was brought up with a certain

7 amount of racism, okay, and racist attitudes, all right.

8 And it has affected how I have seen people of other

9 races in the past, okay, but it was not the main

10 motivating factor in my killing of Robert Gortarez. I

11 did not -- As you said, it was not a hate crime, okay.

12       And I have participated in -- My activities with

13 the TRUST is like multi-racial. They started as a group

14 oriented towards African Americans, okay, and they have

15 since expanded to include all races. And I was invited

16 in their second intake to be a permanent member of the

17 TRUST. And we have explored those issues with racism

18 and institutional and societal racism, okay.

19       My associates on the yard on the baseball team

20 since 1997 have included men of every race. My

21 participation in the Chapel activities, men of every

22 race. One of my -- Well, I can say one of the guys I

23 was closest to before he paroled, Eddy Ramirez, okay,

24 Mexican, and we were close in the Chapel.

25       **PRESIDING COMMISSIONER ENG:** Well, let's not get

1   too far off and get back here, okay.

2        **INMATE NEBLETT:**  It's inescapable that issue of

3   race here.  My current cellie is Nicaraguan, okay,

4   Robert Morales.  And it had nothing to do with the fact

5   that I wanted to show something off today, but I wanted

6   a man who I could have a stable relationship with in my

7   cell.

8        **PRESIDING COMMISSIONER ENG:**  Okay.

9        **INMATE NEBLETT:**  Nothing to do with race.

10       **PRESIDING COMMISSIONER ENG:**  I just wanted that

11  addressed because it was concerning, you know, to see

12  this in two psych evaluations, you know,

13  (indiscernible), so.

14       **INMATE NEBLETT:**  Yes.

15       **PRESIDING COMMISSIONER ENG:**  Sorry to take that

16  away from you.

17       **DEPUTY COMMISSIONER THOMPSON:**  Not at all.  I was

18  through with him anyway.

19       **PRESIDING COMMISSIONER ENG:**  Okay.

20       **DEPUTY COMMISSIONER THOMPSON:**  But I can return

21  it to the Chair.

22       **PRESIDING COMMISSIONER ENG:**  Okay.  Let's go on

23  right now and talk about your parole plans, sir, okay.

24       **INMATE NEBLETT:**  All right.

25       **PRESIDING COMMISSIONER ENG:**  According to --

| | |
|---|---|
| 1 | Let's see.  The most updated December 2006 Board Report |
| 2 | in terms of your parole plans, it states that you |
| 3 | submitted parole plans for San Francisco County, San |
| 4 | Diego County, and New York. |
| 5 | **INMATE NEBLETT:**  Yes. |
| 6 | **PRESIDING COMMISSIONER ENG:**  Obviously, we would |
| 7 | want to take a look at the San Diego County as number |
| 8 | one, being that that is the county of your last |
| 9 | residence and the county of commitment.  So for San |
| 10 | Diego, the Way Back -- You list the Way Back for |
| 11 | residence along with the San Diego Rescue Mission. |
| 12 | **INMATE NEBLETT:**  Yes. |
| 13 | **PRESIDING COMMISSIONER ENG:**  Okay. |
| 14 | **INMATE NEBLETT:**  I'd like to add. |
| 15 | **PRESIDING COMMISSIONER ENG:**  .Do we have letters? |
| 16 | **INMATE NEBLETT:**  One from the Way Back. |
| 17 | **PRESIDING COMMISSIONER ENG:**  Okay. |
| 18 | **INMATE NEBLETT:**  It's basically a brochure dated |
| 19 | February, the letter I got from them.  My father |
| 20 | actually called San Diego Rescue Mission, and I'm |
| 21 | waiting to hear from Second Chance Strive Foundation, |
| 22 | okay.  I recently got a street address for them, and I |
| 23 | wrote them this past month.  And that's really -- It's |
| 24 | listed in the San Diego Yellow Pages as number one under |
| 25 | emergency housing, okay. |

1       So I think I'll be able to walk in there as in

2   the San Diego Rescue Mission.  And they also -- It

3   specializes for ex-offenders, employment, housing,

4   mental health, sober living.  And that's Second Chance

5   Strive.  But the Way Back is a similar program in that

6   it's a live-in, two-year residential sober living

7   program, okay.  That's where my plans are oriented.

8       **PRESIDING COMMISSIONER ENG:**  Do you have to give

9   a two-year commitment to them?

10      **INMATE NEBLETT:**  No, but you can participate in

11  the full two years.

12      **PRESIDING COMMISSIONER ENG:**  Okay.

13      **INMATE NEBLETT:**  Depending on employment.  Well,

14  for instance, if I'm in San Diego, I'd just as soon

15  transfer my parole to New York City as soon as possible,

16  okay.  So I would file those papers within weeks of

17  release, within a couple of months, while participating

18  in a residential program.  I will stay in-house until

19  permitted to go home to New York.

20      **PRESIDING COMMISSIONER ENG:**  This is a small

21  facility, 29-bed residential facility.

22      **INMATE NEBLETT:**  Yeah.  That's why I'm big on

23  Second Chance Strive.  They've got six houses.  I just

24  wish I had all --

25      **PRESIDING COMMISSIONER ENG:**  Right.

1          **INMATE NEBLETT:**   -- the paperwork I was shown two
2    weeks ago.

3          **PRESIDING COMMISSIONER ENG:**   So we do -- Just for
4    the record, this is from the Way Back Recovery Home for
5    Men located in San Diego, California.  And this is just
6    a little brochure that sort of outlines the things that
7    they have to offer.  Now how do you apply?  Interviews
8    for admission to the program are on Tuesdays and
9    Wednesdays.

10         **INMATE NEBLETT:**   Yes.  Well, San Diego Rescue
11   Mission is emergency housing and so is Second Chance.
12   So I would basically be paroled -- If I parole to San
13   Diego County, I'd go to RJDCF, Donovan, a week before my
14   release.  They'll put me on the bus down there from San
15   Quentin, all right.  And there, okay, I would call the
16   San Diego Rescue Mission and I'd be released to them by
17   my parole officer.  And then from there, I would have an
18   interview with the Way Back, okay.

19         And aside from the monetary support offered from
20   my father, that would be my situation until I could go
21   into the long-term program, the Way Back or Second
22   Chance Strive.  And as I said, Second Chance is a walk-
23   in program --

24         **PRESIDING COMMISSIONER ENG:**   Okay.

25         **INMATE NEBLETT:**   -- just like San Diego Rescue

*Capitol Electronic Reporting*

69

1   Mission.

2       **PRESIDING COMMISSIONER ENG:**   Okay.   The problem

3   is, sir, that generally speaking especially with lifers

4   that have been in for a long time, it's -- This is just

5   the first line in terms of whether or not you get a

6   date.   And when a Panel gives a date, then all the

7   documentation goes through this very rigorous, very

8   detailed decision review where a lot of the information

9   is verified.   Investigations are done to make sure

10  whoever's offering certain things, that they do list as

11  not just to show.

12      Because the last thing that anybody wants,

13  especially a Panel that's going to sign their names for

14  a grant, is to have that person be all of a sudden on

15  the streets which significantly reduces the chances of

16  survival and success.   So it is important for you to get

17  more solid in terms of the residential.   It's very, very

18  important.   And we understand because there's a lot of

19  inmates in your situation that do not have any family or

20  anything in this State.

21      However, there are places that are sort of

22  transitional residential programs, that offer a lot of

23  these things that you actually pay to get into.   And

24  actually, I think it's an excellent way, especially for

25  any lifer that's going to have a chance to get out, to

1    transition.  Because you're used to being in this

2    environment that whether you want to recognize it or not

3    is a very, very structured environment.

4         And you've been, you know, out of society

5    mainstream for quite a long time.  And before that it

6    was the Navy, which isn't exactly being on the streets

7    on your own, and paying the rent and you know, having

8    the checkbooks, and using ATMs and getting adjusted, you

9    know, getting your licenses and cars.  There's a lot of

10   different things.

11        So some of these residential programs that are

12   offered, they also, you know, will help you transition

13   back into the mainstream and teach you basic steps.  So

14   you may want to talk to some other inmates, because I

15   remember, there was one here that really impressed me

16   and that's -- And I've used that because he ended up

17   prepaying for a few months to go into this residential

18   program.  It also, you know, has some of the structure

19   that you have here with the substance abuse and other

20   things for anger management.

21        Sir, it's just a thought that you may want to

22   take a look at that because that shows that, you know --

23   If you have the funds, if your parents can help you with

24   that, that's great to actually get into something where

25   you got a reserved spot versus walking in off the

1  streets with homeless people, too.  So it's just another
2  thing for you to add.

3        **INMATE NEBLETT:**  Yes.

4        **PRESIDING COMMISSIONER ENG:**  Because a lot of
5  these programs, just like a lot of people wanted -- Do
6  you have in here Delancy Street?  Well, you have --
7  Delancy Street is one of those that you got to wait in
8  line with everybody else, and there's absolutely no
9  guarantee that they're going to accept you.  And then
10  what are you going to do?  You have to be able to sleep
11  somewhere.

12        And I'm sure you can -- You're a bright man.  If
13  you were sitting in this seat, would you want the
14  thought of somebody who's been incarcerated for 20, 25
15  years to have to play Russian Roulette going out there,
16  and hopefully they're going to find a bed with a bunch
17  of homeless people.

18        **INMATE NEBLETT:**  May I -- I'm sorry, I didn't
19  have a chance to communicate longer with Second Chance
20  Strive in San Diego, but they do specialize in ex-
21  offenders, not homeless people.  And they do offer --
22  Employment is their first priority, housing, mental
23  health, sober living.  And as I said, they're in the San
24  Diego AT&T Yellow Pages under emergency housing.  This
25  is a program that has walk-ins straight from RJD, okay.

72

```
 1          So far as prepaid, I explored a house in
 2  Metamorphosis in San Diego in 2000, and I never got an
 3  answer back from them, okay.
 4          PRESIDING COMMISSIONER ENG:  I know.  It takes a
 5  lot, it does take a large effort.
 6          INMATE NEBLETT:  And San Francisco, Saint Anthony
 7  Foundation is the same thing for me.  John Kelly walked
 8  me right into a Saint Anthony bed, okay.  And I do have
 9  a contact with a man.  Lee Boone works for Walden House,
10  okay, and that's his newest phone number, newest contact
11  form, okay, and he says to me I can get you into Walden
12  House two weeks ago, okay.
13          PRESIDING COMMISSIONER ENG:  People say a lot of
14  things, sir.  This Panel has to go by documentation
15  because again, if and when you're given a date, it goes
16  to people that are going to look at the paperwork.
17  They're not sitting across --
18          INMATE NEBLETT:  I have been in contact with
19  these people and you can call Delancy Street, you can
20  call Second Chance, you can call the Way Back, you can
21  call Mr. Lee Boone, you can call Mr. John Kelly.  And
22  they will tell you that I have been in contact, and I'm
23  genuinely seeking a situation.
24          PRESIDING COMMISSIONER ENG:  We're not
25  questioning that you've been in contact, okay.  The
```

| | |
|---|---|
| 1 | problem is whether or not at any given time, that |
| 2 | there's going to be space available that you -- It's |
| 3 | going to be a sure thing that once you're let out those |
| 4 | gates, that you would be, that you would have a place. |
| 5 | We see this all the time, okay. And as much as we'd |
| 6 | like to have blind faith, we can't. And it's not fair |
| 7 | to you either. You need to have more solid plans so you |
| 8 | know where you're going to be heading out once, if and |
| 9 | when you're released out those doors, okay. |
| 10 | So in terms of employment, it states that they're |
| 11 | the same as in the last report, that you would seek |
| 12 | employment as an industrial machinery repairman. |
| 13 | **INMATE NEBLETT:** Construction electrician, same |
| 14 | thing almost. |
| 15 | **ATTORNEY STRINGER:** We do have a letter from -- |
| 16 | **INMATE NEBLETT:** That would be the dream job, |
| 17 | would be the industrial machinery repairman. |
| 18 | **PRESIDING COMMISSIONER ENG:** Okay. |
| 19 | **INMATE NEBLETT:** That's the dream. |
| 20 | **PRESIDING COMMISSIONER ENG:** Okay. |
| 21 | **INMATE NEBLETT:** But the reality is construction |
| 22 | as an electrical apprentice, and they put a shovel into |
| 23 | my hands. That's what I'm doing. |
| 24 | **PRESIDING COMMISSIONER ENG:** Okay. So this |
| 25 | letter is a Joint Apprentice and Training Committee out |

*Capitol Electronic Reporting*

1   of San Mateo County, June 8th, 2006, signed by Kathleen

2   Barber, B-A-R-B-E-R, the Training Director, stating they

3   recognize the receipt of your letter dated June 5th,

4   inquiring regarding the feasibility of employment in the

5   electrical industry after your release, okay.  They say

6   everyone is welcome to apply to the electrical

7   apprenticeship.  Okay.

8        **INMATE NEBLETT:**  And again, programs like Delancy

9   Street and Walden House place you into apprenticeships

10  like that as part of their program.  So I'm covering as

11  many bases that I can.  That is the policy of the IBEW

12  statewide.  Not just for San Mateo, but it's San Diego,

13  San Francisco, it's just that I haven't -- I didn't

14  receive replies back from them.

15       **PRESIDING COMMISSIONER ENG:**  Okay.

16       **DEPUTY COMMISSIONER THOMPSON:**  See, we don't

17  contest that you have been in touch with them and that

18  if we call them, except that we don't call people, that

19  they would confirm they have heard from you.  What we

20  would need is something in writing.

21       Now Delancy Street comes out and interviews you,

22  and then they'll decide if you look like a successful

23  prospect, and then they may or may not take you into

24  their program.  And they give you something in writing

25  that says that at any point this person is released from

1  custody, he can come to this address and we will place
2  him.  And the other programs do much the same.  All of
3  these are saying the door is open, come on in, but that
4  in of itself is not enough.

5  **PRESIDING COMMISSIONER ENG:** Right.  Okay.

6  **ATTORNEY STRINGER:** And my client does have a
7  contact letter for Delancy Street that does show his,
8  that they can contact in that program.

9  **INMATE NEBLETT:** And again for Walden House.

10  **DEPUTY COMMISSIONER THOMPSON:** It shows that he
11  has contact, so all of these.

12  **PRESIDING COMMISSIONER ENG:** Yeah.  We're not
13  questioning that, but it's good for you to show this.
14  Monday, February 19th, 2007, from Delancy Street
15  Foundation, and they're recognizing that you have been
16  inquiring about them, that they do have five facilities
17  nationwide.  Okay.  And requires a two-year commitment.
18  So they basically tell you what it's about, what's
19  required, yeah, and you do need to apply.  And this is
20  signed by Tom Ridge, the Intake Coordinator.  What else
21  do you have there?

22  **ATTORNEY STRINGER:** A similar letter from Walden
23  House which is, again, a contact letter.

24  **PRESIDING COMMISSIONER ENG:** Right.  So we've got
25  June 26th, 2006 Walden House, again recognizing that

1    they have received a letter requesting information from

2    Mr. Neblett.  And this one, due to parole restrictions,

3    you must be a residence of San Francisco to parole to

4    this county.  San Francisco County is like that.  Same

5    thing with -- They're a little stricter with the San

6    Francisco Delancy Street, too.  Because again, these

7    programs have limited space, and San Francisco has their

8    share of folks that, of determinate sentences that are

9    coming out all the time into their --

10       **INMATE NEBLETT:**  If I may speak to that.  The

11   reason that I did put in for San Francisco parole plans

12   was because of my contacts I've made in this area since

13   1993.  Friends have written letters promising support

14   and friendship.

15       **DEPUTY COMMISSIONER THOMPSON:**  Well, apparently,

16   the Board, with respect to lifers, has the option to

17   release to where the best programs --

18       **INMATE NEBLETT:**  Yes.

19       **DEPUTY COMMISSIONER THOMPSON:**  -- appears to

20   exist.

21       **PRESIDING COMMISSIONER ENG:**  Right.

22       **DEPUTY COMMISSIONER THOMPSON:**  Otherwise, you

23   have to go back to the county of commitment.

24       **PRESIDING COMMISSIONER ENG:**  Right.

25       **DEPUTY COMMISSIONER THOMPSON:**  That certainly

1   would be a factor in that.

2   **INMATE NEBLETT:**  And Delancy Street and Walden

3   House are not prepaid.

4   **PRESIDING COMMISSIONER ENG:**  No, no.  We know

5   that, no.  I was just recommending to you that that's

6   another alternative with solid.  Because until you can

7   produce a letter saying that whatever time you get out

8   --

9   **INMATE NEBLETT:**  May I --

10  **PRESIDING COMMISSIONER ENG:**  -- that you will

11  have a spot.

12  **INMATE NEBLETT:**  May I?  It's a catch-22 for the

13  two best programs, okay.  If I am found suitable and my

14  parole plans for San Francisco are approved, then I will

15  be interviewed and most likely accepted based on my

16  prison record, okay.  Scott Silverman, walk-ins; Saint

17  Anthony Foundation, walk-ins; San Diego Rescue Mission,

18  walk-ins.  I think I can maintain for a day or a week or

19  two before I go into a long-term program.

20  **DEPUTY COMMISSIONER THOMPSON:**  And I would hope

21  that you can as well, and I think from one support

22  system or another, you would.  But the thing is, until

23  you're out, they really aren't going to do much until

24  you have a date.  And getting a date is one thing and

25  maintaining it is another.  I'm sure the stories have

```
1   not been filed under forget.  You get a date, it has to
2   pass the En Banc Review, then it goes to the Governor's
3   office.
4       So until you get it approved all the way through
5   those hurdles, you don't have a date.  You have a
6   prospective date, and they're not going to go for
7   investing in saying you've got this and we'll give it to
8   you until it's a certain date.
9       PRESIDING COMMISSIONER ENG:  Yeah.  You know
10  what?  I think this is premature right now in discussing
11  this.  I think that we've exhausted that.  Sir, you
12  basically have to back up your statements with
13  documentation, bottom line.  Because that's what
14  everybody is going to be looking for.
15      INMATE NEBLETT:  Last comment.  There's an
16  interstate parole compact with New York.  My family
17  wants me, that's where I want to be, okay.  And I could
18  parole to New York and be at home the day I'm released.
19      PRESIDING COMMISSIONER ENG:  Have you already
20  done that?
21      INMATE NEBLETT:  No, I'm here.  Catch-22.
22      PRESIDING COMMISSIONER ENG:  Not unless your --
23      INMATE NEBLETT:  If I'm found suitable, unless,
24  no, no, it's parole compact.  There's no need to bring
25  another body to --
```

*Capitol Electronic Reporting*

1      **DEPUTY COMMISSIONER THOMPSON:** But New York has
2 the final say.

3      **INMATE NEBLETT:** Yes.

4      **DEPUTY COMMISSIONER THOMPSON:** You need to have a
5 guaranteed residence, you need to have a guaranteed job
6 or source of support. And that you could get in writing
7 from your parents, I'm sure.

8      **INMATE NEBLETT:** The same as a support letter
9 from my father.

10      **DEPUTY COMMISSIONER THOMPSON:** As far as -- Well,
11 there again, it would guarantee a residence and support
12 until you got established. That they would do when you
13 just have a prospective date. But New York still has
14 the final choice and if New York says no, you don't go
15 to New York, because we can't force New York to take
16 you.

17      But it would be wise, if you're thinking in that
18 direction and you well may be, to get a letter from your
19 father or letter from some, mother, family, whoever,
20 that says at the time that he will be found suitable for
21 parole, we guarantee he can live with us and we will
22 support him until he can get employment. And if New
23 York will accept it, that's when the wheels start to
24 turn. And if you do happen to owe any restitution, that
25 has to be paid first.

1    **PRESIDING COMMISSIONER ENG:**  This is stuff you

2    should be discussion with your Legal Counsel, too.

3    Okay.

4    **DEPUTY COMMISSIONER THOMPSON:**  Yeah.

5    **PRESIDING COMMISSIONER ENG:**  I want to move on.

6    I'd got a letter here.  It's a handwritten letter dated

7    7/13/06.  It's a little old.  Is this -- I'm trying to

8    -- is this Robert Neblett, signed by Robert Neblett?

9    **INMATE NEBLETT:**  From my father.

10    **PRESIDING COMMISSIONER ENG:**  Is this your --

11    Okay.  Because I'm trying to -- Yeah, there it is.  It

12    says -- Okay.  Okay.  Your father at this time was 80

13    years old.  Is that correct?

14    **INMATE NEBLETT:**  He's 80 years old this year.

15    **PRESIDING COMMISSIONER ENG:**  Okay, okay.  So is

16    this a general support letter, and this was supposed to

17    be for your October 2006 hearing.  But there's no

18    address, I don't have any address or anything on it.

19    **INMATE NEBLETT:**  4414 Newton Road, Astoria, New

20    York, 11103.

21    **PRESIDING COMMISSIONER ENG:**  Then here's one from

22    Saint Anthony, June 14th, 2006.  It's not Saint

23    Anthony's policy to interview you while you're

24    incarcerated.  Services are available to you upon your

25    release, yeah.  And they supply a copy of the services

1   that they provide.  John Kelly, Burlingame, California,

2   June 28th, 2006.

3       **INMATE NEBLETT:**  I received a Jefferson award for

4   community service this past year.

5       **PRESIDING COMMISSIONER ENG:**  He's known you for

6   over ten years and Mr. Kelly is a brown card volunteer

7   here at Quentin, and he met you back in 1995 during the

8   spiritual weekend, Kairos.

9       **INMATE NEBLETT:**  Yes.

10      **PRESIDING COMMISSIONER ENG:**  Okay.  So this is a

11  general support letter, too, correct?

12      **INMATE NEBLETT:**  No.  It's for me, specifically.

13  He's a friend of mine.

14      **PRESIDING COMMISSIONER ENG:**  Yeah.  I'm saying

15  support of your release.

16      **INMATE NEBLETT:**  Just general support, yeah.

17      **PRESIDING COMMISSIONER ENG:**  It's support of your

18  release.

19      **INMATE NEBLETT:**  Yes.

20      **PRESIDING COMMISSIONER ENG:**  Of you personally.

21  I didn't mean for the general population at San Quentin.

22      **INMATE NEBLETT:**  But he does say he will help me

23  in anyway I can to find housing and what not upon my

24  release.

25      **DEPUTY COMMISSIONER THOMPSON:**  That's what we

*Capitol Electronic Reporting*

82

1   would call a general.

2          **PRESIDING COMMISSIONER ENG:**  It's a general

3   support.

4          **INMATE NEBLETT:**  Okay.

5          **PRESIDING COMMISSIONER ENG:**  If people -- If

6   they're going to offer you financial support, what you

7   want to do is find out and we need to know, what do they

8   mean financial support?  How much do they want to be

9   supporting you and for long?  Because it's expensive to

10  live out there.

11         If they're offering you residential, okay, does

12  this mean you're going to have your own bedroom or are

13  you going to take up a spot on the floor amongst 20

14  people living in one room?  I mean just to give you an

15  idea and for how long that will be.

16         **INMATE NEBLETT:**  Yes.

17         **PRESIDING COMMISSIONER ENG:**  Okay.  Are you going

18  to be living in somebody's garage or the basement?  And

19  it's in your best interest to have a solid idea.  Okay.

20  So then we've got September 25th, 2006, Nancy Bourne,

21  B-O-U-R-N-E.

22         **INMATE NEBLETT:**  General support, yes.

23         **PRESIDING COMMISSIONER ENG:**  General support

24  letter, okay.  Yeah.  She taught you three courses.

25         **INMATE NEBLETT:**  Yes.  She was a teacher or

83

1   teacher's aide in three of the classes.

2        **PRESIDING COMMISSIONER ENG:**  Okay.  We've got

3   this letter of June 8th, 2006, Northern California

4   Service League in San Francisco.

5        **INMATE NEBLETT:**  Employment.

6        **PRESIDING COMMISSIONER ENG:**  Okay.  They're

7   located in San Francisco with an office in San Jose,

8   telling you about the parolee employment program.  Are

9   you eligible for any Veteran benefits?

10       **INMATE NEBLETT:**  I've been working on upgrading

11  my discharge and it's very difficult.  They refused my

12  latest application, so I am not eligible for Veteran's

13  programs at this time.

14       **PRESIDING COMMISSIONER ENG:**  Okay.  Did I miss

15  any letters?

16       **ATTORNEY STRINGER:**  We have the additional

17  letters apparently not in the packet from the Mankind

18  Program, Miller Avenue Baptist Church, Christina

19  Sinclaire and Jackie McQuarrie.  And one additional

20  letter from -- These are letters of support from

21  Dr. Kimberly Richman.

22       **PRESIDING COMMISSIONER ENG:**  Okay, all right.

23  Let me get through these.  August 18th, 2006, the

24  Mankind Program in San Rafael, signed by Mark Owens and

25  Peter Van Dyke.  Owens is the Program Manager and

1  Mr. Van Dyke is the Class Facilitator. It states that

2  Mr. Neblett has been an active participant in the

3  Mankind Batterer's Re-Education Program here at San

4  Quentin. It says August of 2005.

5      **INMATE NEBLETT:** And that was a program commended

6  by Secretary Tilton.

7      **PRESIDING COMMISSIONER ENG:** Right. I know about

8  that part. Okay. So that's a general support letter.

9  Miller Avenue Baptist Church in Mill Valley, Kent

10 Philpott, P-H-I-L-P-O-T-T. He's the Pastor at Miller

11 Avenue Baptist Church. So for over 20 years, he's been

12 involved in volunteer activities here at San Quentin.

13     It says that he's been involved in the Sports

14 Program since 1997, and Mr. Neblett played on the

15 baseball team and was equipment manager for a number of

16 years but, okay. And he says he's spoken with you many

17 dozens of times over the last ten years. Okay, so

18 that's a general support letter.

19     December 14th, 2006, Christina Sinclaire,

20 S-I-N-C-L-A-I-R-E, with the San Quentin TRUST, outside

21 sponsor. She states that she's known you for two years,

22 is an outside sponsor for the TRUST Program. It says --

23 Another general support letter. Jackie McQuarrie,

24 M-C-Q-U-A-R-R-I-E, December 12th, 2006, also with the

25 TRUST Alliance with USF, San Quentin. And has known

```
 1  Mr. Neblett for a year and a half because she volunteers
 2  for the San Quentin TRUST for the development of
 3  incarcerated men.  Okay.  Another general support
 4  letter.
 5        And then we have USF, Department of Sociology,
 6  letter from Dr. Kimberly Richman, R-I-C-H-M-A-N.
 7  Dr. Richman has known Mr. Neblett for nearly three years
 8  in her capacity as a sponsor for again, the San Quentin
 9  TRUST Program.  So another general support letter.
10  Okay, those are good.
11        So anything else that I may have missed in terms
12  of letters or anything else?
13        INMATE NEBLETT:  Nothing.  Just, you know, the
14  fact that Lee Boone has been involved with Walden House
15  for so long and basically said, I can get you in, John.
16        DEPUTY COMMISSIONER THOMPSON:  Ask him to put
17  that in writing.
18        PRESIDING COMMISSIONER ENG:  In writing.
19        INMATE NEBLETT:  He's not very good for that.
20        PRESIDING COMMISSIONER ENG:  Well, if he's been
21  dealing -- If that gentleman has been dealing with any
22  of the institutions in the State of California and with
23  possible parole, then he knows that it doesn't mean
24  anything unless it's in writing and it's current.  So,
25  okay.
```

| 1 | Okay, sir, we also sent out Penal Code Section |
| 2 | 3042 notices, and those notices do go to agencies that |
| 3 | have a direct interest in your case. We are in receipt |
| 4 | of a letter from the District Attorney's Office, County |
| 5 | of San Diego. And this particular one, unfortunately, |
| 6 | Mr. Sachs was unable to come in. We were having |
| 7 | problems with our hook-up via video conference, so he |
| 8 | asked that I enter into the record their letter. Again, |
| 9 | this is dated November 30th, 2006. |
| 10 | **ATTORNEY STRINGER:** And Commissioner, I'm sorry |
| 11 | to interrupt you on that but I've objected to this |
| 12 | particular letter before. Not to the narrative from |
| 13 | Mr. Sachs, I have no objection to that. But he has |
| 14 | attached to it victim impact statements that are very |
| 15 | remote in time. They're not current. |
| 16 | **PRESIDING COMMISSIONER ENG:** We have many other |
| 17 | cases where we do not have current impact letters from |
| 18 | victims and victim's next-of-kin. And it's been |
| 19 | instructed that they are to be read at every Subsequent |
| 20 | Parole Consideration Hearing, because there are many |
| 21 | times that they have been (indiscernible), and it's too |
| 22 | difficult for them to every year, every few years, to be |
| 23 | making the same basic statements. So you can object but |
| 24 | we're overruling it, and it will be read into the |
| 25 | record. |

1           **ATTORNEY STRINGER:**  Just to supplement it, we

2    don't have Mr. Sachs to testify to that particular set

3    of circumstances, as to whether or not they were

4    notified and declined to appear.

5           **PRESIDING COMMISSIONER ENG:**  But they also --

6    Because it's been submitted to us and it's in our

7    records, we can consider it.  And they made sure before

8    we went off and when we were on the phone, that we were

9    in receipt of these letters.  So again, your objection

10   is noted but it's overruled.  Okay.

11          And again, this is in response to the notices

12   about your upcoming hearing and they basically state

13   that,

14              "We've undertaken a review of the file and

15          circumstances surrounding the commitment offense.

16          We ask the Board to consider this letter and any

17          and all information we have previously submitted

18          made a part of this inmate's central file,

19          including our prior letters.

20              "After a careful review, we are of the

21          opinion that this inmate is not yet suitable for

22          parole and his release would pose an unreasonable

23          risk of danger to public safety and society.

24          Accordingly, given the totality of the

25          circumstances, The People are opposed to parole."

88

1       It states that they've enclosed photographs
2   depicting the cruelty and callousness of the offense,
3   and ask that you consider these photos in regarding our
4   decision.

5           "No amount of time or productivity while
6       in prison can or should dilute the impact of
7       these photographs as they graphically reveal a
8       compelling snapshot of the inmate's conduct and
9       character in a free society.  Public safety
10      considerations mandate that we not take yet
11      another chance with another innocent potential
12      victim.

13          "In addition, we are also resubmitting
14      victim impact statements from the victim's son,
15      mother, sister, and brothers.  We ask that the
16      Board consider the transcripts attached herewith.
17      The next-of-kin have been devastated by this
18      senseless act of violence.  We ask that these
19      important statements be considered as they must,
20      pursuant to Penal Code Section 3043, etcetera.

21          "Finally, a Deputy DA will appear at the
22      hearing and orally represent our views.  However,
23      we were having technical difficulties and they
24      asked us to please just read this into the record
25      as they were not able to participate in the

1 | hearing today."

2 | And it does state, in the unlikely event that a
3 | Deputy DA is unable to appear, we ask that the Board
4 | rely on this letter of opposition to parole and all
5 | other letters previously sent in this matter, and made a
6 | permanent part of the central file according to Section
7 | 2030, subdivision, etcetera. Okay. And it basically
8 | states thank you for considering this letter and
9 | attachments. And it's signed by Mr. Richard Sachs,
10 | S-A-C-H-S, Supervising Deputy District Attorney, Lifer
11 | Hearing Unit.

12 | We've got a transcript that was recorded on June
13 | 23rd, 1997, the Office of the District Attorney of San
14 | Diego, and states,

15 | "Hello, my name is Martha Johnson. I'm
16 | the mother of Robert Anthony Gortarez, the
17 | victim. I, the same as what happened on that
18 | day, was that I had the feeling when I heard it
19 | on the news that there was a young man in his
20 | early 20s, and I had the feeling that, feeling
21 | like Robert had not come home that night. So it
22 | was early in the morning when I heard it. They
23 | said 'tragedy at Fiesta Island.' And I guess a
24 | mother feeling, and he has affected us, every
25 | member of the family, relatives, and it has been

1        hell for all of us.

2        "About John Neblett being released, he had

3        no remorse. The statements that he made still

4        hurt. I can still hear them. I would like for

5        him to just stay there as long. Why should he be

6        released when we are going through what we are

7        going through? His son misses him. He just said

8        that he wished he had more brothers and sisters.

9        But he's the only grandson he left me. Thank God

10       for that. No, John Neblett does not deserve to

11       be released. We are not over it. I suppose we

12       will never be over this. Thank you."

13       Then we have another transcript recorded on June

14 23rd, 1995, and the Office of the District Attorney, San

15 Diego.

16       "Hello, my name is Christina Rico,

17       R-I-C-O, and this is in regards to the victim,

18       Robert Gortarez, regarding John Neblett, CDC

19       Number D-04841. What happened was I was watching

20       the news, and they said they needed help

21       identifying a body with marks Robert Junior had

22       on his back. And I knew that my husband had gone

23       to the Over the Line Tournament, but I didn't

24       want to believe it in my head that this had

25       really happened.

1        "And then my brother-in-law called me on

2        the phone and he said that I needed to call the

3        Coroner because we might think it's Robert.  And

4        I called and they described him to me, and I

5        still didn't want to believe it.  And the Coroner

6        met me at my mother-in-law's house and showed me

7        a picture, and it was him.

8        "And when he died, my son was a year and a

9        half years old.  Me and my husband had only been

10       married for one year.  I never got to see how our

11       marriage would have turned out.  My husband never

12       got to spend any time with his son.  In fact, my

13       son doesn't really remember his father.

14       "He was robbed of his father, he was

15       robbed of going to baseball games, and watching

16       his son ever play, watching his son grow up.  His

17       son is 13 years old now and he was robbed of

18       that.  How has it affected me?  I can't go to

19       Fiesta Island where the murder took place

20       anymore.

21       "I feel that John Neblett was a cruel man.

22       There was no reason for this murder.  There was

23       no reason at all for him to kill my husband.

24       I'll never be over it.  He was only 22 years old

25       when he died.  He was robbed of his whole life.

1          He was a father and a husband, and he didn't

2          deserve what he got.  And I feel there is no

3          reason for John Neblett to be released from

4          prison."

5      And we have another very short transcript

6  recorded June 23rd, 1997, the Office of the District

7  Attorney of San Diego.

8          "Hi, my name is Richard Flores,

9          F-L-O-R-E-S.  I am the youngest brother of Robert

10         Gortarez, the victim.  You heard how it happened

11         being shot in the back of the head or pretty

12         close to it.  It was a cowardly act, cold-

13         blooded.  I consider it to be first-degree murder

14         but he was sentenced to second degree.  I don't

15         think he should ever get out.

16         "I miss my brother, think about him a lot,

17         dream about him only to wake up realizing he's

18         not going to be here.  I don't think John Neblett

19         should be set free, not only because the victim

20         was my brother, but anybody who commits a crime

21         like that should never be released.  That's all I

22         have to say."

23     Then we have another one recorded June 23rd,

24  1997, the Office of the District Attorney, San Diego.

25         "Okay, my name is Roy Johnson.  I'm the

1    youngest brother of Robert Gortarez.  In 1984, I

2    was fairly young so I didn't make any of the

3    prior Parole Hearings.  I believe that he was

4    very terminal, a very bad thing that happened to

5    my brother.

6         "I don't think the prisoner should be

7    released.  He's affected our family many, many

8    ways.  Several times I wanted to go out and call

9    my brother and let him know he has two beautiful

10   nephews that he's never seen.  He's never been

11   able to see the rest of his family.  It's growing

12   every day.  I don't honestly, don't think he

13   should be affected.  He was in the military at

14   the time he done this deed, and I think he should

15   stay in a lot longer.

16        "He made us miss somebody and lose

17   somebody from our family.  I strongly believe

18   that he should be left away from his family as

19   long as possible, because we will never see my

20   brother, never.  And all we got is our memories

21   and it goes on day by day.  It's a struggle to go

22   on like that.  I just believe that he should

23   strongly be kept behind bars for as long as

24   possible, as long as is allowed by law.  That's

25   about it."

1    | I just want to make sure there's no more letters
2    in here. I believe that's it. Okay.

3    | Now is a point in time that we're just going to
4    open it up to any follow-up questions, first by the
5    Panel. And I do have a couple, sir. You've done
6    Impact, you've done TRUST, this Insight, you've done a
7    decent amount of self-help programming. What is one key
8    thing that you have learned in applying in your life
9    today is helping you?

10   **INMATE NEBLETT:** Stopping and thinking before I
11   act. I have made it a very large part of my life now
12   the past two years to write poetry. It's a lot of
13   thinking, a lot of brain sweat to write good poetry.
14   And it has -- And it comes really out of the Man Alive
15   Program where, when you think you're in a situation that
16   causes you to feel defensive and fearful, okay, to
17   basically stop and remember to breathe, okay.

18   | So my thinking, my whole change in thinking kind
19   of stems from, at least my latest change in thinking
20   where it evolved into poetry, started when I started
21   going to Mankind two years ago. And I've written some
22   pretty good stuff, but to be aware, to be at that next
23   level of awareness, to be sensitive to the feelings of
24   others in situations that could potentially evolve into
25   violence, is where you can be where you're clean and

*Capitol Electronic Reporting*

1   sober.  If you're senses are impaired, then you can't
2   read people.

3        So I could say that my cognitive ability has gone
4   through the roof when it comes to thinking, because of
5   those things I've learned in Man Alive and how to focus
6   myself and be sensitive.

7        **PRESIDING COMMISSIONER ENG:**  Now you had some
8   real anger issues.

9        **INMATE NEBLETT:**  I was 21 years old --

10       **PRESIDING COMMISSIONER ENG:**  And very possibly
11  even up to today.  So how do you deal with that?  Have
12  you been able to figure out what triggers anger and
13  frustration and stress in you to just elevate that, your
14  blood pressure --

15       **INMATE NEBLETT:**  Choices, choices.  If I want to
16  react that way, I can make a choice to react that way
17  and it's a really stupid choice to make.  If I'm going
18  to choose to be offended, then think that I have a
19  rational excuse to elevate my stress and anger.  Well
20  then, yeah, I'll go there.  But I normally don't have
21  many opportunities for righteous, truthful reasons to go
22  that direction.

23       **PRESIDING COMMISSIONER ENG:**  Well sometimes, we
24  don't have those choices.  For instance, people driving
25  in traffic every day out there, okay.  You're sitting

1    there and for whatever reason, you just feel your

2    temperature starts to rise, okay. That's what I'm

3    talking about. Because that's a regular emotion that

4    humans have.

5         **INMATE NEBLETT:** Yes, it is.

6         **PRESIDING COMMISSIONER ENG:** And anger is a

7    typical emotion. And sometimes, we don't have a choice

8    when it's going, our blood pressure is going to get

9    elevated. So how do you deal with that?

10        **INMATE NEBLETT:** The biggest thing is to remember

11   to breathe. That's the first thing that you have to do.

12   Once you get an awareness of where your body is at, then

13   you can start thinking of the reasons why you're

14   choosing to get angry and if you're on the highway,

15   there really is -- There's no one thing you can fight

16   against to reduce that.

17        I mean the MacArthur Maze collapse is just

18   totally snarled up this area and it's going -- People

19   are just -- They may choose to get angry about it. But

20   if they're going the right way about it, they are going

21   to write to their Assemblyman and find out how long it's

22   going to take to repair this and exert pressure on the

23   politicians to get it going.

24        **PRESIDING COMMISSIONER ENG:** So with you

25   specifically --

*Capitol Electronic Reporting*

1    **INMATE NEBLETT:**  That's the right application.

2    **PRESIDING COMMISSIONER ENG:**  But with you

3  specifically, because you escalated to a point of

4  tremendous violence.  You took somebody's life that was

5  really unprovoked.  So what in you -- What you figured

6  out triggers anger in you?

7    See, what triggers it in you is going to be

8  different than what triggers anger in me or Commissioner

9  Thompson or anybody else in this room.  It's going to be

10  different.  But not everybody gets escalated to the

11  point where they, to such an extreme where you take a

12  life.  So you need to convince this Panel or, whether

13  you get a date or not, or any Panel, you need to

14  convince people and convince yourself what makes us

15  believe that you could be in control in the future.

16    **INMATE NEBLETT:**  Okay.  Twenty-three years

17  without a write-up concerning a fight, I've maintained

18  in here.  But really, the way my thinking has changed

19  about the roots of violence so far as being a man is

20  concerned.  I don't have that macho attitude anymore.  I

21  have changed.  That kind of thinking where many of the

22  men in this country is still going to think that way.

23    Well, I hope to be part of that change, that

24  changes that way of thinking that violence is an okay

25  response to imagined or perceived, imagined threats.

*Capitol Electronic Reporting*

1  Where the only time a threat is real -- The only time a

2  threat is absolutely real is when somebody is rushing

3  you and they have a knife or a gun.  I know the

4  difference between what's real and imagined.  That's all

5  I can say, really.

6      **PRESIDING COMMISSIONER ENG:**  What's the most

7  critical step for you in the 12 steps?

8      **INMATE NEBLETT:**  Critical step was the first one.

9  Admitting I was powerless over alcohol, my life had

10 become unmanageable.  That's what they call knowing

11 you're at the bottom, knowing that it's time to start

12 changing, okay.  And coming to prison as a result of

13 murdering somebody was the bottom for me, all right.

14     **PRESIDING COMMISSIONER ENG:**  So what do you think

15 about -- I mean I haven't even looked at those victim

16 impact statements.  I mean I knew they were in there,

17 but I hadn't read them until I read them out loud.  When

18 I was reading that, so what do you think when you think

19 about your victim and how would you feel if you were

20 that son or his brother?

21     **INMATE NEBLETT:**  I've learned over the years to

22 think more about myself, compassion, empathy for others.

23 I destroyed the man's life, the potential that he could

24 contribute to society.

25      And of course, the victims, is really -- It's

*Capitol Electronic Reporting*

1  infinite, the damage that I've done to them.  There's no
2  way to repay.  For the number of victims, you're talking
3  about seven life in terms of prisons, or eight life in
4  terms of prisons.  Because so far as -- I've seen it, I
5  have seen it this way myself.  I've looked in the mirror
6  and I've said, you may as well be a multiple murderer,
7  okay.  You've had that much of an effect, okay.

8       So I've taken a really good look at just how
9  dastardly -- All the writing I've been doing, I'm just
10 looking for an appropriate adjective, just how terrible
11 an act it was.  And knowing that they're never going to
12 have that father, brother, son, husband, grandfather.
13 What I've taken away from that family is irreplaceable,
14 and that's a part of me that's always going to be with
15 me, is that remorse, that anger at that 21-year-old man
16 who committed the act.

17      What I can do to repair it if -- You see, I've
18 always thought about making restitution in the ninth
19 step, to injure them with any need for me to have
20 forgiveness is just totally out of the equation, okay.
21 I don't anticipate going to them unless they want me to
22 say, hey, we want to hear what you've got to say, John.
23 I've not inflict myself upon them through these years
24 for me, for forgiveness.

25      **PRESIDING COMMISSIONER ENG:**  Well, have you

1  written a letter and just put it in your files?

2      **INMATE NEBLETT:**  I've written that letter in

3  here, okay, especially when I went to Kairos in 1995.

4  First, giving them and the Parole Board for the anger

5  that they had towards me.  It's a natural reaction for

6  me to feel that, oh, I'm not that guy, and I have a

7  reason to feel anger over this so I can be mad at this

8  situation.  No, that's not in the equation for me.

9      What is, in terms of like I said, that letter to

10 my heart making kind of the restitution I make is really

11 in the poetry that I write, okay.  I decline to inflict

12 my poems on you but really, my idea behind writing is

13 that it's got to be beautiful.  If I'm adding to the

14 amount of beauty in the world, because I can't add

15 children right now, I can't have kids, okay.  So I'm not

16 adding to God's creation that way, but I can do it with

17 some good poetry.  This is my -- It is my way of making

18 restitution to the world for what I've done to them.

19 It's the only way I can see it, okay.

20      If I can give them anything in the future, they

21 want to talk to me, I'm always open to it.  Whatever

22 they want from me that I can give, they'll get.  And

23 that letter is always going to be in my heart.

24      **PRESIDING COMMISSIONER ENG:**  Okay.

25      **INMATE NEBLETT:**  My family has suffered just as

1  much from my actions.  I took away two men from their

2  families the day I did this.  My father's been in my

3  corner for 23 years.  So has my mom, so has my siblings.

4  And yet, they have not given me anything but support.

5       And that could really be a re-doubling of my

6  sense of remorse for the crime, because like I said

7  earlier in this hearing, my mother doesn't totally

8  accept the fact that I've been squeaky clean for 23

9  years.  She finds it inexplicable that I have not been

10 found suitable for parole and come home since my first

11 hearing in 1993.  I've done those things that the Board

12 of Prison Terms wants me to do in order to be released,

13 to be found suitable.  And every time, I've been found

14 unsuitable.

15      I came into this in '93 with a trade from the

16 United States Navy.  And that's one of the suggestions

17 they made to me, that Panel at the end of my hearing,

18 oh, we want you to get a suitable vocation where you can

19 make money.  And I was signed off for Electronics

20 Technician skills from the United States Navy, and it

21 was totally illogical to hear that.

22      And then the need for therapy, after I'd gone to

23 900 hours of group therapy from 1990 to 1991 in RJDCF.

24 I even got the passes that they used to write us in

25 order to make those movements, okay, because it's only

1   in one psych evaluation that I did attend psychotherapy

2   by Dr. Menudi (phonetic) in 1992.

3       **PRESIDING COMMISSIONER ENG:**  Sir, you seem to be

4   getting very frustrated about the past and --

5       **INMATE NEBLETT:**  Well, the thing is --

6       **PRESIDING COMMISSIONER ENG:**  I mean you committed

7   a murder.  You took somebody's life.

8       **INMATE NEBLETT:**  I'm not frustrated at -- It's

9   the sentence, life without.  I'm a responsible adult.  I

10  have demonstrated in my life prior to this commitment

11  offense, that I was a law-abiding adult, okay.  When I

12  did have my two episodes where I had to show up for

13  Court because of my drinking, I showed up, okay.

14      I have a responsible nature, okay.  Two or three

15  failure to lock up or being late in 23 years, okay, and

16  I might have the same number of A days, okay.  I am a

17  man who knows his responsibilities.  I am a responsible

18  person.  And really, all you have to go by is by my

19  work, and it's been demonstrated for 23 years.  I

20  confessed and pleaded guilty and took responsibility.

21  That is my nature.  That is -- I have not been

22  rehabilitated.  I've grown up.

23      I've changed from a man who thinks that he has to

24  respond with anger and violence to potential situations,

25  to really being sensitive and willing to communicate and

1   having empathy.  You've had the empathy to listen to my
2   side of the story.  You have the communication ability
3   to understand where I'm coming from.

4          You thought maybe I was frustrated.  There's a
5   little frustration there, but I'm really trying to
6   communicate where I am at right now, okay.  And if it
7   seems the stress level is a little bit elevated, well,
8   that is natural.

9          **PRESIDING COMMISSIONER ENG:**  I'm going to give
10  you a reality check, okay?

11         **INMATE NEBLETT:**  Please.

12         **PRESIDING COMMISSIONER ENG:**  A lot of people
13  won't be upfront and honest, but I believe in being
14  upfront and honest.  I'm going to tell you how I
15  perceive you.  That I perceived when we were discussing
16  the parole plans that you got there, you know, a bit of
17  anger there, and that's why I started asking more
18  things.  Because all of a sudden, you gave me as a Panel
19  member some red flags, all of a sudden started going up
20  that this guy doesn't have control of anger.

21         And that I have concerns because anger drove you
22  to take a man's life, when you didn't have indications
23  that you would ever do that before.  And I'm telling
24  you, all of a sudden, you know, you gave me that feeling
25  and I can't explain it.  And I'm saying it on the record

1  because that is something that I hope helps you to look

2  at why would I -- Why would any Panel member perceive

3  you in that way?  And that's why I couched it and said,

4  you are frustrated.

5      **INMATE NEBLETT:**  Okay.  Let's go back to being on

6  the highway, your analogy, okay.  So I'm in a stressful

7  situation here at this hearing, okay.

8      **PRESIDING COMMISSIONER ENG:**  Sure.

9      **INMATE NEBLETT:**  And the catch-22 of the idea

10  that I have to have guaranteed bed from one of these

11  programs versus the fact that I won't have a guaranteed

12  bed unless they come out to interview me, and they won't

13  come out to interview me unless I get found suitable, is

14  kind of frustrating.

15      And the fact that I did explain that I've looked

16  into the walk-in programs that are available in San

17  Diego County and in San Francisco.  And I didn't

18  perceive that, you know, you were accepting them, yeah,

19  my thinking did get a little bit towards that

20  frustration thing.  But so far as anger is concerned,

21  all I can say is that you can perceive.  And

22  communication skills is something I've been working on

23  all these years, okay, and if I miscommunicated

24  something to you where you saw that, my mistake.

25      **PRESIDING COMMISSIONER ENG:**  I'm going to correct

1   you there.  It may not have been your intent to show

2   anger, but my perception is not wrong.

3           **INMATE NEBLETT:** Okay.

4           **PRESIDING COMMISSIONER ENG:** Okay.  My perception

5   is what it is.  I perceived you to be angry and

6   therefore, I believe you are, whether or not you

7   intended or not, okay.  And that's what you have to

8   learn how to manage and deal with, because that's going

9   to be happening to you all the time in the outside and

10  you're going to get a lot more frustrated.

11          And the other thing is, I'm at the point -- I

12  don't care if you accept or not whether or not we

13  require documentation.  That's your choice.  If you want

14  to come in here continuously with no documentation and

15  sit here, and almost getting argumentative is the way I

16  perceived it, about well, they told me this, you know,

17  so and so, I've got his card and he says I can walk in

18  at any time.  That's your choice.  Okay.  That's your

19  choice.

20          But you better pay -- I recommend that if you

21  ever intend to walk out of here and get a date, you

22  should pay attention to what's in some of your prior

23  hearing transcripts, and take a look at what makes sense

24  for your success on the outside.  Sir, words are cheap.

25  People will say a lot of things and when push comes to

1  shove, it doesn't happen, okay.

2  It's in your best interest to solidify as much as

3  you can because it's going to be difficult enough if and

4  when you get a date, when you walk out those doors to

5  transition, and to have major things like a residence, a

6  roof over your head.  I am not sure that that's

7  solidified for a long amount of time, and where are you

8  going to be getting money, and a lot of other things is

9  overwhelming for the strongest people that aren't coming

10  out of being in an institution for 20 years.  So that's

11  just for food for thought.

12  Commissioner, do you have anything to follow up

13  with?

14  **DEPUTY COMMISSIONER THOMPSON:**  No, but I would

15  just wonder about your commitment offense.  When

16  everybody left, you were okay but then this one man came

17  back.  Was that reflex conditioned behavior, a man can

18  be angry, he came back after he left and I can solve it

19  violently, it's okay?  That was certainly your early

20  training.

21  **INMATE NEBLETT:**  My intent when he came back,

22  when I was walking to the couch to pick up the gun, all

23  I have to do is scare him, all I have to do is scare

24  this guy.  The gun is in my hand, my temper ran away

25  with me.  Like I said, the feeling of power that it

1   meant to me, coupled with that conditioned response, led

2   me to walk up to him and shoot him.  And that was the

3   man I was 23 years ago.

4        **DEPUTY COMMISSIONER THOMPSON:**  And the man you're

5   not 23 years later because you're 23 years older, and

6   you have learned, and you have modified.  You can modify

7   conditioned behavior but can we ever say we know for

8   sure?

9        **INMATE NEBLETT:**  No, absolutely not.  You're

10  taking a risk.  I've said I demonstrated being a

11  responsible person for 23 years in the system.  Taking

12  me at my word is a lot.  I thought my word meant

13  something, since it meant something when I confessed and

14  pleaded guilty, when I showed up for all my hearings,

15  when I was considered for probation.  And that didn't

16  happen.

17       **DEPUTY COMMISSIONER THOMPSON:**  It did mean

18  something.

19       **INMATE NEBLETT:**  That didn't happen.

20       **DEPUTY COMMISSIONER THOMPSON:**  It still means

21  something, but now you've got to balance it.

22       **INMATE NEBLETT:**  I hear you and really, so far as

23  expressing myself emotionally, it's under control.  I'm

24  in a setting where it's -- Well, it shouldn't be

25  perceived --

*Capitol Electronic Reporting*

1     **PRESIDING COMMISSIONER ENG:** Well if you get out

2 of control, we can take care of it.

3     **INMATE NEBLETT:** Exactly.

4     **PRESIDING COMMISSIONER ENG:** So it's a different

5 situation.

6     **INMATE NEBLETT:** Yeah.

7     **PRESIDING COMMISSIONER ENG:** You're in a very

8 highly structured environment.

9     **INMATE NEBLETT:** My feelings don't just go that

10 way anymore, to escalate. They just don't.

11     **DEPUTY COMMISSIONER THOMPSON:** Okay. I have

12 nothing else, thank you.

13     **PRESIDING COMMISSIONER ENG:** Okay. Mr. Stringer,

14 any follow-up questions.

15     **ATTORNEY STRINGER:** Just one or two,

16 Commissioner. Thank you. Mr. Neblett, if the Board was

17 to grant you a parole date and impose a number of

18 conditions upon you, you acquire a sponsor, attend AA,

19 test for drugs and alcohol on a daily or weekly basis,

20 would you comply with each and every one of those

21 conditions?

22     **INMATE NEBLETT:** I would.

23     **ATTORNEY STRINGER:** And if I was to tell you that

24 an old adage of AA is once a drunk, always a drunk,

25 would you agree with that?

*Capitol Electronic Reporting*

1    **INMATE NEBLETT:**  I would agree so much as people
2    who believe that for themselves.  Because I have stated
3    myself honestly at this hearing that I do not consider
4    myself an alcoholic, I would believe that.  If I was an
5    alcoholic, I would answer that in the affirmative, but
6    I'm not an alcoholic, so I can't say that.  I am
7    recovered.

8    **ATTORNEY STRINGER:**  But you would faithfully and
9    honestly participate in AA if that was the condition of
10   your parole.

11   **INMATE NEBLETT:**  Yes.  As I do so now with
12   complete and total honesty.  I don't represent myself at
13   AA meetings as hi, I'm John, I'm an alcoholic.  I'd say
14   hi, I'm John.

15   **ATTORNEY STRINGER:**  And I noticed in your
16   vocational training that you, among other things, had
17   studied the National Electrical Code and also studied
18   Residential Wiring.  Are your skills sufficient that you
19   could obtain employment in that area?

20   **INMATE NEBLETT:**  Yes.

21   **ATTORNEY STRINGER:**  And you would attempt to
22   enroll with the IBEW, the International Brotherhood of
23   Electrical Workers?

24   **INMATE NEBLETT:**  Yes.

25   **ATTORNEY STRINGER:**  Okay, thank you.  Thank you,

1    Commissioner.

2         **PRESIDING COMMISSIONER ENG:**   Okay.   Let's move

3    into final statements.   Mr. Stringer.

4         **ATTORNEY STRINGER:**   As the Panel is aware, the

5    relative standard that must be used is whether or not

6    Mr. Neblett, as he sits before you now, poses an

7    unreasonable risk of danger to society or a threat to

8    public safety.

9         I would submit that the factors in Mr. Neblett's

10   favor are one, prior to coming into the institution, he

11   had no or just a minimal juvenile and adult record.

12   Nothing in his past before coming into the institution

13   would indicate any propensity for violence.

14        While in the institution, his disciplinary

15   history has been minimal.   I would also indicate that,

16   and does not go to any type of institutional violence.

17   So that would also indicate that his propensity for

18   violence is non-existent.   Therefore, I think you can

19   consider Mr. Neblett's commitment offense a one-time

20   aberrant act in a long history of law-abiding either

21   outside the institution or within the institution.

22        Mr. Neblett has upgraded himself as best he can

23   within the prison system.   He has previous marketable

24   skills that were developed in the Navy.   He also has

25   augmented those skills in the prison system, and now

1    could easily obtain employment in the electrical or

2    other fields.  He's also upgraded himself educationally

3    as he so testified and supported that with transcripts,

4    and continues to upgrade himself within the prison

5    system.

6            Those that know Mr. Neblett and have evaluated

7    him speak very highly of him.  Just a few of those

8    letters, I will read into the record.  One is dated

9    April 10th of 2007 from the Insight Prison Project, and

10   is signed by Peter Van Dyke and Jacque Verdune.  The end

11   of that letter says, quote, we commend John Neblett for

12   his efforts in rehabilitating himself.  As the Secretary

13   of Corrections stated, these men are the ambassadors of

14   the type of change we want to see throughout the

15   correctional system.

16           The TRUST Fellows Group wrote a letter authored

17   by Gary Mendez, who's a PhD and National Director.  He

18   indicates that Mr. Neblett's activities are focused and

19   demonstrate a protractive consistency in behavior and

20   goals as well as qualifications of (indiscernible) as

21   contributing to human welfare.  He exemplifies the

22   character desirable of a TRUST Fellow and a good

23   citizen.  We further ask the Board of Parole Hearings to

24   find John Neblett suitable for parole.

25           From San Francisco, the University of San

1    Francisco, a letter written by Dr. Kimberly Richman from

2    the Department of Sociology.  I'm going to extrapolate

3    from that, that Dr. Richman is a sociologist.  She

4    states about Mr. Neblett, he's participated in numerous

5    voluntary programs including AA; Man Alive; Life Plan

6    for Recovery; Squires, which is an intervention

7    counseling program for at-risk youth; a San Quentin

8    Positive Christian Community, a group therapy with

9    Dr. Al Sherlens (phonetic).

10        He's also acquired numerous vocational skills,

11   an electrician, completed his Associate's degree from

12   Hartnell College, and continues to take college classes

13   at Patton University.  Therapeutic educational and

14   vocational skills he has acquired through these

15   activities will without a doubt ensure his smooth

16   transition back into the community as a contributing and

17   law-abiding member of society.

18        Mr. Neblett has paid his debt to society and he

19   truly transformed himself from a liability to an asset.

20   I'm confident that upon parole, he will prove to be an

21   asset to his community as well.  He is passionate,

22   engaged, educated, eloquent, caring and committed.  I

23   have no doubt that upon parole, he will continue to be a

24   law-abiding and non-violent person and make positive

25   contributions to society and his community.

1        These assessments are borne by the evaluations of

2   various psychological evaluators throughout the years.

3   In November 14th of 2000, Dr. Susan Bekan (phonetic)

4   wrote, for a decade or more, Mr. Neblett has been

5   assessed as having a low propensity to be dangerous if

6   released from prison.  His violence potential was

7   assessed as low or less than average in psychological

8   evaluations of 1998, 1992 and 1995.  His violence

9   potential continues to decline.

10       In November 11th of 2006, Dr. Starrett indicated,

11  quote, Mr. Neblett was in the low range in terms of his

12  risk management for the future.  And the doctor also

13  opined that these types of crimes tend to not remit.

14  And I would also like to add to that that it is an

15  accepted psychological point that recidivism declines

16  with age, and Mr. Neblett has been incarcerated for an

17  extensive length of time.

18       Dr. Starrett again evaluated Mr. Neblett in

19  February of 2007, had him with a GAF score of 80.  And

20  said, the inmate overall propensity for future violence

21  in the low range on all factors, that is, historical,

22  clinical, and risk management, when compared to similar

23  inmates.

24       Mr. Neblett does have those parole plans

25  available to him within the State of California.  He is

1   attempting to parole to San Diego which, of course, is
2   not the most ideal location for any parolee because they
3   flat out have an antipathy to anyone that's coming to
4   their community from the prison system.  CDC and Parole
5   does have the ability to locate Mr. Neblett in many of
6   the other counties within the State of California, or
7   approve his interstate compact transfer to New York.

8         I say that because during the 120-day evaluation
9   period, if Mr. Neblett was to acquire a date, certainly
10  he could firm up those plans either in another county or
11  with New York, or in whatever jurisdiction the Board
12  would like him to parole to.  Upon his release, the
13  State of California, of course, could place him in many
14  and varied transitional housing units until he could
15  transfer to New York, or they could mandate that he
16  enter and complete a residential substance abuse
17  program.

18        They could also mandate that he test regularly
19  for any alcohol or substance abuse, that he attend AA
20  and that he acquire a sponsor.  The State of California,
21  through the Parole Division, would always know where
22  Mr. Neblett was, what he was doing, and where he was
23  working.  He does have marketable skills so certainly,
24  he would not be a burden to society, and would be a
25  productive member of that society as a member of the

1   International Brotherhood of Electrical Workers.

2          He is a very intelligent man, he writes poetry,

3   he is a writer, and is in some ways extremely

4   introspective.  And rather than him coming to the Board

5   and just parroting what he perhaps thinks the Board

6   wants to hear, he has displayed some emotion here and in

7   my view, that's good.  Because upon his release, he will

8   be exposed to many different types of situations as has

9   been discussed here, everything from road rage to being

10  disrespected on the street.  And certainly, if he didn't

11  react a little to that, he would be denying those

12  emotions that are within him.

13         Therefore, I would submit that he's been very

14  honest and forthright with the Board, that he has earned

15  a date, and that the Board would be comfortable with

16  granting him that date since he, under the law, does not

17  at this time present as an unreasonable risk of danger

18  to society or a threat to public safety.  Thank you.

19         **PRESIDING COMMISSIONER ENG:**  Okay.  Mr. Neblett,

20  this is your opportunity to make a final statement to

21  the Panel if you want.

22         **INMATE NEBLETT:**  Thank you.  Thank you,

23  Mr. Stringer, for that support.  I realize that my

24  parole plans are problematic unless I were to be in

25  prepaid program.

1          The reason I am really hot on Scott Silverman, he

2    had a personal contact with Peter Van Dyke, and Scott

3    Silverman is the Director for Second Chance Program

4    Strive in San Diego.  And as I said, they are listed in

5    the Yellow Pages for emergency housing walk-ins, okay.

6    If during the investigation that takes place, if I'm

7    found suitable and you inquire as to the legitimacy of

8    this program, and the fact that they do take walk-ins

9    and they do provide long-term support for ex-offenders,

10   you will find that he will take me if I am paroled to

11   San Diego County.

12         So far as my support in the Bay Area, I would

13   like to minimize my possibility of negative victim

14   impact in San Diego, not just because of the antipathy

15   that my lawyer stated, people with parolees, lifer

16   parolees, murderers being paroled, not just because of

17   that.  I really am doing it for the concern of the

18   victims, okay.  I wouldn't want to have a negative

19   contact.  I'd like to reduce that possibility.

20         And yeah, San Francisco Bay Area I do have

21   friends in the area, okay, who can help me get into

22   Walden House, Delancy Street, Saint Anthony's.  So if

23   you do find me suitable, then those interviews can take

24   place.  They can come.  That catch-22 will be wiped out,

25   okay.  The investigation requirements and En Banc

1 | hearing might be satisfied.

2 | If you delay me just because of that, that I

3 | should do something to get a concrete situation, then

4 | yeah, that could happen a year or two years down the

5 | line, but it's really a waste of the taxpayer's money.

6 | I can say that I'm really trying to be sensitive and

7 | have empathy, and increase my communication skills with

8 | people, especially that empathy thing. I wouldn't want

9 | to make people think I was angry and maybe have a little

10 | bit of fear over it, okay. Because communication is a

11 | two-way street and I have to always be at that next

12 | level of awareness, okay. I'm going to give you the

13 | first --

14 | [INTERRUPTION -- PHONE RINGING]

15 | **INMATE NEBLETT:** Here we go.

16 | **PRESIDING COMMISSIONER ENG:** Can you grab that

17 | thing and just turn it off. Continue, sir. Just click

18 | no. Here, let me have that, please. Go ahead.

19 | **INMATE NEBLETT:** That moment when a person feels

20 | like it's okay to escalate, it's a longer piece of work

21 | but it starts with these four lines. I have awareness

22 | of this moment, this moment of fatal peril. Right now

23 | my image is in trouble, I feel like I'm going to die,

24 | okay. Thirty-six lines long, I performed it Saturday

25 | for the Peace Day Celebration out there, and to be at

1  that next level is new for me.  The fact that I'm 44, my
2  testosterone levels have dropped them and my awareness
3  level has dropped, climbed, okay.

4       So I think that really speaks towards my
5  cognitive abilities, and I really can't add to what my
6  lawyer has done for me and what you pulled out of me in
7  terms of another look at myself for that reality check.
8  I'm mature enough now to take those suggestions and
9  realize, yeah, I killed somebody.  It was horrible,
10  okay.

11       I feel like I want to get out of prison someday,
12  yeah, that's what I feel like.  I'm going to be
13  frustrated if I'm not found suitable, okay.  Feelings of
14  anger might come up but they're not directed towards
15  anything, anybody.  What it would be really, would be a
16  situation where I'd have to do all I can to improve my
17  situation, where this -- Our society has made it my -- I
18  realize my level of responsibility for myself.

19       I've said several times I'm a responsible adult,
20  and I believe I can take care of myself with the help of
21  my friends, okay.  It's not just me and that's what I
22  was feeling that day in that motor home I was all by
23  myself.  Now I got people in my life, 'm not just
24  thinking of myself anymore.

25       I'm thinking -- I'm in here today with a

1  respectful attitude, an engaging attitude, and imploring

2  attitude that my family needs me, okay.  My father is

3  80, my mom's 70.  Whatever I can give them in direct

4  restitution for the rest of my life might help mitigate

5  those things that I did to get in here.  That's where I

6  see restitution going for me.  The restitution I can

7  make to my family.

8       I believe my parole plans are concrete.  I'm a

9  trustworthy person.  I've demonstrated it over the

10 years.  An investigation into Second Chance or any of

11 the other plans I've expounded on, San Diego Rescue

12 Mission, like I said, my father's been in contact, they

13 will remember me if called.  John Kelly and Philpott and

14 all my friends, they're there for me.  That's all I have

15 to say.  Thank you.

16      **PRESIDING COMMISSIONER ENG:**  Thank you.  We'll

17 now recess for deliberations.  The time is 11:58.

18                    **R E C E S S**

19                      --oOo--

20

21

22

23

24

25

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2              **D E C I S I O N**

3         **PRESIDING COMMISSIONER ENG:**  Okay, we're back on

4    record.  The time is 12:25.  All parties that were

5    present prior to our taking a recess for deliberations

6    has since returned.

7         Before I get into the reading of the Decision, I

8    had missed in the packet that we also did have a letter

9    from the City of San Diego Police Department that I

10   failed to read into the record, so I have to do that

11   now.  The letter is dated March 5th, 2007, and it's

12   signed by Kevin Rooney, R-O-O-N-E-Y, Lieutenant in the

13   Homicide Unit.  And it does state that, he says that,

14        "I believe the circumstances leading to

15        the arrest and conviction of John Neblett for the

16        January 1984 murder of 22-year-old Robert

17        Gortarez, on July 14th, '84, officers were

18        flagged down at a recreational area known as

19        Fiesta Island.  The citizen reported a shooting

20        that had occurred within a parked motor home.

21        "Officers investigated and found the body

22        of Robert Gortarez on the floor of the motor

23        home.  Gortarez died from a gunshot wound to the

24        neck.  John Neblett was arrested at the scene,

25   **JOHN NEBLETT      D-04841      DECISION PAGE 1     5/02/07**

*Capitol Electronic Reporting*

1 |     pled guilty to murder, was sentenced to 15 years
2 |     to life in prison.

3 |         "For the murder of Robert Gortarez, it is
4 |     the recommendation of the San Diego Police
5 |     Department that John Neblett remain in custody
6 |     and not be considered for parole."

7 |     And that it says, if I can be of further
8 | assistance, blah, blah, blah.  Okay.  So that's been
9 | read into the record.  Okay.

10 |     In the matter of John Neblett, CDC Number
11 | D-04841, the Panel has reviewed all the information
12 | received from the public, and relied on the following
13 | circumstances in concluding that the prisoner is not
14 | suitable for parole, and would pose an unreasonable risk
15 | of danger to society or a threat to public safety if
16 | released from prison.

17 |     We find that the commitment offense was carried
18 | out in a very cruel, very cold and callous manner.  It
19 | was carried out in a rather calculated manner, in that
20 | the inmate basically chose to go retrieve the weapon
21 | that was inside the motor home.  And basically walked up
22 | to Mr. Gortarez, the victim, who was sitting down, and
23 | basically shot this unarmed victim at very, very close
24 | range.  And it really showed a total disregard for human
25 | **JOHN NEBLETT    D-04841    DECISION PAGE 2    5/02/07**

*Capitol Electronic Reporting*

1   life.

2       The motive for the crime, per Mr. Neblett, was

3   that he states that he -- It was really based on fear

4   and anger that he had at the time.  But based on this

5   Panel's taking of it is rather inexplicable in relation

6   to this man losing his life just like he did.

7       These conclusions are drawn from the Statement of

8   Facts wherein,

9           "On July 14th, 1984, Mr. Gortarez was in

10          and out of the motor home on several occasions

11          drinking beer and asking for cigarettes.  Then

12          apparently, Mr. Mohrman, who was the owner of the

13          motor home, and Mr. Neblett had left to get some

14          ice for the beer and upon returning, Mr. Neblett

15          gave Mr. Gortarez another beer and a cigarette

16          and then told him to leave.  Gortarez complied,

17          but returned a short time later asking for more.

18          "Neblett became agitated with Gortarez's

19          obnoxiousness and unwillingness to leave, so

20          Neblett retrieved the gun from the rear of the

21          motor home and placed it to Gortarez's head while

22          he was seated on the step outside the motor home.

23          Neblett stated, quote, we told you to get the

24          hell out of here, I'm not fucking with you,

25   **JOHN NEBLETT      D-04841      DECISION PAGE 3    5/02/07**

1 | unquote.  Gortarez told him to take it easy.

2 | "Neblett fired the gun in an upward angle

3 | below Gortarez's ear, resulting in the victim's

4 | death.  Mr. Neblett then moved the body to the

5 | back of the motor home and told someone to call

6 | the police because he had killed a man."

7 Regarding a prior record, this inmate does have

8 an escalating pattern of criminal conduct, that we find

9 that it may be minor but it's definitely a pattern.  And

10 his two prior arrests before this life crime occurred,

11 basically all had to do with alcohol consumption.

12 He does have somewhat of an unstable social

13 history in that, in terms of the documents and the

14 discussions that we had that both of his parents were

15 drinkers.  And that basically, this inmate feared his

16 father who could become rather physical at times

17 especially when drinking, and coupled along with his

18 prior record of the arrest related to alcohol.

19 Regarding his institutional behavior, we find

20 that his misconduct while incarcerated includes six 128A

21 counseling chronos, the last one being in September of

22 1996 for smoking.  And then he has only one more serious

23 115 disciplinary which by the way, this one happened to

24 be an administrative one on August 19th, '88 for

25 **JOHN NEBLETT     D-04841      DECISION PAGE 4     5/02/07**

*Capitol Electronic Reporting*

1   delaying mandatory lock-up.  Okay.

2          Regarding this inmate's parole plans, this Panel

3   finds that he lacks realistic parole plans.  He does not

4   have viable residential plans in the last county of

5   legal residence, and he does not have acceptable

6   employment plans.  We did have rather in-depth

7   discussion about recommendations that this inmate could

8   follow, or not bother to, in terms of really firming

9   these things up.  And I know that, sir, you were

10  focusing on prepaid residential plans.  That was just

11  one option as a suggestion to take a look at.

12         And also, it also helps to have, to bring in some

13  sort of documentation from prospective employers that

14  might say that, based on Mr. Neblett's skill-set or work

15  history, etcetera, that these are the types of positions

16  that might be open to him.  And for these types of

17  positions, this is the type of pay range that one could

18  expect, to give you a better idea as to what type of

19  income or how many jobs you might have to get on the

20  outside.

21         And that when you're inquiring about this, you

22  can even use as an excuse that the Parole Board really

23  needs more detailed information. And it's actually to

24  your benefit because one would like to know if they're

25  **JOHN NEBLETT      D-04841       DECISION PAGE 5      5/02/07**

1   applying for a job, well, what are the hours involved,
2   do I have to work 80 hours to get paid for 20 hours,
3   etcetera.

4          So I'm using extremes, but it's still is always
5   helpful for you to have some understanding of what their
6   expectations are, what's the type of positions, is it a
7   fit for you or not. And they don't have to basically
8   give you a job offer, but at least it gives you
9   information that you can bring forward to say, this is
10  what I can look at, because you do have marketable
11  skills.

12         Regarding 3042 responses, we do note that we did
13  read into the record a letter from the District
14  Attorney's Office of San Diego County that stated their
15  opposition to parole. Also, the letter from the City of
16  San Diego Police Department, who was the law enforcement
17  agency that investigated the case, and they stated their
18  opposition to parole. Along with, we read into the
19  record, four transcripts of recorded statements that
20  were made by the victim's family, and all were in
21  opposition of parole.

22         The Panel makes the following findings. We find
23  that this inmate does need anger management in order to
24  face, discuss, understand, and cope with stress and
25  **JOHN NEBLETT     D-04841      DECISION PAGE 6     5/02/07**

*Capitol Electronic Reporting*

1   anger in a non-destructive manner.  Until progress is

2   made, this prisoner continues to be unpredictable and a

3   threat to others.

4        However, we feel that this inmate should be

5   commended for his active participation in the

6   Insight Prison Program; TRUST, his past participation in

7   TRUST, and Impact and Squires.  And he does have very,

8   very good work reports and has been disciplinary free

9   basically since -- I forgot what year it was, sorry.

10       **DEPUTY COMMISSIONER THOMPSON:**  '88.

11       **PRESIDING COMMISSIONER ENG:**  '88, which is good.

12  However, these positive aspects of his behavior do not

13  outweigh the factors of unsuitability.  This is a two-

14  year denial.  In a separate Decision, the Hearing Panel

15  finds that it is not reasonable to expect that parole be

16  granted at a hearing during the following two years.

17  Specific reasons for this finding are as follows.

18       And one thing, sir, is the commitment offense in

19  that it was very, very cruel in that you made the choice

20  to arm yourself with a loaded weapon and it seemingly,

21  totally unprovoked.  You chose to go up and shoot this

22  man at very, very close range in his head taking his

23  life.  And again, it was carried out in a rather

24  calculated manner in that you chose to go in and arm

25  **JOHN NEBLETT      D-04841      DECISION PAGE 7     5/02/07**

1    yourself.

2         It was carried out in a manner that demonstrates
3    a total disregard for human life.  And the motive,
4    according to what you were stating, is that you were
5    fearful and angry.  And yet, there was just the two of
6    you there, and it just -- There's a lot of questions,
7    and that's why this Panel finds that it's somewhat hard
8    to explain why this man lost his life the way he did.

9         This inmate does have a history of -- We'll call
10   it misconduct in the two prior arrests that were
11   alcohol-related that apparently led up to this crime, as
12   he had been drinking a lot of beer all day long with
13   these people.

14        And we feel that this prisoner has not completed
15   the necessary programming that is absolutely essential
16   to his adjustment, and he does need the additional time
17   to gain this programming.  And specifically, he has
18   failed to participate and complete a lot of anger
19   management.  It's very important that you be able to
20   communicate what you've learned from going to specific
21   anger management, and how specifically you can apply it
22   to your circumstances.  Therefore, a longer period of
23   observation and evaluation of the prisoner is required
24   before the Board should find that the prisoner is
25   **JOHN NEBLETT    D-04841    DECISION PAGE 8    5/02/07**

1  suitable for parole.

2      We recommend that you remain disciplinary-free,

3  that you continue to upgrade  yourself vocationally and

4  educationally, and that you do participate in any and

5  all types of self-help.  That basically concludes the

6  reading of the Decision.

7      I wish you luck, sir.  I'm going to ask if fellow

8  Commissioner has any comments that she would like to

9  make.

10  **DEPUTY COMMISSIONER THOMPSON:**  I would also wish

11  you luck, but I would also want to say I, too, got a

12  sense of anger management very badly needed when you

13  were talking about how you were going to confirm things

14  and what was going on.  Very much like a volcano.

15  Simmering, not erupting, but simmering.

16      And how you're going to confirm it will remain up

17  to you, but there are some suggestions.  But it was

18  palpable across this table and that combined with

19  conditioned response, is a concern about unreasonable

20  risk.  All people present risk.  That's just from people

21  being in the same place at the same time.

22      But are you a little more than that and

23  (indiscernible) unreasonable because you have acted out,

24  and something is still very definitely there.  And not

25  **JOHN NEBLETT     D-04841     DECISION PAGE 9     5/02/07**

1  while I have a sense of that kind of emotional

2  investment do I feel you're ready to come out.

3      **PRESIDING COMMISSIONER ENG:**  Before we conclude,

4  there is one thing.  And again, right now it'll probably

5  -- You won't even pay any attention but later on, I hope

6  you take a look at this in the transcript.

7      Because while you were giving your final

8  statement, you made a statement in saying that, back

9  when you were 21 when this life crime occurred, that you

10 were all alone.  And that you ended up getting into

11 trouble.  But today, you feel that you have the support

12 and maybe inadvertently, you were pointing to the

13 letters that your Defense Counsel had stated from the

14 people from, I think it was the TRUST, from the TRUST

15 Program.  And that you feel that with that support, that

16 you could make it.

17     And what I wrote down -- I was writing that down

18 because number one, what you don't realize is, we sit

19 across inmates all day long five days a week, okay.  And

20 we see a lot of the same letters for a lot of the

21 inmates and again, I caution you, not to say that they

22 wouldn't be there for you.  But you need to plan based

23 on the fact that these types of folks may not be there

24 for you when you're out by yourself.

25 **JOHN NEBLETT**     **D-04841**     **DECISION PAGE 10**     **5/02/07**

1      And I wrote down, risk is if these folks aren't

2  there for him, what will happen? Because of the

3  statement you made, that you said that you felt you were

4  all alone and that you got into trouble. So take it for

5  however you want, but these are things that, I'm being

6  honest with you, come up as red flags, too.

7      So again, we wish you luck. That concludes the

8  hearing. The time is 12:39.

9                          --oOo--

10

11

12

13

14

15

16

17

18

19

20

21  **PAROLE DENIED TWO YEARS**
                                      **AUG 3 0 2007**
22  **THIS DECISION WILL BE FINAL ON:** _____

23  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

24  **DATE, THE DECISION IS MODIFIED.**

25  **JOHN NEBLETT    D-04841    DECISION PAGE 11    5/02/07**

*Capitol Electronic Reporting*

# CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, TERESA MORRIS, as the Official Transcriber,

hereby certify that the attached proceedings:

In the matter of the Life )          CDC Number: D-04841
Term Parole Consideration )
Hearing of:               )
                          )
JOHN NEBLETT              )
_____ )

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

MAY 2, 2007

9:24 A.M.

were held as herein appears. Further, this transcript

is a true, complete and accurate record, to the best of

my ability, of the recorded material provided for

transcription.

Teresa Morris
_____
TERESA MORRIS
June 16, 2007
Capitol Electronic Reporting

EXHIBIT "B"

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PAROLE HEARINGS
2007 CALENDAR
FORENSIC ASSESSMENT SERVICES UNIT
SAN QUENTIN STATE PRISON

## I. IDENTIFYING INFORMATION

| | |
|---|---|
| **Inmate Name:** | **Neblett, John** |
| **CDC Number:** | **D-04841** |
| **DOB (*Current Age*):** | **03/05/63 (33)** |
| **Controlling Offense:** | **PC §187 Murder First Degree** |
| **Date of Offense (*Age at time*):** | **07/14/84 (21)** |
| **Sentence:** | **15 years to life** |
| **County of Commitment:** | **San Diego** |
| **Date Entered into CDCR:** | **04/17/85** |
| **Date Received at San Quentin:** | **June 1993** |
| **Classification Score:** | **19** |
| **CDCR Forensic Evaluator:** | **Richard Starrett, Ph.D., Ph.D.** |
| **Date of Evaluation:** | **02/23/07** |

## II. SOURCES OF INFORMATION

The inmate's Central File (C-File) and Unit Health Record (UHR) were reviewed. He was interviewed for the purpose of the current evaluation on 02/23/07. He was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the Board of Parole Hearings (BPH) to assist in determining his suitability for parole. The inmate appeared to understand the nature and purpose of the evaluation, and the possible consequences of the interview to the best of the inmate's ability. Unless otherwise indicated, the inmate agreed to participate in the interview. For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist. Also, it is the conclusion of the undersigned examiner that it was not necessary to provide auxiliary aids or assistance to achieve effective communication. This evaluator is not responsible for any inaccurate statements, or subsequently changed opinions, expressed by the inmate.

## III. SOCIAL HISTORY

CHILDHOOD/ADOLESCENCE: The inmate was born in New York. He denies any prenatal or birth complications, or birth defects growing up. He states that his development in terms of speech, language, and motor skills were within normal limits. He denies any enuresis, speech problems and emotional problems in childhood. He denies any health problems in childhood. There was borderline sexual abuse in the

family context. The inmate was molested in later adolescence. There were disruptions to his childhood. His parents separated when he was 13 years of age. At the current time, the inmate denies that there was ever cruelty to animals.

EDUCATION: The inmate dropped out of school in the tenth grade. He denies any learning problems, grade failures, or ever being in special education classes. He was suspended from school and never expelled. He used alcohol and drugs during high school years and got into one fight.

The inmate is currently taking Statistics through a correspondence college course. He would like work towards a BA degree.

FAMILY HISTORY: The inmate was born and raised in New York. He was raised by his parents until they separated when he was approximately 13 years of age. From the age of 13 on, he was raised by his mother. He is the fourth of five children. The inmate lived in two residences most of his life. There were never any out of home placements. The inmate's father was an operations engineer and his mother was a waitress. He had a distant relationship with his father because his father worked a lot and they were not close. They are still not close. He was a lot closer with his mother and that relationship continued through adulthood. There is a family history of diabetes. His parents abused alcohol at times. There were no mental health problems in the family. Other family members have an arrest history. There was spousal abuse when the inmate was growing up. There was marginal physical and emotional abuse and there was sexual abuse outside the home.
The inmate states his family is currently supportive and he has letters of support from them. He states he is now having contact with his older sister.

PSYCHOSEXUAL DEVELOPMENT / SEXUAL ORIENTATION: The inmate states that his first sexual encounter with a same age female about the age of 14. He has had three sex partners and one serious relationship. He describes his sexual orientation as heterosexual in nature. He denies any crimes against women, children or any sex related crimes. The inmate has engaged in high risk behavior with at least two prostitutes. There are known exposure to HIV.

MARITAL / RELATIONSHIP HISTORY: The inmate has never been married and never had a live-in relationship. He has no children.

ADULT PEER RELATIONSHIPS / GANG AFFILIATIONS: The inmate states that right around the time of the crime, he was a military base and hanging out with a peer group. There was some drinking and infrequent use of marijuana. Two of the peers had a criminal record. There were no gang relationships. The inmate states his current relationship in prison are positive, people that are involved in church, baseball and programming. He is active in his religion, AA, NA and self-help.

LEISURE / RECREATION: The inmate states he usually gets up around 5:00 AM and works from 7:00 to 1:15. Currently, he is running about two miles a day. He does

homework, likes to poetry in the evening, takes a nap, goes to dinner and then usually in the evening, and spends time at school, in AA or NA, baseball, church or some kind of groups.

MILITARY HISTORY:  The inmate was in the military for approximately four years. He received a less than honorable discharge due to this offense.

EMPLOYMENT / INCOME HISTORY:  The inmate states worked as a waiter for about a year and a half.  His longest job was in the Navy for four years.  He denies receiving public assistance or Social Security Disability.

The inmate is currently working as a clerk.  In the past, he has worked as a TA, prison industries and yard crew.  He was a lead electrician from 1997 to 2006.  He has a vocation in electronics.

PLANS IF GRANTED RELEASE:  The inmate is developing three sets of parole plans, one for San Diego, one for San Francisco and one for New York where his family resides.  The inmate is developing job offers and making community contacts.  He has the name of community groups for support in each area and programs.

## IV. CLINICAL ASSESSMENT

MENTAL HEALTH HISTORY:  The inmate states that he was in the mental health system briefly for stress during 1985 but has not been in since then.  He denies any psychiatric hospitalizations.  He denies every being on psychotropic medications in recent years.

MEDICAL HISTORY:  The inmate denies any allergies, asthma, cardiac, respiratory, vision, hearing, or orthopedic problems.  The inmate has prior surgeries on his right leg.  The inmate states that he was strangling his sister and she stabbed him in the leg with a knife.  He has no head injuries.  He denies any seizures, thyroid, diabetes or venereal diseases.  He denies any disabilities.  He sees his current health as extremely good.

SUBSTANCE ABUSE HISTORY:  The inmate began drinking about the age of 14.  He has had approximately two legal difficulties with drinking.  The inmate smoked marijuana and that has caused him some problems.  Alcohol was involved in controlling case.  He has never been involved in a treatment program in the community. He has been continuously involved in treatment while incarcerated since 1989, according to his account.

CURRENT MENTAL STATUS / TREATMENT NEEDS / PERSONALITY DISORDERS: as oriented by person, place and time.  He was alert and cooperative.  His simple registration and short term memory were intact.  His simple abstract thinking was intact along with mathematical ability.  His complex problem solving was a little weak.  He did not quite understand proverbs.

At the current time, he denies any problems with depression, anxiety, mood swings or mood disorder.  He denies any auditory or visual hallucinations.  He denies any

delusional or paranoid thinking. He denies any eating or sleeping problems. He denies any mental health problems as a child. He denies any suicidal or homicidal thinking.

IMPULSIVITY / BEHAVIORAL CONTROL: The inmate's crime reflects impulsivity. However, since the inmate has been incarcerated, he has only had one CDC 115 disciplinary, which was in 1988. He has had none for violence or addictive behavior. He has had six 128's and the last one was in 1996. The inmate's impulsivity has significantly remitted.

DIAGNOSTIC IMPRESSION:

| Axis I: | 304.8 | Polysubstance Dependent, in remission since 1984 and in treatment since 1989. |
|---------|-------|-------------------------------------------------------------|
| Axis II: | V71 | Adult Antisocial Behavior, remission and through self-help. |
| Axis III: | | Deferred. |
| Axis IV: | | Incarceration for life term. |
| Axis V: | | GAF: 80. |

The inmate meets the diagnostic criteria for Polysubstance Abuse because of his use of alcohol and drugs prior to his arrest. In addition, alcohol was involved in his controlling case. The inmate has been clean and sober throughout his incarceration, thus the remission. He also has been active in treatment. The inmate had a minor arrest as a juvenile for public intoxication and an adult arrest for possession for alcohol and the instant offense, thus V-code Antisocial Behavior. The inmate has had no violent related CDC 115's or serious CDC 115's since incarcerations, thus he is currently in remission and has been receiving treatment through self-help programs.

## V. CRIMINAL HISTORY / REVIEW OF LIFE CRIME

JUVENILE AND ADULT RECORD / PRIOR PRISON COMMITMENTS: Juvenile Arrest History: In 1981, public drunkenness and released on his own cognizance.

Adult Arrest History: 1982, possession of alcohol and the instant offense.

When asking the inmate why he was getting into trouble as a young man, he states that he had learned to be a good liar. There was a lack of parental control.

PRIOR PERFORMANCE ON SUPERVISED RELEASE: The inmate was never on parole or probation prior. We have no records in this area. The inmate's performance while incarcerated has been exemplary.

LIFE CRIME: The inmate was convicted of PC §187 Murder in the First Degree.

Summary of the Crime: On July 14, 1984, police responded to a shooting that occurred in a motorhome park on Fiesta Island. The motorhome belonged to William Mohrman. According to a witness, one shot was fired within the motorhome. A white man with

blood on his hands, later identified as the inmate, exited the motorhome, stating: "I shot him," yelling for someone to call the cops because he had killed a man. It was noted that the witness's accounting was different from official reports and the victim's statement.

Earlier that day, the inmate and a friend picked up a quarter keg of beer and drove to Fiesta Island for the "Over the Line" tournament. They began to socialize with Mohrman and various other people at his motorhome. The Mohrman took out his gun and he showed it to some friends. He returned a short time later and unloaded the gun and left it on the sofa in the motorhome. The shells were placed next to the gun. The inmate's friend put the gun and shells in a rear cabinet. Then Mohrman and the inmate left to get some ice for the beer. During the time they were gone, Gortarez joined Davilla and others outside. Gortarez was in and out of the motorhome on several occasions, drinking a beer and asking for cigarettes. Upon his return which the ice, the Mohrman gave Gortarez another beer and cigarettes and then told him to leave. Gortarez complied but returned a short time later asking for more.
The inmate became agitated with Gortarez's obnoxiousness and unwillingness to leave. The inmate retrieved the gun from the rear of the motorhome and placed it to the victim's head, while he was seated on the step outside the motorhome. The inmate stated: "We told you to get the hell out of here. I'm not going to fuck with you." The victim told him to take it easy. The inmate fired the gun in an upward angle below the victim's ear, resulting in the victim's death. The inmate then moved the body to the back of the motorhome and told someone to call the cops because he killed a man.

Inmate's Version: The inmate's version remains as previously reported, except he elaborated somewhat. The Probation Officer's Report indicates that the inmate arrived at Fiesta Island with a friend, Davilla. They began to socialize and drink beer with the co-worker Mohrman and others at Mohrman's motorhome. During the time the inmate and Mohrman were going to get beer, Gortarez arrived and was in the motorhome with other visitors. When the inmate returned, Davilla introduced him to those present, including Gortarez. Mohrman did not want Gortarez around and looked to the inmate to make Gortarez leave the premises. The inmate initially said Gortarez was very drunk and abusive and even tried to become involved in a disagreement with some other people. Eventually, Gortarez left but returned when the inmate was alone. The inmate expressed fear that Gortarez had returned to get him.
He now admits nothing occurred to warrant the fear. The inmate allegedly felt that was "in him mind" that there was reason to fear Gortarez. He states that Gortarez's mere presence enraged him. He is still unable to say why this is so. Subsequently, he got Mohrman's gun, not knowing whether or not it was loaded and confronted Gortarez with it. He felt strong and in control. After he cocked it, the inmate placed the gun to Gortarez's head and pulled the trigger. The inmate insists it was not his intent to kill him. Due to the excessive amount of beer consumed before the incident, the inmate describes himself as being out of control and feeling intimidated by the victim. After the shooting, the inmate summoned assistance from Mohrman and told him to call the police. He then confessed to authorities what he had done. To date, the inmate still expresses remorse for taking a human life and is still trying to cope with the guilt.

Aggravating Factors: Gortarez was particularly vulnerable. The inmate had the opportunity to cease but continued. The murder was senseless and served no purpose. The inmate was under the influence of alcohol. The inmate was the sole participant in the crime and acted without provocation.

Mitigating Factors: The inmate has no prior felony convictions.

In the current interview, when asking the inmate why this crime occurred, he said at the time, he was a weak person. He thought violence was the answer and having a gun in his hand gave him some power. He said there was no prejudice or ethnicity involved in it. He said the crime was done primarily out of fear and anger. At the time, he was self-medicating himself. The inmate states that he thinks that one of the witnesses said that he made some ethnic remark regarding the victim. The inmate states that if he did, he does not remember it because of the amount of alcohol that he had and that if he did make this statement, there was no excuse for it. He said it was not a hate crime, it was a crime of passion done out of his fear. The inmate states there were a lot of ideas running through his mind at the time, something he later identified as a hallucination. The idea that kept running through his mind was that "you are a sissy and you're not going to do anything." His friend was expecting him to do something. He acted out of anger and fear and was blaming the victim because of his anger and fear.

When asking the inmate his feelings about the crime, the inmate states he wished that it had never happened. He wished he could take it back. The inmate is sorry that he committed this crime and expresses remorse. He is trying to make restitution by changing his life and writing poetry and making a contribution to society that way. He is trying to be the best person he can. He prays for the survivors.

When asking the inmate what has changed about him so that something like this will not happen again, he says he had grown up. He has learned that violence is not the response. He has learned from his mistakes. He has learned to communicate with people and be more accepting and forgiving. He has a strong belief system now. He became a born-again Christian in 1995. He knows that he is going to be held accountable for what he has done.

## VI. INSTITUTIONAL HISTORY / PROGRAMMING

The inmate was received into California Department of Corrections and Rehabilitations on April 21, 1985. The inmate's current points are 19. The inmate has had one CDC 115 in 1988. He has six CDC 128's counseling Chronos and the last one was in 1996. The inmate has accomplished educational upgrades. He completed a Graduate Equivalency Diploma and graduated from a two-year college. He is currently taking college courses and this semester is taking Statistics. The inmate has a vocation in electronics. He has worked in the PIA industries for nine years. He has been in Maintenance Operations for four years. He plans to work in the electronics field on release. His current work assignment is as a clerk. The inmate has been involved in

AA for approximately 17 years. He has started doing self-help right around the same time in 1989. He is currently active in the Impact Program and the Trust Program. He is active in his religion and has been for the last ten years. The inmate also sought out one-to-one treatment and group treatment in the past. He has been active as equipment management for the baseball team since 1997. The inmate will continue to be in self-help, his religion, AA and NA upon release.

## VII.  ASSESSMENT OF RISK FOR VIOLENCE

*The current research literature indicates that an empirically based approach to is the most reliable and valid method for assessing risk of future violence. In the present evaluation, two separate assessment guides were used to help estimate this individual's risk for future violence in the community: the Psychopathy Check List – Revised (PCL-R) and the History – Clinical – Risk – 20 (HCR-20). The data for scoring these instruments were obtained from information derived in both the inmate interview and the files reviewed. These measures are widely used and are supported by years of research in the risk assessment field. They have been cross-validated with various forensic populations, including United States males in correctional settings; however, the following results need to be regarded with some level of caution since some individuals may possess idiographic differences that could limit the applicability of these instruments. The evaluator has taken these factors into consideration in determining how much weight to allot each of the measures and in formulating an overall estimate of risk for future violence in the community. Estimates of risk for violence will be presented categorically: low, moderate, or high.*

PCL-R:  The PCL-R was used to rate the inmate's records and current interview on his level of psychopathy. The inmate scored in the low range in his level psychopathy. This rating is based on criminal traits rather than psychopathic personality traits.

HCR-20:  The HCR-20 was used to rate the inmate's records and current interview on his level of dangerousness.

Historical:  According to the probation report and prior records his minor criminal history would be a mitigating factor. In rating this individual on the historical factors, he would rate in the low range of his likelihood to commit future violent acts when compared to other similar inmates. This rating is based on the fact he has no prior violence, he was steadily employed in the Navy at the time. The only elevating factors are his age at the time, being involved in unstable relationships, and substance abuse.

Clinical/Insight:  The inmate accepts responsibility for the crime. His remorse is obvious. The inmate does have insight into the factors that contributed to the crime. In rating this individual on the clinical, he would rate in the low range for future violence. This rating is based on his level of insight, his positive response to treatment, not having a negative attitude, no active mental health symptoms and not being impulsive.

Environmental Risk Management: The inmate's parole plans seem feasible. He has handled stress, destabilizers and compliance well in the institutional setting. The inmate would rate in the low range on this factor also.

In summary, the inmate's overall rating is in the low range for his propensity to commit violence in the future when compared to similar inmates.

OVERALL RISK ASSESSMENT: The inmate scored in the low range in his level of psychopathy. The inmate's overall propensity for future violence is in the low range on all factors, that is historical, clinical and risk management when compared to similar inmates.

## VIII. CONCLUSION / RECOMMENDATIONS

It is recommended the inmate continue to program positively.

*Dr. A Starrett*

|  | 2-23-07 |
|---|---|
| Richard Starrett, Ph.D.,Ph.D., CA License # PSY-13628 | Date Submitted |

Forensic Psychologist /
Board of Parole Hearings
California Department of Corrections and Rehabilitation

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use, or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA). If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

EXHIBIT "C"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
DECEMBER 2006 CALENDAR

NEBLETT, JOHN                                                              D04841

## I.    COMMITMENT FACTORS:

### A.    Life Crime:

Neblett was convicted of Murder 2nd, PC187, with use of a firearm.  Case number
CR69761 from San Diego County.  He was sentenced to 15 year to life.  His
Minimum Earliest Release Date (MEPD) is 1/2/94. The victim was Robert Anthony
Gortarez, age 22.

### 1.    Offense Summary:

On 7/14/84 at 1635 hours police responded to a shooting that had occurred in
a motor home parked on Fiesta Island.  The motor home belonged to William
Mohrman.  According to witnesses, one shot was fired within the motor home.
A white man with blood on his hand, later identified as John Neblett exited he
motor home stating "I shot him," yelled for somebody to call the cops because
he had killed a man. It is noted that witnesses accounting differs from official
report and Neblett's statement.  Earlier that day, Neblett and a friend picked
up a quarter-keg of beer and drove to Fiesta Island for the "over the line"
tournament.  They began to socialize with Mohrman, and various other people
at Mohrman's motor home.  Mohrman took out his gun and showed it to some
friends.  He returned a short time later, unloaded the gun and left it on the sofa
in the motor home.  The shells were placed next to the gun.  Neblett's friend
DaVilla, put the gun and shells in a rear cabinet.  Mohrman and Neblett left to
get some ice for the beer.  During the time they were gone, Gortarez joined
DaVilla and the others outside.  Gortarez was in and out of the motor home on
several occasions, drinking beer and asking for cigarettes.  Upon his return
with the ice, Neblett gave Gortarez another beer and cigarette, and then told
him to leave.  Gortarez complied but returned a short time later asking for
more.     Neblett became agitated with Gortarez's obnoxiousness and
unwillingness to leave.  Neblett retrieved the gun from the rear of the motor
home and placed it to Gortarez's head while he was seated on the step outside
the motor home.  Neblett stated, "We told you to get the hell out of here.  I am
not fucking with you. "Gortarez told him to take it easy.  Neblett fired the gun
in an upward angle below Gortarez's ear resulting in the victim's death.
Neblett then moved the body to the back of the motor home and told
somebody to call the cops because he had killed a man.    Source of
information: Probation Officers Report.

NEBLETT, JOHN            D-04841            CSP-SQ            SUB. DEC 2006

2. **Prisoner's Version:**

Remains primarily as previously reported, except that he elaborated, somewhat. The Probation Officers Report indicates Neblett arrived at Fiesta Island with his friend, Davilla. They began socializing and drinking beer with a co-worker, Mohrman and others at Mohrman's motor home. During the time Neblett and Mohrman were gone to get the beer, Gortarez arrived and was in the motor home with the other visitors. When Neblett returned DaVilla introduced him to those present including Gortarez. Mohrman did not want Gortarez around and looked to Neblett to make Gortarez leave the premises. Neblett initially said Gortarez was very drunk and abusive and even tried to involve them in his disagreement with some other people. Eventually Gortarez left but returned when Neblett was alone. Neblett expresses fear that Gortarez had returned to get him. He now admits nothing occurred to warrant the fear Neblett allegedly felt but that **"in his mind"** there was reason to fear Gortarez. He stated that Gortarez's mere presence enraged him. He is still unable to state why this is so. Subsequently he got Mohrman's gun, not knowing whether or not it was loaded, and confronted Gortarez with it. He felt strong and in control. After cocking it, Neblett placed the gun to Gortarez's head and pulled the trigger. Neblett insists it was not his intention to kill him. Due to the excessive amount of beer consumed before the incident, Neblett described himself as being out of control and feeling intimidated by Gortarez. After the shooting, Neblett summoned assistance from Mohrman and told him to call the Police. He then confessed to the authorities what he had done. To date Neblett still expresses remorse for taking a human life and still trying to cope with the guilt.

B. **Aggravating/Mitigating Circumstances:**

1. **Aggravating Circumstances:**

    A)  Gortarez was particularly vulnerable.
    B)  Neblett had the opportunity to cease but continued with the crime.
    C)  The murder was senseless and served no purpose.
    D)  Neblett was under the influence of alcohol during the commission of the crime
    E)  Neblett was sole participant in the crime and acted without provocation.

2. **Mitigating Circumstances:**

    A)  Neblett has no prior felony convictions.

## II.   PRECONVICTION FACTORS:

NEBLETT, JOHN          D-04841          CSP-SQ          SUB. DEC 2006

A.   Juvenile Record:

   1)   1981, Memphis TN-Public Drunkenness, released on own recognizance and
        small fine.

B.   Adult Convictions and Arrests:

   1)   1982, San Diego CA- Possession of Alcohol on a beach, $40.00 fines
   2)   Instant Offense. Source of information: Probation Report dated 1/9/85 and
        DOJ and FBI Rap sheets.

C.   Personal Factors:

   Remain primarily as previously reported. Neblett was born and raised in New York.
   He was the second youngest of five children consisting of two older stepsisters, one
   older brother and one younger sister. His parents Christine and Robert Neblett were
   hard workers. His mother was a waitress and his father was a handyman. Neblett
   remembers both as parents showing signs of alcohol abuse. They fought regularly
   and showed minimal affection towards each other and towards the kids. However
   both parents have been free from alcohol dependence for several years. Their
   financial situation was stressed but comfortable. Neblett began working odd jobs at
   an early age for spending money and to assist the family. When his parents divorced
   (He was about 14 years of age), his grades began to suffer. Conflict between him and
   his younger siblings increased and he began using marijuana with his friends. He
   eventually dropped out of school and joined the U.S. Navy in 1981. Neblett's
   marijuana use was then substituted by alcohol consumption that progressively
   intensified until the time of the commitment offense. According to his military
   evaluation, Neblett's performance was good and he excelled in technical school
   training and was twice recommended for an early advancement to E-4 Sergeant.
   Because of the commitment offense, he was given less than honorable discharge from
   the Navy. Neblett described his relationship with his parents as "very new." When
   he was first incarcerated, his parents were in shock regarding the murder. Neblett by
   his own actions distanced himself from his parents for a significant time by rarely
   corresponding with them. He described this period as a very emotional and traumatic
   time when he was trying to come to terms with the guilt of taking another person's
   life and the   consequences of it. Throughout, however, Neblett's parents have
   remained supportive. This coupled with therapy programs has aided him in putting
   things into perspective. The relationship he shares with his two stepsisters is good.
   However there is no contact with his brother and younger sister. This is a mutually
   accepted situation, reflective of the past offense, as well as, the fact that these siblings
   are undergoing serious problems of their own. The brother is in jail and the sister is
   abusing drugs.

NEBLETT, JOHN              D-04841         CSP-SQ        SUB. DEC 2006

III.    POSTCONVICTION FACTORS:

        Special Accommodations/Disability:

        Neblett stated that no accommodations were necessary for the purpose of effective communication was required per the Armstrong Remedial Plan.

A.    Custody History:

        Neblett was received in CDC on 4/17/85 at the California Institute for Men (CIM) Reception Center. Subsequent placements have been California Medical Center (CMF), and R.J. Donovan State Prison (RJDSP). Neblett was transferred to San Quentin State Prison (S.Q.) on 6/1/93. All transfers were non-adverse. Neblett has made acceptable adjustment to each move. Neblett was transferred to CTF on 5/21/85 from CIM and custody was set at Close B, due to his length of term. On 6/16/86 Neblett appeared before the Board of Prison Terms (BPT) for his Annual/Close B custody review. Removal of his Close B status was denied at that time due to his short time in custody. 4/18/88, he appeared before the BPT. The Board recommended that he attend Alcohol Anonymous/Narcotics Anonymous substance abuse groups. On 5/9/88 his Custody Level was reduced to Med. A. On 7/25/90, Neblett was transferred to R.J. Donovan State Prison, Facility III. On 4/23/91 after a review of his case factors he was transferred to Facility I. He appeared before the BPT on 4/21/91 and the Board recommended that he have some psych treatment. On 6/1/93, Neblett was transferred to San Quentin where he continued to work in Voc. Electric. He had been working in electronics while he was at RJD-SP. All his work reports have been rated as above average to exceptional. Neblett appeared before the BPT on 8/15/95 for his Subsequent Hearing and the Board denied him parole 2 years. Also on 7/15/97, he went before the board and parole was denied 3 years with recommendation to remain disciplinary free, participate in self-help groups, and upgrade vocationally and academically. On 9/26/97, Neblett was seen before the Unit III UCC for a Program Review requesting a job change from Voc. Electric to PIA as a Maintenance Electrician. On 4/19/00, Neblett appeared before the UCC for his annual review, UCC acted to continue his present program. On 3/8/01, Neblett appeared before the UCC for a Post Board Review after his 3/1/01 hearing. Parole was denied two years. The BPT recommended he participate in self-help group therapy programs and continue to remain disciplinary free. On 5/11/01 and 5/9/02, Neblett appeared for his annual review and the UCC acted to continue his present program. On 4/3/03 Neblett appeared for his post board review, parole was denied one year with recommendation of an updated Psychiatric Evaluation Report. On 5/8/03, Neblett appeared before the UCC for his annual review and UCC acted to continue his current program. On 5/6/04, Neblett was taken to UCC in absentia for his annual review, the UCC acted to continue his current program. On 8/27/04, appeared before the BPT for his Subsequent Hearing. The Board ordered the hearing postponed for one year due to the need for parole plans and letters of confirmation. On 5/5/05, he was taken before the UCC in absentia for his annual review. The UCC acted to

NEBLETT, JOHN      D-04841      CSP-SQ      SUB. DEC 2006

continue his current program. On 11/22/05, Neblett appeared before UCC for his Post Board following his 10/6/05 BPH Hearing. BPH found an Agreed Unsuitable finding for one year, due to him needing to produce parole plans. On 2/1/06, Neblett appeared before UCC for a Program Review. UCC acted to unassign him from PIA and reassign him to the support services waiting list. Neblett is currently assigned as the Plant Operations Clerk.

Therapy & self-help Activities:

CHRONOS:

Alcoholics Anonymous: 6/30/05, 3/29/04, 12/29/03, 10/1/03, 1/9/03, 7/3/02, 4/5/02, 1/7/02, 10/7/99, 10/5/98, 4/15/98, 10/9/97, 7/8/97, 4/8/97, 12/30/96, 10/11/96, 5/9/96, 1/23/96, 11/   7/95,   4/18/94, 1/7/94, 6/2/95, 5/21/95, 12/1/94, 11/3/94, 7/15/94, 11/30/93, 11/17/93, 3/1/93, 11/30/92, 8/28/92, 5/27/92, 1/6/92, 5/8/91, 7/20/90, 4/19/90, 2/5/90, and 8/2/89.
Narcotics Anonymous: 4/18/98.
Gavel Club: 3/12/98, 4/3/97.
Alternative to Violence Project: 4/8/98, 5/3/91.
Advance Alternative to Violence Project: 8/22/97.
Recovery Substance Abuse Program: 12/6/92.
Laudatory: 3/23/06, 12/26/02, 8/22/02, 9/4/97, 10/9/92.
Walk-A Thon: 5/6/96.
Restorative Justice Seminar: 1/29/05.
Impact: 2/6/06, 6/19/06, 58/22/06, 4/17/06, 3/27/06, 5/23/05, 6/27/05, 9/26/05, 8/1/05.
T.R.U.S.T.: 4/24/06, 12/24/05, 1/1/98.

ACADEMICS:

College Program: 6/27/06 ENG-243, 3/23/06 ENG-102, 5/18/05 Bbl-002, 9/28/99 Bus 207, 5/25/99 His 225, 4/23/98 Math 30, 1/26/98 Eng 98, 12/19/97 Math 15, Fall 1987 Math 51 and Anthro 3.

Neblett received his Associates Degree in General Education from Harthell College in 6/1988 while incarcerated at CTF.

CERTIFICATES:

|  |  |
|---|---|
| 7/10/06 | Module I- What is a Man |
| 10/3/05 | Module IV- Relationships |
| No Date | T.R.U.S.T |
| No Date | T.R.U.S.T |

NEBLETT, JOHN          D-04841          CSP-SQ          SUB. DEC 2006

| | |
|---|---|
| 9/25/97 | Academic Theoretical Components |
| 9/19/97 | Job Preparation |
| 9/11/97 | Business Management |
| 9/8/97 | Communication Training |
| 6/1/97 | New Beginning Christian Course |
| 5/19/96 | S.Q.U.I.R.E.S. |
| 9/26/94 | Commercial Wiring |
| 6/30/94 | Electricity III |
| 4/11/94 | Twenty Week Study of the National Electrical Code |
| 1/7/94 | Residential Wiring |
| 10/6/93 | Residential Hands on Testing & Analysis |
| 9/23/93 | Electricity II, Devices, Circuits and Materials |

## B.    Disciplinary History:

### CDC 115's:

| | | |
|---|---|---|
| 8/13/88 | Delaying mandatory lock-up | Administrative |

### CDC 128A's:

| | |
|---|---|
| 9/29/96 | Smoking |
| 4/7/92 | Absent from work area |
| 7/26/89 | Failure to report |
| 6/8/88 | Delaying mandatory lock-up |
| 4/20/86 | Failure to perform work assignment |
| 11/1/85 | Delaying lock-up |

## IV.    FUTURE PLANS:

### A.    Residence:

If granted parole at this time Neblett has submitted the following parole plans for San Francisco County, San Diego County, and New York:

1.) St. Anthony Foundation, San Diego County Division
P.O. Box 826880
Sacramento, Ca 94280
Contact: Merri Litka
Work Force Services Branch
Job Services Division

2.) The Way Back
2516 'A' Street
San Diego, Ca 92102

NEBLETT, JOHN            D-04841            CSP-SQ            SUB. DEC 2006

(619) 235-0592

3.) San Diego Rescue Mission
P.O. Box 80427    ——— *120 Elm St.*
San Diego, Ca. 92138
(619) 687-3720

4.) Delancy Street
600 Embarcadero
San Francisco, Ca, 94107 .
Contact: Mike Quaid
        Intake Coordinator
        (415) 957-9800 ext. 723

5.) Waldon House Adult Residential Facility
815 Bulma Vista Ave West
San Francisco, Ca, 94117
Contact: Lee Boone
        Re-entry Coordinator
        (415) 554-1450

6.) If allowed to parole out of state he would like to parole to New York due to all of
his immediate family living there.

## B.    Employment:

Neblett's employment plans basically remain the same as stated in his last report. He
plans to seek employment as an Industrial Machinery Repairman utilizing the
knowledge he has received while being incarcerated and the skills acquired in the
Navy and continue his education towards a B.A. degree in electrical engineering. He
also expresses an interest in working towards a F.C.C. Class II license. Neblett will
be utilizing the State Employement Development Division (SEDD) and the
International Brotherhood of Electrical Worker Union (IBEW) in San Diego to gain
emplacement.

## V.    SUMMARY:

A.    On 10/6/05, Neblett received an Agreed Unsuitable ruling from BPH, recommending
that he stay disciplinary free, get self-help/ group therapy, and learn a trade. Neblett
has maintained a positive program since his last Board appearance.    He has
participated in self-help groups such as Impact and T.R.U.S.T, and has continued to
upgrade academically. Neblett has remained disciplinary free since 1988.

NEBLETT, JOHN          D-04841          CSP-SQ          SUB. DEC 2006

**B.**     Prior to release Neblett would benefit from:

      1) Continuing positive programming.

      2) Take advantage of the various self-help therapy programs.

      3) Continuing to upgrade academically.

**C.**     This Board Report is based upon a three-hour review of his Central File and a forty-five minute interview with Neblett. He was afforded the opportunity to review his Central File on 9/14/06 and declined.

**D.**     No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication.

NEBLETT, JOHN               D-04841               CSP-SQ               SUB. DEC 2006

PAGE 8 OF 9

B. EBERT
Correctional Counselor I

K. Hilliard
Correctional Counselor II (a)

C. Belshaw
Correctional Counselor III, C&PR

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 10/1/05 TO PRESENT | | | Placement: San Quentin II, general placement.<br><br>Custody/Classification: Medium A, classification score 19. On11/22/05, Neblett appeared before UCC for his Post Board Review following his 10/6/05 BPH Hearing. BPH came to an Agreed Unsuitable finding for one year due to him needing to produce parole plans. On 2/1/06, Neblett appeared before UCC for a Program Review. UCC acted to remove him from PIA at his work supervisor's request and place him on the support services waiting list.<br><br>Academics: 6/27/06 ENG- 243, 3/23/06 ENG-102.<br><br>Work Record: He is currently assigned as the Plant Operation Clerk, with no work supervisor reports noted.<br><br>Group Activities: He has received chronos for his participation in the following: Alcoholics Anonymous dated 4/5/06. Impact dated 8/1/05, 9/26/05, 2/6/06, 3/27/06, 4/17/06, 5/22/06, 6/19/06. T.R.U.S.T. dated 12/24/05 and 4/24/06. He has received certificates for his completion of the following: Module IV- Relationships dated 10/3/05. Module I- What is a Man dated 7/10/06. T.R.U.S.T. Not dated.<br><br>Psychiatric Treatment: None.<br><br>Prisoner Behavior: Exceptional, he has remained disciplinary free this period.<br><br>Other: He received a Laudatory chrono dated 3/23/06. |
| N/A TO | | | Placement:<br><br>Custody/Classification:<br><br>Academics:<br><br>Work Record:<br><br>Group Activities:<br><br>Psychiatric Treatment:<br><br>Prisoner Behavior:<br><br>Other: |

| CORRECTIONAL COUNSELOR SIGNATURE | | | | DATE 9/21/06 | |
|---|---|---|---|---|---|
| NAME | | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
| NEBLETT, JOHN | | D-04841 | CSP-SQ | SUB. DEC. 2006 | |

BPT 1004 (REV.7/86)

PAGE 1  OF 2

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNI

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

ORDER:

☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATI |
|------|-----------|-------------|----------|--------------|
| NEBLETT, JOHN | D-04841 | CSP-SQ | SUB. DEC. 2006 | |

EXHIBIT "D"

2

3

FILED

JAN 1 2 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
By _____ Deputy

4

5

6

7

8                    SUPERIOR COURT OF CALIFORNIA

9                        COUNTY OF SANTA CLARA

10

11    _____
                                          )
12    In re                               )    No.: 71194
                                          )
13          DONNELL E. JAMEISON,          )
                                          )    POST FINDINGS AND ORDER
14    On Habeas Corpus                    )    FURTHER DISCOVERY ORDER
      _____)

15

16    Factual Findings

17         Based upon the evidence presented at the hearing, the Court

18    makes the following factual findings:

19         1) During the months of October through December of 2003 the

20    Board conducted 470 parole suitability hearings. For all of the 470

21    inmates considered, the Board determined at those hearings or in

22    prior hearings that the commitment offense was 'exceptional' under

23    §2402(c)(1).[1]

24         2) The number of cases examined (470) is a statistically

25    significant sample from which conclusions can be extrapolated for the

26    entire year and for several years before and after.

27

28    [1] In over 90% of cases the inmates were denied parole at that hearing and the
      'exceptional' nature of the commitment offense was a basis for that decision. In
      the remaining 10% of cases, inmates had been denied parole at a previous hearing in
      which the commitment offense was also found to be 'exceptional.'

                                          1

1        3)   The number of cases examined (470) is statistically

2   sufficient to make conclusions about a population of 20,000, and thus

3   the actual population of all inmates serving life sentences and

4   currently subject to the Board's interpretation of § 2402(c)(1).[2]

5   Discussion

6        The applicable law is articulated in the following passage from

7   Dannenberg, explaining its holding in Rosenkrantz:

8            [In Rosenkrantz] we cautioned, sole reliance on the
            commitment offense might, in particular cases, violate
9           section 3041, subdivision (a)'s provision that a parole
            date "shall normally be set" under "uniform term"
10          principles, and might thus also contravene the inmate's
            constitutionally protected expectation of parole.  We
11          explained that such a violation could occur, "for
            example[,]  where  no  circumstances  of  the  offense
12          reasonably  could  be  considered  more  aggravated  or
            violent  than  the  minimum  necessary  to  sustain  a
13          conviction for that offense."  (In re Rosenkrantz (2002)
            29 Cal.4th 616, 683.)   Quoting In re Ramirez (2001) 94
14          Cal.App.4th 549, 570, we suggested that, in order to
            prevent the parole authority's case-by-case suitability
15          determinations  from  swallowing  the  rule  that  parole
            should  "normally"  be  granted,  an  offense  must  be
16          "particularly  egregious"  to  justify  the  denial  of
            parole. (Rosenkrantz, supra, at p. 683.)
17              (In re Dannenberg (2005) 34 Cal.4th 1061, 1094-
            1095.   See also In re Weider (2006) C.D.O.S. 11137,
18          D.A.R. 15795, LEXIS 1916, quoting this language.)

19       Thus, the general rule is that a parole date should normally be

20   set.  Using the crime itself as grounds for a parole denial is

21   permissible but should not "swallow" that rule.  While there does not

22   need to be intra case comparison for the purposes of assuring

23   proportionality, or uniformity, of the sentence, the requirement that

24   "an offense must be 'particularly egregious' to justify the denial of

25   parole" necessarily envisions some sort of comparison.   It is for

26

27   [2] Professor Kafai testified that a "sample size of 470 would [] still be a reliable
     sample" for "a population of 20,000."  (TX at p. 51.)   According to the Board's
     official website (www.corr.ca.gov) there are 20,916 inmates serving life sentences
28   as of the June 30, 2006, "Prison Census."  Since not all of those inmates are
     currently eligible for parole hearings it can safely be said that there are less
     than 20,000 inmates who could possibly come before the Board for parole hearings as
     are at issue here

2

1  this reason that it was essential to the *Dannenberg* holding that "the
2  regulations do set detailed standards and criteria for determining
3  whether a murderer with an indeterminate life sentence is suitable
4  for parole." (*Dannenberg* at p. 1080.  See also page 1096, footnote
5  16: "the Board must apply detailed standards when evaluating whether
6  an individual inmate is unsuitable for parole on public safety
7  grounds.")

8      Admittedly, the Board's decision making processes, guided by the
9  "detailed standards and criteria" need not be so regimented that
10 different panels may not see *some* cases differently. However, if the
11 § 2402(c)(1) factor truly constitutes an exception to the rule, then
12 there must be a substantial number of cases to which the exception
13 does not apply. The fact that 100% of cases are deemed to be
14 'exceptionally egregious' in the findings of the Board reveals not
15 only a mere violation of the rule that a parole date shall normally
16 be set, but also that the "detailed standards and criteria" are being
17 applied in such a way that they have no meaning whatsoever.

18     In formulating a proper remedy in this case, it must be noted
19 that the sample/point estimate from 2003 may not be not valid for
20 drawing conclusions about the behavior of the Board today.  With a
21 different Governor, and different commissioners, there may have been
22 some effort to apply the § 2402(c)(1) criteria in a meaningful (as
23 opposed to blanket) manner.  It therefore appears that a more recent
4  sampling is necessary to definitively and conclusively resolve the
5  issue before the court.  Absent this determination, there is no way
6  to guarantee that an order requiring the Board to conduct a new
7  hearing will ensure due process or provide any real solution at all.

       The significance of the question before the Court cannot be

1  overstated.  If Petitioner proves, as it so far appears, that the
2  Board has uniformly applied § 2402(c)(1) to deny parole in every
3  case, Petitioner will have also proved the invalidity of the Board's
4  supposedly "detailed standards" and the existence of a bias which
5  permeates the Board's processes.

6     Because of the far reaching implication of these findings and
7  conclusions, the Board shall have every opportunity to demonstrate
8  good faith efforts to operate within the "detailed standards"
9  mandated by the California Supreme Court.[3]  Respondent shall
10 therefore provide discovery, in the same manner as already provided,
11 for the month of June 2006.

12 Separation of Powers

13    Counsel for Petitioner has indicated that he will seek a court
14 order that Petitioner be released on parole if this Court invalidates
15 the Board's criteria and methods and decides to independently review
16 the matter guided by the controlling Penal Code sections instead of
17 the Title 15 guidelines.  Respondent has objected "it's a separation
18 of powers issue for a petitioner to ask the Court to grant him
19 parole."  Respondent has correctly identified the issue presented,
20 and the question should be fully briefed.

21    The separation of powers doctrine provides "that the legislative
22 power is the power to enact statutes, the executive power is the
23 power to execute or enforce statutes, and the judicial power is the
24 power to interpret statutes and to determine their
25 constitutionality."  (Lockyer v. City and County of San Francisco

26

[3] Along these lines, Respondent may want to have the Commissioners themselves offer
27 an explanation for the evidence thus far gathered.  Because the Board performs a
"quasi-judicial function" in this regard, (Hornung v. Superior Court (2000) 81
28 Cal.App.4th 1095, 1099,) Petitioner may not inquire into the Board members mental
processes.  However that does not mean Respondent is precluded from offering such
direct evidence if they want to testify as to their good faith and conscientious
efforts.

4

1    (2004) 33 Cal.4th 1055, 1068.)  If the evidence proves that the Board

2    is not executing/enforcing the legislature's statutes as intended it

3    will be the court's duty to intervene.  The question to be answered

4    in that case is whether the Board is violating the separation of

5    powers doctrine by appropriating to itself absolute power over parole

6    matters and disregarding the limits and guidelines placed by the

7    statute.[4]

8        "Government Code section 11342.2 provides: 'Whenever by the

9    express or implied terms of any statute a state agency has authority

10   to adopt regulations to implement, interpret, make specific or

11   otherwise carry out the provisions of the statute, no regulation

12   adopted is valid or effective unless consistent and not in conflict

13   with the statute and reasonably necessary to effectuate the purpose

14   of the statute.'  Administrative regulations that alter or amend the

15   statute or enlarge or impair its scope are void and courts not only

16   may, but it is their obligation to strike down such regulations."

17   (Pulaski v. Occupational Safety & Health Stds. Bd. (1999) 75

18   Cal.App.4th 1315, 1341, citations omitted.)

19       The vice of overbroad and vague regulations such as are at issue

20   here is that they can be manipulated, or 'interpreted,' by executive

21   agencies as a source of unfettered discretion to apply the law

22   without regard to the intent expressed in the legislature's enabling

23   statutes.  In short, agencies may usurp unlimited authority from

24   vague regulations and become super-legislatures that are

_____

[4] "It is settled that Administrative regulations that violate acts of the
Legislature are void and no protestations that they are merely an exercise of
administrative discretion can sanctify them.  They must conform to the legislative
will if we are to preserve an orderly system of government.  Nor is the motivation
of the agency relevant: It is fundamental that an administrative agency may not
usurp the legislative function, no matter how altruistic its motives are."
(Agricultural Labor Relations Board v. Superior Court of Tulare County (1976) 16
Cal.3d 392, 419 quoting Morris v. Williams (1967) 67 Cal.2d 733, 737, and City of
San Joaquin v. State Bd. of Equalization (1970) 9 Cal.App.3d 365, 374.)

1 | unaccountable to the people. As it has sometimes been framed and
2 | addressed in the case law, a vague or all encompassing standard runs
3 | the risk of "violat[ing] the separation of powers doctrine by
4 | 'transforming every [executive decisionmaker] into a "mini-
5 | legislature" with the power to determine on an ad hoc basis what
6 | types of behavior [satisfy their jurisdiction].'" (*People v. Ellison*
7 | (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*
8 | *(Caswell)* 1988) 46 Cal.3d 381, 402.)

9 | "It is concern about 'encroachment and aggrandizement,' the
10 | [United States Supreme Court] reiterated, that has animated its
11 | separation of powers jurisprudence. 'Accordingly, we have not
12 | hesitated to strike down provisions of law that either accrete to a
13 | single Branch powers more appropriately diffused among separate
14 | Branches or that undermine the authority and independence of one or
15 | another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th
16 | 472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,
17 | 382.)

18 | This articulation of the principle seems to speak directly to
19 | the situation at hand.  The Board, by its enactment and
20 | interpretation of Title 15, § 2402, has appropriated to itself
21 | absolute and unreviewable power over parole decisions for inmates
22 | serving life terms. Extending far beyond the letter and spirit of
23 | the Penal Code provisions, Title 15, § 2402, gives the Board the
24 | power to declare every crime sufficient to deny parole forever.
25 | "[I]t is an elementary proposition that statutes control
26 | administrative interpretations." (*Ohio Casualty Ins. Co. v.*
27 | *Garamendi* (2006) 137 Cal.App.4th 64, 78.) Title 15 § 2402 as applied,
28 | however, has no controls or limitations.

6

1    The PC § 3041(b) exception to the rule that parole shall be
2    granted can only be invoked when the "gravity of the current
3    convicted offense or offenses, or the timing and gravity of current
4    or past convicted offense or offenses, is such that consideration of
5    the public safety requires a more lengthy period of incarceration for
6    this individual." The word "gravity" is a directive for comparison
7    just as "more lengthy" indicates a deviation from the norm. While
8    *Dannenberg* held there does not need to be intra case comparison for
9    the purposes of term uniformity or proportionality, there necessarily
10   has to be some sort of comparison for the purposes of adhering to the
11   legislative mandate that parole is available. The evidence so far
12   presented strongly supports a finding that the Board employs no
13   meaningful yardstick in measuring parole suitability. This would be
14   a violation of the separation of powers doctrine. (*People v. Wright*
15   (1982) 30 Cal.3d 705, 712-713. And see *Terhune v. Superior Court*
16   (1998) 65 Cal.App.4th 864, 872-873.)

17   Due Process Considerations

18   The same evidence shows a fundamental violation of due process.
19   Although the Board's Title 15 criteria are not on par with
20   legislative enactments, there is no reason a vagueness challenge,
21   such as has been presented in this case, should not be analyzed
22   identically. When distinguishing between murders for purposes of the
23   death penalty the United States Supreme Court has stated: "Our
24   precedents make clear that a State's capital sentencing scheme also
25   must genuinely narrow the class of persons eligible for the death
26   penalty. When the purpose of a statutory aggravating circumstance is
27   to enable the sentencer to distinguish those who deserve capital
28   punishment from those who do not, the circumstance must provide a

7

1 principled basis for doing so.   If the sentencer fairly could
2 conclude that an aggravating circumstance applies to every defendant
3 eligible for the death penalty, the circumstance is constitutionally
4 infirm."   (*Arave v. Creech* (1993) 507 U.S. 463, 474, citing *Maynard*
5 *v. Cartwright* (1988) 486 U.S. 356, 364: "invalidating aggravating
6 circumstance that 'an ordinary person could honestly believe'
7 described every murder," and, *Godfrey v. Georgia* (1980) 446 U.S. 420,
8 428-429: "A person of ordinary sensibility could fairly characterize
9 almost every murder as 'outrageously or wantonly vile, horrible and
10 inhuman.'")

11      The evidence here demonstrates the lack of any "principled
12 basis" for distinguishing between cases.   It has been shown that the
13 Board has applied the criteria in a way that results in finding that
14 "an aggravating circumstance applies to every defendant eligible" for
15 parole.   There is no demonstration of any effort by the Board to
16 narrow the group of inmates who may be denied parole because of their
17 parole eligible crime.

18      In the same vein, the United States Supreme Court has also
19 stated: "In evaluating a facial challenge to a state law, a federal
20 court must, of course, consider any limiting construction that a
21 state court or enforcement agency has proffered."   (*Kolender v.*
22 *Lawson* (1983) 461 U.S. 352, 355, quoting *Hoffman Estates v. Flipside,*
23 *Hoffman Estates, Inc.* (1982) 455 U.S. 489, 494, n. 5 (1982).)   No
24 'limiting construction' of the regulations has been offered to rebut
25 the conclusion that the Board employs § 2404 to in a way that
26 provides for limitless power and unrestricted authority.

27 Orders

28      The parties shall submit further briefs, on or before March 2,

8

1 · 2007, addressing the three points outlined above. ([1] Whether,

2 based on all the evidence, the Board has knowingly violated the

3 statutory directive that parole should be the rule and not the

4 exception, [2] Whether the Board standards and criteria are invalid

5 as violating the separation of powers doctrine, and, [3] Whether the

6 Board standards and criteria are void for vagueness and a due process

7 violation.)

8    Respondent is further ordered to provide discovery to Petitioner

9 of the transcripts of the parole denials of every life term inmate

10 who had a parole hearing in June of 2006. Respondent shall first

11 examine the list of hearings and results for June 2006, and for those

12 inmates who were denied parole shall provide a copy of that

13 transcript to Petitioner. For those inmates who were granted parole

14 Respondent shall provide a copy of the transcript of the prior

15 hearing at which parole was denied.

16    Respondent is to comply with the first part of this discovery

17 order (the inmates who were denied parole in June, 2006,) within 25

18 days. Respondent is to comply with the remainder of the discovery

19 order (the prior parole denials for those who were granted parole in

20 June, 2006,) within 15 days thereafter.

21

22

23 DATED:    January 11, 2007

LINDA R. CONDRON
JUDGE OF THE SUPERIOR COURT

24

25

26 cc:  Petitioner's Attorney (Jacob Burland)
        Attorney General (Jessica Blonien)

27

28

EXHIBIT    "E"

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

FILED Stephen M. Kelly, Clerk

FEB 2 8 2008

Court of Appeal Fourth District.

In re JOHN NEBLETT

on

Habeas Corpus.

D052001

(San Diego County
Super. Ct. No. CR69761)

THE COURT:

The petition for a writ of habeas corpus has been read and considered by Justices
Benke, McIntyre and Aaron.

John Neblett pleaded guilty to second degree murder in 1984 and the court
sentenced him to prison for 15 years to life. His minimum eligible parole date was
January 2, 1994. On May 2, 2007, the Board of Prison Terms (Board) conducted a
subsequent parole consideration hearing and found Neblett unsuitable, concluding he
posed an unreasonable risk of danger to society and a threat to public safety if he were
released from prison. The Board determined the murder was carried out in a cruel, cold
and callous manner because Neblett shot an unarmed man at very close range, showing a
total disregard for human life. The Board noted Neblett had a "minor" pattern of criminal
conduct related to alcohol consumption before the life crime. Neblett's last discipline in
prison was in 1988 for delaying mandatory lockup. The Board found Neblett did not
have realistic parole plans because he does not have viable residential plans in the last
county of legal residence and does not have acceptable employment plans. The Board
commended Neblett for positive programming and good work reports. It recommended
he participate in anger management, based on his behavior at the parole consideration
hearing.

Neblett contends there is no evidence to support the Board's determination he
poses a current threat to society. He asserts the Board denied him due process by relying
on immutable factors. Neblett also contends the denial of parole in 2007 is a violation of
his 1984 plea agreement.

The Board must grant parole unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (Pen. Code, § 3041, subd. (b).) The Board considers the circumstances tending to establish unsuitability (Cal. Code Regs., tit. 15, § 2402, subd. (c) and suitability (Cal. Code Regs., tit. 15, § 2402, subd. (d)) and exercises broad discretion in balancing the interests of the inmate and of the public. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655-657.) "[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Id.* at p. 658.)

The facts of the crime as recited by the Board are: On July 14, 1984, Neblett and a friend went to the Over the Line Tournament on Fiesta Island in San Diego, taking a quarter keg of beer. There they socialized in a motorhome owned by Neblett's coworker. The victim, Robert Gortarez, was unknown to Neblett and his friends. Gortarez asked for beer and cigarettes and was provided some and told to leave. He left but returned and sat on the motorhome's step. Neblett became angry with Gortarez, retrieved a gun from the motorhome and placed it against Gortarez's head. Gortarez told him to take it easy. Neblett fired the gun in an upward angle below Gortarez's ear, killing him.

The record shows the Board considered the specified factors for parole. Notably, the Board made a record of the anger and frustration Neblett demonstrated at the hearing supporting his unsuitability. The Board did not rely solely on the crime and the decision is supported by the evidence. Neblett did not have a contractual right to parole when he pleaded guilty in 1984. We do not address Neblett's challenge to the superior court order denying his petition in that court. (*In re Clark* (1993) 5 Cal.4th 750, 767, fn. 7.) Neblett's request for judicial notice of various California decisions is denied as unnecessary.

The petition is denied.

Benke

BENKE, Acting P. J.

Copies to: All parties

2

EXHIBIT    "F"



**F** (ENDORSED)
**I L E D**

AUG 3 0 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of Santa Clara Clerk
**BRET MORROW** Santa Clara
DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

1
2
3
4
5
6
7  In re                                  )    No.: 71614
                                          )
8      ARTHUR CRISCIONE,                  )
                                          )    ORDER
9  On Habeas Corpus                       )
                                          )
10 ─────────────────────────────────────)
11

12                        INTRODUCTION

13      Petitioner alleges that he has been denied due process of law

14  because the Board has used standards and criteria which are

15  unconstitutionally vague in order to find him unsuitable for parole.

16  Alternatively, he argues that those standards, even if

17  constitutionally sound, are nonetheless being applied in an arbitrary

18  and meaningless fashion by the Board.  He relies upon evidence that

19  in one hundred percent of 2690 randomly chosen cases, the Board found

20  the commitment offense to be "especially heinous, atrocious or

21  cruel", a factor tending to show unsuitability under Title 15

22  §2402(c)(1).

23            Are the Board Criteria Unconstitutionally Vague?

24      Our courts have long recognized that both state and federal due

25  process requirements dictate that the Board must apply detailed

26  standards when evaluating whether an individual inmate is unsuitable

27  for parole on public safety grounds.  (See *In re Dannenberg* (2005) 34

28

1

1   Cal.4th 1061 at p. 1096, footnote 16.). Those standards are found in

2   15 CCR §2402(c) (Dannenberg, supra, 34 Cal.4th at p. 1080,) and do

3   include detailed criteria to be applied by the Board when considering

4   the commitment offense:

5       (c) Circumstances Tending to Show Unsuitability. The following

        circumstances each tend to indicate unsuitability for release.

6       These circumstances are set forth as general guidelines; the

        importance attached to any circumstance or combination of

7       circumstances in a particular case is left to the judgment of

        the panel. Circumstances tending to indicate unsuitability

8       include:

9       (1) Commitment Offense. The prisoner committed the offense in an

        especially heinous, atrocious or cruel manner. The factors to be

10      considered include:

11          (A) Multiple victims were attacked, injured or killed in

          the same or separate incidents.

12

         (B) The offense was carried out in a dispassionate and

13          calculated manner, such as an execution-style murder.

14          (C) The victim was abused, defiled or mutilated during or

         after the offense.

15

         (D) The offense was carried out in a manner which

16          demonstrates an exceptionally callous disregard for human

         suffering.

17

         (E) The motive for the crime is inexplicable or very

18          trivial in relation to the offense.

19

     In response to Petitioners claim that the regulations are

20

  impermissibly vague, Respondent argues that while "especially

21

  heinous, atrocious or cruel" might be vague in the abstract it is

22

  limited by factors (A)-(E) of §2402(c)(1), and thus provides a

23

  'principled basis' for distinguishing between those cases which are

24

  contemplated in that section and those which are not. An examination

25

  of cases involving vagueness challenges to death penalty statutes is

26

  instructive here and shows that Respondent's position has merit:

27

     "Our precedents make clear that a State's capital sentencing

28

2

1      scheme also must genuinely narrow the class of persons eligible
       for the death penalty. When the purpose of a statutory
2      aggravating circumstance is to enable the sentencer to
       distinguish those who deserve capital punishment from those who
3      do not, the circumstance must provide a principled basis for
       doing so. If the sentencer fairly could conclude that an
4      aggravating circumstance applies to every defendant eligible for
       the death penalty, the circumstance is constitutionally infirm."
5      (Arave v. Creech (1993) 507 U.S. 463, 474, citing Maynard v.
       Cartwright (1988) 486 U.S. 356, 364: "invalidating aggravating
6      circumstance that 'an ordinary person could honestly believe'
       described every murder," and, Godfrey v. Georgia (1980) 446 U.S.
7      420, 428-429: "A person of ordinary sensibility could fairly
       characterize almost every murder as 'outrageously or wantonly
8      vile, horrible and inhuman.'")

9
          It cannot fairly be said that 'every murder' could be
10
       categorized as "especially heinous, atrocious or cruel" under the
11
       Board regulations, since the defining factors contained in
12
       subdivisions (A)-(E) clearly narrow the group of cases to which it
13
       applies. Although Petitioner also argues that the "vague statutory
14
       language is not rendered more precise by defining it in terms or
15
       synonyms of equal or greater uncertainty" (People v. Superior Court
16
       (Engert) (1982) 31 Cal.3d 797, 803, Pryor v. Municipal Court (1979)
17
       29 Cal.3d 238, 249. See also Walton v. Arizona (1990) 497 U.S. 639,
18
       654), the factors in those subdivisions are not themselves vague or
19
       uncertain. The mere fact that there may be some subjective component
20
       (such as "exceptionally callous" disregard for human suffering) does
21
       not render that factor unconstitutionally vague.   The proper degree
22
       of definition of such factors is not susceptible of mathematical
23
       precision, but will be constitutionally sufficient if it gives
24
       meaningful guidance to the Board.
25
          A law is void for vagueness if it "fails to provide adequate
26     notice to those who must observe its strictures and
       impermissibly delegates basic policy matters to policemen,
27     judges, and juries for resolution on an ad hoc and subjective
       basis, with the attendant dangers of arbitrary and
28

                                    3



1    discriminatory application."  (*People v. Rubalcava* (2000) 23
     Cal.4th 322, 332, quoting *People ex rel. Gallo v. Acuna* (1997)
2    14 Cal. 4th 1090, 1116, quoting *Grayned v. City of Rockford*
     (1972) 408 U.S. 104, 108-109.)

3
     A review of cases expressing approval of definitions to limit the
4
     application of otherwise vague terms in death penalty statutes leads
5
     inextricably to the conclusion that the limiting factors in §2402(c)
6
     easily pass constitutional muster.  An Arizona statute was upheld
7
     that provided a crime is committed in an 'especially cruel manner'
8
     when the perpetrator inflicts mental anguish or physical abuse before
9
     the victim's death," and that "mental anguish includes a victim's
10
     uncertainty as to his ultimate fate."  (*Walton v. Arizona* (1990) 497
11
     U.S. 639, 654.)  Similarly, the court in *Maynard v. Cartwright*, 486
12
     U.S. at 364-365, approved a definition that would limit Oklahoma's
13
     "especially heinous, atrocious, or cruel" aggravating circumstance to
14
     murders involving "some kind of torture or physical abuse.  In
15
     Florida, the statute authorizing the death penalty if the crime is
16
     "especially heinous, atrocious, or cruel," satisfied due process
17
     concerns where it was further defined as "the conscienceless or
18
     pitiless crime which is unnecessarily torturous to the victim."
19
     *State v. Dixon* (1973) 283 So. 2d 1 at p. 9.
20
         Here, the factors in subdivisions (A)-(E) provide equally clear
21
     limiting construction to the term "especially heinous, atrocious, or
22
     cruel" in §2402(c).
23
     **Has the Board Engaged in a Pattern of Arbitrary Application of the**
24   **Criteria?**
25
         As previously noted, 15 CCR §2402 provides detailed criteria for
26
     determining whether a crime is "exceptionally heinous, atrocious or
27
     cruel" such that it tends to indicate unsuitability for parole.  Our
28

                                    4

09/12/2007  11:08  

1  courts have held that to fit within those criteria and thus serve as
2  a basis for a finding of unsuitability, the circumstances of the
3  crime must be more aggravated or violent than the minimum necessary
4  to sustain a conviction for that offense.  (*In re Rosenkrantz* (2002)
5  29 Cal.4th 616, 682-683.)  Where that is the case, the nature of the
6  prisoner's offense, *alone,* can constitute a sufficient basis for
7  denying parole.  (*In re Dannenberg, supra,* 34 Cal.4th at p. 1095.)

8     Petitioner claims that those criteria, even if constitutionally
9  sound, have been applied by the Board in an arbitrary and capricious
10  manner rendering them devoid of any meaning whatever.  The role of
11  the reviewing court under these circumstances has been addressed
12  previously in the specific context of Parole Board actions:

13     "[Courts have] an obligation, however, to look beyond the facial
       validity of a statute that is subject to possible
14     unconstitutional administration since a law though fair on its
       face and impartial in appearance may be open to serious abuses
15     in administration and courts may be imposed upon if the
       substantial rights of the persons charged are not adequately
16     safeguarded at every stage of the proceedings.  We have
       recognized that this court's obligation to oversee the execution
17     of the penal laws of California extends not only to judicial
       proceedings, but also to the administration of the Indeterminate
18     Sentence Law."  (*In re Rodriguez* (1975) 14 Cal.3d 639, 648,
       quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 277.)
19

20     Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case
21  closest on point to the present situation, the California Supreme
22  Court stated: "This court has traditionally accepted its
23  responsibility to prevent an authority vested with discretion from
24  implementing a policy which would defeat the legislative motive for
25  enacting a system of laws."  Where, as here, the question is whether
26  determinations are being made in a manner that is arbitrary and
27  capricious, judicial oversight "must be extensive enough to protect
28



1  limited right of parole applicants 'to be free from an arbitrary
2  parole decision... and to something more than mere pro-forma
3  consideration.'" (*In re Ramirez* (2001) 94 Cal.App.4th 549 at p. 564,
4  quoting *In re Sturm* (1974) 11 Cal.3d 258 at p. 268.)

5      This Court, therefore, now examines Petitioner's "as applied"
6  void for vagueness challenge.

7

8                      The Evidence Presented

9      A similar claim to those raised here, involving allegations of
10 abuse of discretion by the Board in making parole decisions, was
11 presented to the Court of Appeal in *In re Ramirez, supra*. The court
12 there observed that such a "serious claim of abuse of discretion"
13 must be "adequately supported with evidence" which should be
14 "comprehensive." (*Ramirez, supra*, 94 Cal.App.4th at p. 564, fn. 5.)
15 The claim was rejected in that case because there was not "a
16 sufficient record to evaluate." (*Ibid.*)  In these cases, however,
17 there is comprehensive evidence offered in support of Petitioner's
18 claims.

19     Discovery orders were issued in five different cases involving
20 life term inmates (Petitioners) who all presented identical claims.[1]

21

22 [1] This Court takes judicial notice of the several other cases currently
   pending (Lewis #68038, Jameison #71194, Bragg #108543, Ngo #127611.) which
23 raise this same issue and in which proof was presented on this same point.
   (Evidence Code § 452(d). See specifically, in the habeas corpus context,
24 *In re Vargus* (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
   notice was taken of the evidence in four other cases and in which the court
25 noted: "Facts from other cases may assist petitioner in establishing a
   pattern." See generally *McKell v. Washington Mutual, Inc.* (2006) 142
26 Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
   judicial notice of ... established facts from both the same case and other
   cases." And see *AB Group v. Wertin* (1997) 59 Cal.App.4th 1022, 1036:
27 *Judicial notice taken of other cases when matters are "just as relevant to
   the present [case] as they are to the others.")
28

                              6

/·d        L6/9-09S-8S8                    DUBUNG OOOPr   RICLL /0 /0 deo



1    The purpose of the discovery was to bring before the Court a
2    comprehensive compilation and examination of Board decisions in a
3    statistically significant number of cases.  The Board decisions under
4    examination consisted of final decisions of the Board for life-term
5    inmates convicted of first or second degree murder and presently
6    eligible for parole.  Included were all such decisions issued in
7    certain months, chosen by virtue of their proximity in time to the
8    parole denials challenged in the pending petitions.  All Board
9    decisions in the months of August, September and October of 2002,
10    July, August, September, October, November, and December of 2003,
11    January and February of 2004, February of 2005, and January of 2006
12    were compiled.  This resulted in a review of 2690 cases decided in a
13    total of 13 months.

14        The purpose of the review was to determine how many inmates had
15    actually been denied parole based in whole or in part on the Board's
16    finding that their commitment offense fits the criteria set forth in
17    Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A
18    member of the research team conducting the review, Karen Rega,
19    testified that in its decisions the Board does not actually cite CCR
20    rule §2402(c), but consistently uses the specific words or phrases
21    ("verbiage from code") contained therein, so that it could easily be
22    determined when that criteria was being applied.  (For example,
23    finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24    "dispassionate" "calculated" or "execution style" invokes
25    §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26    invokes §2402(c)(1)(C); a crime that is "exceptionally callous" or
27    demonstrated a "disregard for human suffering" fits criteria
28

7

1  §2402(c)(1)(D); and finding the motive for the crime "inexplicable"

2  or "trivial" invokes §2402(c)(1)(E).)

3      Petitioners provided charts, summaries, declarations, and the

4  raw data establishing the above in the cases of Lewis #68038,

5  Jameison #71194, Bragg #108543, and Ngo #127611.  In this case

6  (Criscione #71614) the evidence was presented somewhat differently.

7  Both to spread the burden of the exhaustive examination, and to

8  provide a check on Petitioners' methods, this Court ordered

9  Respondent to undertake an examination of two randomly chosen months

10  in the same manner as Petitioner had been doing.  Respondent complied

11  and provided periodic updates in which they continued to report that

12  at all "the relevant hearings the Board relied on the commitment

13  offense as a basis for denying parole."  (See "Respondent's Final

14  Discovery Update" filed April 5, 2007.)  At the evidentiary hearing

15  on this matter counsel for Respondents stipulated that "in all of

16  those cases examined [by Respondent pursuant to the Criscione

17  discovery orders] the Board relied on the commitment offense as a

18  basis for denying parole."  (See pages 34-35 of the June 1, 2007,

19  evidentiary hearing transcript.)

20      The result of the initial examination was that in over 90

21  percent of cases the Board had found the commitment offense to be

22  "especially heinous, atrocious or cruel" as set forth in Title 15

23  §2402(c)(1).  In the remaining 10% of cases either parole had been

24  granted, or it was unclear whether §2402(c)(1) was a reason for the

25  parole denial.  For all such cases, the decisions in the prior

26  hearing for the inmate were obtained and examined.  In every case,

27  the Board had determined at some point in time that every inmates

28

8

 

1 crime was "especially heinous, atrocious or cruel" under Title 15
2 §2402(c)(1).

3    Thus, it was shown that 100% of commitment offenses reviewed by
4 the Board during the 13 months under examination were found to be
5 "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6    A further statistic of significance in this case is that there
7 are only 9,750 inmates total who are eligible for, and who are
8 currently receiving, parole consideration hearings as life term
9 inmates. (See "Respondent's Evidentiary Hearing Brief," at p. 4,
10 filed April 16, 2007.)

11
12                    USE OF STATISTICS
13    In *International Brotherhood of Teamsters v. United States*
14 (1977) 431 U.S. 324, 338-340, the United States Supreme Court
15 reaffirmed that statistical evidence, of sufficient "proportions,"
16 can be sound and compelling proof. As noted by the court in *Everett*
17 *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited
18 therein, "courts regularly have employed statistics to support an
19 inference of intentional discrimination."

20    More recently, the United States Supreme Court, in *Miller-El v.*
21 *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas
22 petitioner's allegations that the prosecutor was illegally using his
23 peremptory challenges to exclude African-Americans from the
24 petitioner's jury, noted that "the statistical evidence alone" was
25 compelling. The high court analyzed the numbers and concluded:
26 "Happenstance is unlikely to produce this disparity." (See also
27 *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical
28

9

 
1  evidence" was noted as possibly being dispositive.  And see *People v.*
2  *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3  analysis, combined into an "actuarial instrument" was substantial
4  proof.)

5      A statistical compilation and examination such as has been
6  presented in these cases is entirely appropriate and sufficient
7  evidence from which to draw sound conclusions about the Board's
8  overall methods and practices.

9

10                        THE EXPERT'S TESTIMONY

11      Petitioners provided expert testimony from Professor Mohammad
12  Kafai regarding the statistics and the conclusions that necessarily
13  follow from them.  Professor Kafai is the director of the statistics
14  program at San Francisco State University, he personally teaches
15  statistics and probabilities, and it was undisputed that he was
16  qualified to give the expert testimony that he did.  No evidence was
17  presented that conflicts or contradicts the testimony and conclusions
18  of Professor Kafai.  By stipulation of the parties, Professor Kafai's
19  testimony was to be admissible and considered in the cases of all
20  five petitioners.  (See page 35 of the June 1, 2007, evidentiary
21  hearing transcript.)

22      Professor Kafai testified that the samples in each case, which
23  consisted of two or three months of Board decisions, are
24  statistically sufficient to draw conclusions about the entire
25  population of life term inmates currently facing parole eligibility
26  hearings.  Given that every inmate within the statistically
27  significant samples had his or her crime labeled "'particularly
28

                                10



1 | egregious'" or "especially heinous, atrocious or cruel" under Title
2 | 15 §2402(c)(1), it can be mathematically concluded that the same
3 | finding has been made for every inmate in the entire population of
4 | 9,750. Although he testified that statisticians never like to state
5 | unequivocally that something is proven to a 100% certainty, (because
6 | unforeseen anomalies are always theoretically possible,) he did
7 | indicate the evidence he had thus far examined came as close to that
8 | conclusion as could be allowed. Not surprisingly, Professor Kafai
9 | also testified that "more than 50% can't by definition constitute an
10 | exception."

11 | Having found the data provided to the expert to be sound this
12 | Court also finds the expert's conclusions to be sound. In each of
13 | the five cases before the Court over 400 inmates were randomly chosen
14 | for examination. That number was statistically significant and was
15 | enough for the expert to draw conclusions about the entire population
16 | of 9,750 parole eligible inmates. The fact that the approximately
17 | 2000 inmates examined in the other cases also had their parole denied
18 | based entirely or in part on the crime itself (§2402(c)(1)), both
19 | corroborates and validates the expert's conclusion in each individual
20 | case and also provides an overwhelming and irrefutable sample size
21 | from which even a non expert can confidently draw conclusions.

22 |

23 |                          DISCUSSION

24 | · Although the evidence establishes that the Board frequently says
25 | parole is denied "first," "foremost," "primarily," or "mainly,"
26 | because of the commitment offense, this statement of primacy or
27 | weight is not relevant to the question now before the Court.
28 |

11



1    Petitioners acknowledge that the Board generally also cites other
2    reasons for its decision.  The question before this Court, however,
3    is not whether the commitment offense is the primary or sole reason
4    why parole is denied -- the question is whether the commitment
5    offense is labeled "'particularly egregious'" and thus could be used,
6    under *Dannenberg*, primarily or exclusively to deny parole.

7         The evidence proves that in a relevant and statistically
8    significant period where the Board has considered life term offenses
9    in the context of a parole suitability determination, every such
10   offense has been found to be "particularly egregious" or "especially
11   heinous, atrocious or cruel."[2]  This evidence conclusively
12   demonstrates that the Board completely disregards the detailed
13   standards and criteria of §2402(c).  "Especially" means particularly,
14   or "to a distinctly greater extent or degree than is common."[3]  (EC §
15   451(e).)  By simple definition the term "especially" as contained in
16   section 2402(C)(1) cannot possibly apply in 100% of cases, yet that
17   is precisely how it has been applied by the Board.  As pointed out by
18   the Second District Court of Appeal, not every murder can be found to
19   be "atrocious, heinous, or callous" or the equivalent without "doing
20
21   [2] In a single case out of the 2690 that were examined Petitioner has conceded that
     the Board did not invoke §2402(c)(1).  This Court finds that concession to be
     improvidently made and the result of over caution.  When announcing the decision at
22   the initial hearing of S. Fletcher (E-10330) on 4/6/06, the commissioner did begin
     by stating "I don't believe this offense is particularly aggravated..."  However
     the commissioner proceeds to describe the crime as a drug deal to which Fletcher
23   brought a gun so "we could say there was some measure of calculation in that."  The
     commissioner continued by observing that the reason someone would bring a gun to a
24   drug transaction was to make sure things went according to their plan "so I guess
     we can say that that represents calculation and perhaps it's aggravated to that
25   extent."  As is the Board's standard practice, by using the word 'calculated' from
     §2402(c)(1)(b) the Board was invoking that regulation.  Certainly if Mr. Fletcher
     had brought a habeas petition Respondent's position would be that there is 'some
26   evidence' supporting this.  The ambiguity created by the commissioner's initial
     statement was cleared up several pages later when he announces that "based upon the
27   crime coupled with ..." parole was denied for four years.  (See *In re Burns* (2005)
     136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
     year denial.)
28

                                    12

 
1  violence" to the requirements of due process.  (*In re Lawrence* (2007)
2  150 Cal.App.4th 1511, 1557.)  This is precisely what has occurred
3  here, where the evidence shows that the determinations of the Board
4  in this regard are made not on the basis of detailed guidelines and
5  individualized consideration, but rather through the use of all
6  encompassing catch phrases gleaned from the regulations.
7
8                           THE BOARD'S METHODS
9       Because it makes no effort to distinguish the applicability of
10  the criteria between one case and another, the Board is able to force
11  every case of murder into one or more of the categories contained in
12  §2402(c).
13       For example, if the inmate's actions result in an instant death
14  the Board finds that it was done in a "dispassionate and calculated
15  manner, such as an execution-style murder."  At the same time the
16  Board finds that a murder not resulting in near instant death shows a
17  "callous disregard for human suffering" without any further analysis
18  or articulation of facts which justify that conclusion.  If a knife
19  or blunt object was used, the victim was "abused, defiled, or
20  mutilated."  If a gun was used the murder was performed in a
21  "dispassionate and calculated manner, such as an execution-style
22  murder."  If bare hands were used to extinguish another human life
23  then the crime is "particularly heinous and atrocious."
24       Similarly, if several acts, spanning some amount of time, were
25  necessary for the murder the Board may deny parole because the inmate
26  had "opportunities to stop" but did not.  However if the murder was
27
    ³ Princeton University World Net Dictionary (2006).
28

13

1  accomplished quickly parole will be denied because it was done in a
2  dispassionate and calculated manner and the victim never had a chance
3  to defend themselves or flee. If the crime occurred in public, or
4  with other people in the vicinity, it has been said that the inmate
5  "showed a callous disregard" or "lack of respect" for the
6  "community." However if the crime occurs when the victim is found
7  alone it could be said that the inmate's actions were aggravated
8  because the victim was isolated and more vulnerable.

9       In this manner, under the Board's cursory approach, every murder
10  has been found to fit within the unsuitability criteria. What this
11  reduces to is nothing less than a denial of parole for the very
12  reason the inmates are present before the Board - i.e. they committed
13  murder. It is circular reasoning, or in fact no reasoning at all,
14  for the Board to begin each hearing by stating the inmate is before
15  them for parole consideration, having passed the minimum eligible
16  parole date based on a murder conviction, and for the Board to then
17  conclude that parole will be denied because the inmate committed acts
18  that amount to nothing more than the minimum necessary to convict
19  them of that crime. As stated quite plainly by the Sixth District:
20  "A conviction for murder does not automatically render one unsuitable
21  for parole." (Smith, supra, 114 Cal.App.4th at p. 366, citing
22  Rosenkrantz, supra, 29 Cal.4th at p. 683.)

23       In summary, when every single inmate is denied parole because
24  his or her crime qualifies as a §2402(c)(1) exception to the rule
25  that a parole date shall normally be set, then the exception has
26  clearly swallowed the rule and the rule is being illegally
27  interpreted and applied. When every single life crime that the Board
28

14

 
1  examines is "particularly egregious" and "especially heinous,
2  atrocious or cruel" it is obvious that the Board is operating without
3  any limits and with unfettered discretion.

4      Other examples of the failure to 'connect up' the facts of the
5  individual case with the criteria and the ultimate findings abound in
6  the decisions of the reviewing courts.  Some of the state cases to
7  have reversed Parole Board or Governor abuses of discretion in
8  denying parole include *In re Roderick, In re Cooper, In re Lawrence,*
9  *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*
10  *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith, and In*
11  *re Capistran.*

12      When "the record provides no reasonable grounds to reject, or
13  even challenge, the findings and conclusions of the psychologist and
14  counselor concerning [the inmate's] dangerousness" the Board may not
15  do so.  (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16      When an inmate, although only convicted of a second degree
17  murder, has been incarcerated for such time that, with custody
18  credits, he would have reached his MEPD if he had been convicted of a
19  first, the Board must point to evidence that his crime was aggravated
20  or exceptional even for a first degree murder if they are going to
21  use the crime as a basis for denying parole.  (*In re Weider* (2006)
22  145 Cal.App.4th 570, 582-583.)[4]

23

24  [4]    This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra,* is
   particularly applicable in this case.  Petitioner was convicted of second degree,
   but acquitted of first degree, murder over 25 years ago.  (*People v. Criscione*
25  (1981) 125 Cal.App.3d 275.)  With his custody credits he is beyond the matrix even
   had he been convicted of a first.  In a currently pending habeas petition in which
26  he challenges his 2007 parole denial the first reason the Board gave was the crime
   itself and the presiding commissioner explained: "His actions go well beyond the
   minimum necessary for a conviction of murder in the second degree."  (Decision page
27  2 of 4/2/07 transcript.)  For the Board to penalize the Petitioner for the fact
   that he was acquitted of first degree is further proof of their willfulness and
28

15



1    A "petitioner's young age at the time of the offense" must be
2  considered.  (In re Elkins (2006) 144 Cal.App.4th 475, 500, quoting
3  Rosenkrantz v. Marshall (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,
4  1085: "The reliability of the facts of the crime as a predictor for
5  his dangerousness was diminished further by his young age of 18, just
6  barely an adult. 'The susceptibility of juveniles to immature and
7  irresponsible behavior means their irresponsible conduct is not as
8  morally reprehensible as that of an adult.'")[5]

9    The Board's formulaic practice of stating §2402(c)(1) phrased in
10 a conclusory fashion, and then stating "this is derived from the
11 facts" without ever linking the two together, is insufficient.  (In
12 re Roderick, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the
13 Board is responsible for articulating the grounds for its findings
14 and for citing to evidence supporting those grounds."  (See also In
15 re Barker (2007) 151 Cal.App.4th 346, 371, disapproving
16 "conclusorily" announced findings.)

17    After two decades, mundane "crimes have little, if any,
18 predictive value for future criminality.  Simply from the passing of
19 time, [an inmate's] crimes almost 20 years ago have lost much of
20 their usefulness in foreseeing the likelihood of future offenses than
21 if he had committed them five or ten years ago."  (In re Lee (2006)
22 143 Cal.App.4th 1400, 1412.)  It should be noted that this rule
23 _____
   bias.  The jury had a reasonable doubt that Petitioner committed first degree
24 murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse
   position than if they had not.  Had the jury convicted him of the greater offense
25 Petitioner has served so much time that he would already be having subsequent
   parole hearings on a first and the Board would not have been able to use the 'some
26 evidence' of first degree behavior against him.  As observed previously, the
   Board's position in this regard is "so ridiculous that simply to state it is to
   refute it."  (Weider, supra, 145 Cal.App.4th at p. 583.)
27 [5] This point is particularly significant in the case of Mike Ngo.  Mr. Ngo was only
   18 at the time of his crime.  The impetus behind the shooting was youth group or
28

                                   16

1 | applies with even more force when the Board is relying on any
2 | criminality that occurred before the crime.  In that situation, just
3 | as with the crime itself, the Board must explain why such old events
4 | have any relevance and especially when the inmate has spent a decade
5 | as a model prisoner.

6 |     Murders situationally related to intimate relationships are
7 | unfortunately commonplace because emotions are strongest in such
8 | domestic settings.  When a murder occurs because of "stress unlikely
9 | to be reproduced in the future" this is a factor that affirmatively
10 | points towards suitability.  (*In re Lawrence* (2007) 150 Cal.App.4th
11 | 1511 and cases cited therein.)

12 |     "The evidence must substantiate the ultimate conclusion that the
13 | prisoner's release currently poses an unreasonable risk of danger to
14 | the public.  It violates a prisoner's right to due process when the
15 | Board or Governor attaches significance to evidence that forewarns no
16 | danger to the public."  (*In re Tripp* (2007) 150 Cal.App.4th 306,
17 | 313.)

18 |     The Board "cannot rely on the fact that the killing could have
19 | been avoided to show the killing was especially brutal."  (*In re*
20 | *Cooper* (2007) 153 Cal.App.4th 1043, 1064.)

21 |     The Board's focus must be upon how the inmate "actually
22 | committed his crimes" not the "incorporeal realm of legal
23 | constructs."  (*Lee, supra*, 143 Cal.App.4th at p. 1413.)  This is
24 | especially significant when the murder conviction is based on the
25 | felony murder rule, provocative act doctrine, or accomplice liability
26 | such that the inmate did not intend to kill or may not have even been
27 | _____
   | gang rivalries, posturing, and threats which mature adults would not have been
28 |

17



1 │ the actual killer.

2 │      The Board has ample guidance before it in the decisions of the

3 │ various reviewing courts to constrain its abuse, but has failed to

4 │ avail itself of the opportunity to do so.

5 │

6 │                    SEPARATION OF POWERS DOCTRINE

7 │      The evidence presented, as discussed above, has established a

8 │ void for vagueness "as applied" due process violation.  That same

9 │ evidence also proves a separate but related Constitutional violation

10 │ -- an as applied separation of powers violation.

11 │      The separation of powers doctrine provides "that the legislative

12 │ power is the power to enact statutes, the executive power is the

13 │ power to execute or enforce statutes, and the judicial power is the

14 │ power to interpret statutes and to determine their

15 │ constitutionality."  (*Lockyer v. City and County of San Francisco*

16 │ (2004) 33 Cal.4th 1055, 1068.)  Because the evidence has proven the

17 │ Board is not executing/enforcing the legislature's statutes as

18 │ intended it is this Court's duty to intervene.  The question here is

19 │ whether the Board is violating the separation of powers doctrine by

20 │ appropriating to itself absolute power over parole matters and

21 │ disregarding the limits and guidelines placed by the statute.[6]

22 │      "Government Code section 11342.2 provides: 'Whenever by the

23 │

24 │ caught up in.
     [6] "It is settled that Administrative regulations that violate acts of the
25 │ Legislature are void and no protestations that they are merely an exercise of
     administrative discretion can sanctify them.  They must conform to the legislative
     will if we are to preserve an orderly system of government.  Nor is the motivation
26 │ of the agency relevant: It is fundamental that an administrative agency may not
     usurp the legislative function, no matter how altruistic its motives are."
27 │ (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16
     Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of
     San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

28 │

                                        18



1 express or implied terms of any statute a state agency has authority
2 to adopt regulations to implement, interpret, make specific or
3 otherwise carry out the provisions of the statute, no regulation
4 adopted is valid or effective unless consistent and not in conflict
5 with the statute and reasonably necessary to effectuate the purpose
6 of the statute.' Administrative regulations that alter or amend the
7 statute or enlarge or impair its scope are void and courts not only
8 may, but it is their obligation to strike down such regulations."
9 (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75
10 Cal.App.4th 1315, 1341, citations omitted.)

11      The vice of overbroad and vague regulations such as are at issue
12 here is that they can be manipulated, or 'interpreted,' by executive
13 agencies as a source of unfettered discretion to apply the law
14 without regard to the intend of the people as expressed by the
15 legislature's enabling statutes. In short, agencies usurp unlimited
16 authority from vague regulations and become super-legislatures that
17 are unaccountable to the people. As it has sometimes been framed and
18 addressed in the case law, a vague or all encompassing standard runs
19 the risk of "violat[ing] the separation of powers doctrine by
20 'transforming every [executive decisionmaker] into a "mini-
21 legislature" with the power to determine on an ad hoc basis what
22 types of behavior [satisfy their jurisdiction].'" (*People v. Ellison*
23 (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*
24 *(Caswell)* (1988) 46 Cal.3d 381, 402.)

25      "It is concern about 'encroachment and aggrandizement,' the
26 [United States Supreme Court] reiterated, that has animated its
27 separation of powers jurisprudence. 'Accordingly, we have not
28

19

1   hesitated to strike down provisions of law that either accrete to a
2   single Branch powers more appropriately diffused among separate
3   Branches or that undermine the authority and independence of one or
4   another coordinate Branch.'" (Kasler v. Lockyer (2000) 23 Cal.4th
5   472, 493, quoting Mistretta v. United States (1989) 488 U.S. 361,
6   382.)  This articulation of the principle speaks directly to the
7   situation at hand.  The Board, by its enactment and interpretation of
8   Title 15, §2402, has appropriated to itself absolute power over
9   'lifer' matters.  Overreaching beyond the letter and spirit of the
10  Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by
11  the Board to supply the power to declare every crime enough to deny
12  parole forever.  The fact that Title 15, §2402, has been invoked in
13  every case, but then sometime later not invoked, tends to show either
14  completely arbitrary and capricious behavior or that unwritten
15  standards are what really determine outcomes.  In either event, all
16  pretenses of taking guidance from, or being limited by, the
17  legislature's statutes have been abandoned.  "[I]t is an elementary
18  proposition that statutes control administrative interpretations."
19  (Ohio Casualty Ins. Co. v. Garamendi (2006) 137 Cal.App.4th 64, 78.)
20  Title 15 §2402 as applied, however, has no controls or limitations.
21       The PC § 3041(b) exception to the rule can only be invoked when
22  the "gravity of the current convicted offense or offenses, or the
23  timing and gravity of current or past convicted offense or offenses,
24  is such that consideration of the public safety requires a more
25  lengthy period of incarceration for this individual."  The word
26  "gravity" is a directive for comparison just as "more lengthy"
27  indicates a deviation from the norm.  While Dannenberg held there
28


1 | does not need to be intra case comparison for the purposes of term
2 | uniformity or proportionality, there necessarily has to be some sort
3 | of comparison for the purposes of adhering to the legislative mandate
4 | that parole is available.  The Board employs no meaningful yardstick
5 | in measuring parole suitability.  This is a violation of the
6 | separation of powers doctrine.  (People v. Wright (1982) 30 Cal.3d
7 | 705; 712-713.  And see Terhune v. Superior Court (1998) 65
8 | Cal.App.4th 864, 872-873.  Compare Whitman v. Am. Trucking Ass'ns
9 | (2001) 531 U.S. 457, 472, describing a delegation challenge as
10 | existing when the legislature fails to lay down "an intelligible
11 | principle to which the person or body authorized to act is directed
12 | to conform.")

13

14 | ### RESPONDENT'S POSITION

15 |      The Attorney General has suggested, without pointing to any
16 | concrete examples, that it is possible that the Board, when invoking
17 | the crime as a reason to deny parole, is not placing it within
18 | §2402(c)(1) but instead using is as some sort of 'lesser factor'
19 | which, only when combined with other unsuitability criteria, can
20 | contribute to a valid parole denial.  The two problems with this
21 | position are, first, there is no evidentiary support for this
22 | assertion, and second, it would have no impact on the constitutional
23 | infirmities outlined and proven above.

24 |      Even if Respondent had produced evidence that the Board was
25 | utilizing the crime as a 'lesser factor' which needs others to fully
26 | support a parole denial, the Board would then be admitting it was
27 | denying parole, in part, for the very reason that the person is
28 |

21·


1  before the panel and eligible for parole in the first place - the
2  commitment offense.  Respondent's argument suggests that a crime that
3  only qualified as the *Dannenberg* "minimum necessary" could still be
4  invoked as a reason for denying parole.  Respondent argues that when
5  the crime is invoked 'not in the *Dannenberg* sense,' there must be
6  other reasons for the parole denial and the crime alone would not be
7  enough in this context.  This position is inconsistent with the law
8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly
10  egregious," or one where "no circumstances of the offense reasonably
11  could be considered more aggravated or violent than the minimum
12  necessary to sustain a conviction for that offense." (*Dannenberg,*
13  *supra,* 34 Cal.4th at pp. 1094-1095.)  These are the only two choices.
14  If a crime consists of only the bare elements then it is not
15  aggravated and it cannot, in and-of itself, serve as a basis for
16  parole denials once the inmate becomes eligible for parole.  It is
17  the reason an inmate may be incarcerated initially for the equivalent
18  of 15 or 25 years, and then examined to determination rehabilitation
19  efforts when they come before the Board, but a crime that is no more
20  than the bare minimum cannot be factored into the equation pursuant
21  to PC § 3041(b) or any of the case law interpreting it.

22      In oral argument Respondent suggested a second way the
23  commitment offense can be used outside of §2402(c)(1).  If for
24  example a crime had its roots in gang allegiances or rivalries and
25  the inmate continued to associate with gangs while incarcerated, then
26  an aspect of the crime, even if the crime otherwise consisted of no
27  more than the minimum elements, could be combined with other behavior
28

22



1  to support a parole denial. Similarly, if a crime was rooted in an
2  inmate's then existing drug addiction, and the Board was to point to
3  a recent 115 involving drugs, the evidence that the inmate's drug
4  issues had not been resolved would justify a parole denial even if
5  the crime itself was not aggravated. A finding that the inmate is
6  not suitable for release under these circumstances, however, is not
7  based on the facts of the commitment offense as tending to show
8  unsuitability.. It is based on the conclusion that can be drawn about
9  Petitioner's lack of rehabilitation or change since the offense, and
10 thus, his present dangerousness..

11        Respondent has not demonstrated any flaws in Petitioner's
12 methodology or analysis, nor provided any actual evidence of the
13 crime being invoked other than pursuant to §2402(c)(1). Drawing
14 conclusions from the Board's direct statements, or its precise
15 recitations of the §2402(c)(1) language, logically indicates an
16 invocation of §2402(c)(1), and Respondent's suggestion otherwise is
17 insupportable.

18

19                    THE QUESTION OF BIAS

20        Because the issue has been squarely presented, and strenuously
21 argued by Petitioners, this Court is obligated to rule on the charge
22 that the Board's actions prove an overriding bias and deliberate
23 corruption of their lawful duties.

24        In the discrimination and bias case of USPS Bd. of Governors v.
25 Aikens (1983) 460 U.S. 711, the United States Supreme Court
26 acknowledged "there will seldom be 'eyewitness' testimony as to the
27 [] mental processes" of the allegedly biased decisionmaker. Instead,
28

                              23

1 | an examination of other cases for trends or patterns can provide the
2 | necessary circumstantial evidence. (See *Aikens, supra,* at footnote
3 | 2.) Reaffirming that such circumstantial evidence will be sufficient
4 | the Court stated: "The law often obliges finders of fact to inquire
5 | into a person's state of mind. As Lord Justice Bowen said in
6 | treating this problem in an action for misrepresentation nearly a
7 | century ago, 'The state of a man's mind is as much a fact as the
8 | state of his digestion. It is true that it is very difficult to
9 | prove what the state of a man's mind at a particular time is, but if
10 | it can be ascertained it is as much a fact as anything else.'"
11 | (*Aikens,* at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29
12 | Ch. Div. 459, 483.)[7]

13 | The discovery in these cases was granted in part due to the
14 | Petitioners' prima facie showing of bias and the necessity that it be
15 | "adequately supported with evidence" if such evidence is available.
16 | (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5. See also *Nasha v.*
17 | *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking
18 | to show bias or prejudice on the part of an administrative decision
19 | maker is required to prove the same 'with concrete facts.'" And see
20 | *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,
21 | 841: "The challenge to the fairness of the adjudicator must set forth
22 | concrete facts demonstrating bias or prejudice." See also *Hobson v.*

23 |

24 | [7] As occurred in *Aikens, supra,* and as suggested in prior orders of this Court, Respondent should have provided direct evidence from the decisionmakers. While the fact that a *Defendant* does not explain his or her actions cannot be held against
25 | him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S. 610,) it is appropriate to give some weight to the consideration that the Board has
26 | failed to offer any direct evidence or explanation on its own behalf. While the case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the proposition that Petitioner may not inquire into the Board members mental
27 | processes, Respondent is not precluded from offering such direct evidence if they were able to testify as to their good faith and conscientious efforts.
28 |

24

1 │ *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.
2 │ school desegregation case in which the court determined from a
3 │ statistical and factual analysis that racial bias was influencing
4 │ policy.)

5 │     In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,
6 │ a similar claim of biased decision making was asserted and it was
7 │ rejected because, although the defendant clearly articulated it, "he
8 │ has not demonstrated it. Therefore, he has failed to bear his burden
9 │ of showing a constitutional violation as a demonstrable reality, not
10 │ mere speculation." In the present cases Petitioners have provided
11 │ overwhelming concrete evidence. It is difficult to believe that the
12 │ Board's universal application of §2402(c)(1) has been an inadvertent
13 │ mistake or oversight on their part. It is hard to credit the Board's
14 │ position that it does not know its own patterns and practices reveal
15 │ a complete lack of standards or constraints on their power.
16 │ Respondent's protestations ring hollow, and it seems a statistical
17 │ impossibility, that the Board's use of "detailed" criteria in such a
18 │ fashion that they are rendered meaningless is a result of good faith
19 │ efforts on their part. That *every* murder is "especially heinous,
20 │ atrocious or cruel," and can therefore be an exception to the rule
21 │ that a parole date should be set, does not seem to be an accident on
22 │ their part.

23 │     Although no court has thus far agreed with the accusation that
24 │ the Board approaches its duties with a predetermination and a bias,
25 │ no court has previously been presented the comprehensive evidence
26 │ outlined herein. While this Court does not turn a blind eye to the
27 │ reasonable conclusion that the Board's unconstitutional practices are
28 │

        PAGE 26/34

09/12/2007 11:00

1  willful, there is another possibility.  The pattern of errors

2  demonstrated by the discovery in this case, and the continuously

3  growing body of Court of Appeal opinions finding consistent and

4  persistent abuse of discretion, may instead be caused by the fact

5  that the Board is simply overworked and substantively untrained.  The

6  impossibility of the blanket applicability of §2402(c)(1) may be only

7  the result of sloppy preparation and inadvertent carelessness.

8      The Board must first be given an opportunity to comply with the

9  necessary remedy provided by this court before it is possible to

10  enter a finding of conscious bias and illegal sub rosa policy.  To do

11  otherwise would ignore the complexities and magnitude of the largely

12  discretionary duties with which that Board is vested.

13

14                          CONCLUSION

15      The conclusive nature of the proof in this case, and the

16  suggestion of institutional bias do not preclude formulation of an

17  remedy which will guarantee adequate restrictions on, and guidance

18  for, the Board's exercise of discretion in making parole suitability

19  determinations.  The Board can be made to lawfully perform its duties

20  if given explicit instructions.

21      As noted supra, a reason the proof in this case irrefutably

22  establishes constitutional violations is because the Board does not,

23  in actual fact, operate within the limiting construction of the

24  regulations.  The Board's expansive interpretation allows it to

25  operate without any true standards.  Although numerous rulings of

26  both state and federal courts of appeal have invalidated the Board's

27  application of the §2402(c) criteria to particular facts, the Board

28

Sep 07 07 11:40a    Jacob Burland    805:11 70 70 qac



1 │ does not take guidance from these binding precedents and ignores them

2 │ for all other purposes. In the most recent of these cases, *In re*

3 │ *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District

4 │ held four of five §2402 factors "found" by the Board to be

5 │ unsupported by any evidence: At footnote 14 the court took the time

6 │ to criticize the Board for its repeated use of a "stock phrase"

7 │ "generically across the state." The court also clarified that "at

8 │ minimum, the Board is responsible for articulating the grounds for

9 │ its findings and for citing to evidence supporting those grounds."

10 │      There is nothing in the evidence presented that would allow any

11 │ conclusion but that, without intervention of the Courts, the Board

12 │ will ignore the lessons of these rulings in the future and continue

13 │ to employ its formulaic approach of citing a criteria from

14 │ §2402(c)(1), repeating the facts of the crime, but never

15 │ demonstrating a logical connection between the two.  This is the

16 │ core problem with the Board's methodology -- they provide no

17 │ explanation or rationale for the findings regarding the crime itself.

18 │   This practice results in violence to the requirements of due

19 │ process and individualized consideration which are paramount to the

20 │ appropriate exercise of its broad discretion.

21 │      The only solution is one that compels the Board to identify the

22 │ logical connection between the facts upon which it relies and the

23 │ specific criteria found to apply in the individual case.  For

24 │ example, the Board often finds that an inmate's motive is "trivial"

25 │ without ever suggesting why, on these facts, that motive is not just

26 │ as trivial as the motive behind any other murder.  What motive is not

27 │ trivial?  By any definition "trivial" is a word of comparison and

28 │

1  only has meaning when there can be examples that are not "trivial."

2      Similarly, although the Sixth District made it plain four years

3  ago that "all [] murders by definition involve some callousness," (*In*

4  *re Smith* (2003) 114 Cal.App.4th 343, 346,) the Board has continued to

5  deny countless paroles labeling the crime "callous" without ever

6  suggesting what crime would not qualify as "callous" and without

7  consistently explaining why the individual case before it

8  demonstrates "exceptional" callousness.

9      Respondent has consistently refused to suggest what possible

10  instances of murder would not fit the Board's amorphous application

11  of the §2402 criteria.  Citing *Dannenberg*, Respondent insists such

12  comparative analysis is unnecessary.  Respondent fundamentally

13  misunderstands the *Dannenberg* holding.

14      The PC § 3041(b) exception to the rule can only be invoked when

15  the "gravity of the current convicted offense or offenses, or the

16  timing and gravity of current or past convicted offense or offenses,

17  is such that consideration of the public safety requires a more

18  lengthy period of incarceration for this individual."  The word

19  "gravity" is a directive for comparison just as "more lengthy"

20  indicates a deviation from the norm.  While *Dannenberg* held there

21  does not need to be intra case comparison for the purposes of term

22  uniformity or proportionality, there necessarily has to be some sort

23  of comparison for the purposes of adhering to the legislative mandate

24  that parole is available.  This is implicit in §2402 because the

25  qualifier "especially," in "especially heinous atrocious or cruel,"

26  requires that some form of comparison be made.  While the original

27  drafters of §2402 seemed to have recognized this fact, the ongoing

28


1   conduct of the Board has completely ignored it, and this is the
2   essence of the due process violation Petitioners have asserted.
3       As noted in his dissent in the recent case of *In re Roderick,*
4   *supra,* Justice Sepulveda would have deferred to the Board's
5   'exercise' of discretion because "Board members have both training
6   and vast experience in this field.  They conduct literally thousands
7   of parole suitability hearings each year.  The Board therefore has
8   the opportunity to evaluate the egregiousness of the facts of a great
9   number of commitment offenses.  ...  The Board's training and
10  experience in evaluating these circumstances far exceeds that of
11  most, if not all, judges."  The evidence in this case, however,
12  suggests a flaw in granting such deference.  Since the Board
13  continues to place every murder in the category of offenses "tending
14  to show unsuitability," something is certainly wrong.  Since the
15  Board's vast experience is undeniable, the problem must be in the
16  Board's training and understanding of the distinguishing features of
17  the guidelines and criteria.  Although Justice Sepulveda presumes
18  that Board members receive substantive training, there is no evidence
19  before this court to suggest that it does, and substantial
20  circumstantial evidence to suggest that it does not.
21      In the vast numbers of Santa Clara County cases reviewed by this
22  Court, the Board's formulaic decisions regarding the commitment
23  offense do not contain any explanation or thoughtful reasoning.
24  Instead, the Board's conclusionary invocation of words from
25  §2402(c)(1) is linked to a repetition of the facts from the Board
26  report by the stock phrase: "These conclusions are drawn from the
27  statement of facts wherein ..."  Thereafter the inmate files a habeas
28

29

1  corpus petition and Respondent, after requesting an extension of
2  time, files a boilerplate reply asserting the Board's power is
3  "great" and "almost unlimited" and thus any "modicum" of evidence
4  suffices.  Respondent does not cite or distinguish the expanding body
5  of case law that is often directly on point as to specific findings
6  made.  Thereafter, if the writ is granted, the Board is directed to
7  conduct a new hearing "in compliance with due process" and that order
8  is appealed by Respondent.  On appeal the order is usually upheld
9  with modifications and in the end, after countless hours of attorney
10  and judicial time, the Board conducts a new two hour hearing at which
11  they abuse their discretion and violate due process in some different
12  way.

This system is malfunctioning and must be repaired.  The
14  solution must begin with the source of the problem.  The Board must
15  make efforts to comply with due process in the first instance.  The
16  case law published over the last five years provides ample and
17  sufficient guidelines and must be followed.  Although the Board
18  methods suggest it believes this to be optional, it is not.

19

20                              THE REMEDY

21  Thus, it is the order of this Court that the Board develop,
22  submit for approval, and then institute a training policy for its
23  members based on the current and expanding body of published state,
24  and federal, case law reviewing parole suitability decisions, and
25  specifically the application of §2402 criteria.  In addition to
26  developing guidelines and further criteria for the substantive
27  application of §2402 the Board must develop rules, policies and
28

30



1  procedures to ensure that the substantive guidelines are followed.

2      This Court finds its authority to impose this remedy to flow

3  from the fundamental principles of judicial review announced over two

4  centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5  Citing that landmark case, the California Supreme Court has

6  recognized "Under time-honored principles of the common law, these

7  incidents of the parole applicant's right to 'due consideration'

8  cannot exist in any practical sense unless there also exists a remedy

9  against their abrogation." *(In re Sturm* (1974) 11 Cal.3d 258, 268.)

10      In *Strum* the court directed that the Board modify its rules and

11  procedures so that thereafter "The Authority will be required [,]

12  commencing with the finality of this opinion, to support all its

13  denials of parole with a written, definitive statement of its reasons

14  therefor and to communicate such statement to the inmate concerned."

15  *(Sturm* at p. 273.)

16      Similarly, in the case of *Minnis, supra*, the California Supreme

17  Court held the Board's policy of categorically denying parole to drug

18  dealers was illegal.  Based on its analysis the court there was

19  clearly prepared to order that Board to modify its rules and

20  procedures however such was unnecessary because the Board

21  "voluntarily rescinded" the illegal policy.  While the remedy in this

22  case is of greater scope than that necessary in either *Strum* or

23  *Minnis, supra*, so too has been the showing of a systematic abuse of

24  discretion and distortion of process.

25      The most recent case to address the court's roles and duties in

26  overseeing the parole suitability process has been *In re Rosenkrantz,*

27  *supra*, 29 Cal.4th 616.  In that case the court explained that

28

31

1   judicial review of a Governor's parole determination comports with,
2   and indeed furthers, separation of powers principles because the
3   courts are not exercising "complete power" over the executive branch
4   and do not "defeat or materially impair" the appropriate exercise or
5   scope of executive duties.  (*Rosenkrantz* at p. 662.)  Citing *Strum,*
6   *supra,* the court reaffirmed that a life term inmate's "due process
7   rights cannot exist in any practical sense without a remedy against
8   its abrogation." (*Rosenkrantz* at p. 664.)

9       The *Rosenkrantz* court also put forth what it believed was an
10   extreme example but which, unfortunately, has been shown to exist in
11   this case.  The court stated: "In the present context, for example,
12   judicial review could prevent a Governor from usurping the
13   legislative power, in the event a Governor failed to observe the
14   constitutionally specified limitations upon the parole review
15   authority imposed by the voters and the Legislature."  This is
16   exactly what the evidence in this case has proven.  As noted above
17   the Board has arrogated to itself absolute authority, despite
18   legislative limitations and presumptions, through the mechanism of a
19   vague and all inclusive, and thus truly meaningless, application of
20   standards.  The remedy this Court is imposing is narrowly tailored to
21   redress this constitutional violation.

22       The consequence of the Board's actions (of giving § 2402(c)(1)
23   such a broadly all encompassing and universal application) is that
24   they have unwittingly invalidated the basis of the California Supreme
25   Court's holding in *Dannenberg*.  The reason the four justice majority
26   in *Dannenberg* upheld the Board's standard operating procedures in the
27   face of the Court of Appeal and dissent position is because "the
28

32

1   Board must apply detailed standards when evaluating whether an

2   individual inmate is unsuitable for parole on public safety grounds."

3   (*Dannenberg* at p. 1096, footnote 16. See also page 1080: "the

4   regulations do set detailed standards and criteria for determining

5   whether a murderer with an indeterminate life sentence is suitable

6   for parole.") However, Petitioners in these cases have proven that

7   there are no "detailed standards" at all. Instead the Board has

8   systematically reduced the "detailed standards" to empty words. The

9   remedy this Court orders, that there truly be "detailed standards,"

10   requires the promulgation of further rules and procedures to

11   constrain and guide the Board's powers. This remedy differs in

12   specifics, but not in kind, from what courts have previously imposed

13   and have always had the power to impose.

14       The Board must fashion a training program and further rules,

15   standards and regulations based on the opinions and decisions of the

16   state and federal court cases which provide a limiting construction

17   to the criteria which are applied.[8] The Board must also make

18   provisions for the continuing education of its commissioners as new

19   case law is published and becomes binding authority. This Court will

20   not, at this point, outline the requirements and lessons to be taken

21   from the above cases. It is the Board's duty, in the first instance

22   to undertake this task. The training program, and associated rules

23   and regulations, shall be served and submitted to this Court, in

24

25

26

27

28

[8]While the showing and analysis in this case was limited to § 2402(c)(1), the conclusions that the evidence compelled, that the Board has been carelessly distorting and misapplying the regulations, is not so limited. Accordingly, the training program that is necessary for the Board can not reasonably be limited to just § 2402(c)(1). Thus, to the extent case law recognizes, clarifies and establishes remedies for other due process violations they must also be incorporated into the necessary rules and training the Board is required to abide by.

33

1 | writing, within 90 days.  Counsel for Petitioners, and any other
2 | interested parties, may submit briefs or comments within 30 days
3 | thereafter.  After receipt and review of the materials this Court
4 | will finalize the training program, and associated rules, and the
5 | Petitioners in these cases shall receive a new hearing before a Board
6 | that does not operate with the unfettered discretion and caprice
7 | demonstrated by the evidence here presented.

8 |                              ORDER

9 |     For the above reasons the habeas corpus petition is granted and
10 | it is hereby ordered that Petitioner be provide a new hearing which
11 | shall comply with due process as outlined above.  Respondent shall
12 | provide weekly updates to this Court on the progress of its
13 | development of the new rules and regulations outlined above.

14 |
15 |
16 |
17 | DATED:  _Aug 30_, 2007      _Linda R. Condron_
18 |                             LINDA R. CONDRON
                                JUDGE OF THE SUPERIOR COURT
19 |
20 | cc:  Petitioner's Attorney (Jacob Burland)
         Attorney General (Denise Yates, Scott Mather)
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

                              34

EXHIBIT     "G"

Court of Appeal, Fourth Appellate District, Div. 1 - No. D052001
**S161596**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JOHN NEBLETT on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

MAY 1 4 2008

Frederick K. Ohlrich Clerk

_____

Deposit

Deputy

**GEORGE**

Chief Justice

E D

I 2008

WIEKING
RICT COURT
T OF CALIFORNIA

/\8   22

ge

**PROOF OF SERVICE**

I, _Novel Valdivia Sr. C-29917_, declare that I am over the
age of 18 years of age and not a party to this matter. I am
familiar with the business practice of the San Quentin's
Correctional staff of collection and processing of correspondence
for mailing with the United States Postal Service.

On March _6_, 2008, I served the attached **"PETITION FOR REVIEW"**
by placing a true copy thereof enclosed in a sealed envelope
with postage thereon addressed as follows:

Office of the Attorney General            CALIFORNIA COURT OF APPEALS
455 Golden Gae Avenue, Suite 11000        FOURTH APPELLATE DISTRICT
San Francisco, CA 94102-7004              750 B ST. #300
                                          SAN DIEGO, CA 92101-8189

I declare under penalty of perjury under the laws of the State
of California the foregoing is true and correct and that this
declaration was executed on this _6_, day of March 2008, at
San Quentin State Prison 94964.

_Novel Valdivia Sr._
Declarant

JOHN NEBLETT D-04841
SAN QUENTIN STATE PRISON 4-N-10
SAN QUENTIN, CA 94964

SCAN BACK OF
ENVELOPE TOO
— DATE —
HC

legal
mail

UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483

RECEIVED

JUL 2 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



